IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., et al. | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Case No. 1:03-cv-03408-AMD (Consolidated with: 1:03-cv-03414-AMD) |
| PORTER HAYDEN COMPANY, et al. | ) ) | |
| Defendants | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
NATIONAL UNION'S AND AMERICAN HOME'S
JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

National Union Fire Insurance Company of Pittsburgh, Pa., ("National Union") and

American Home Assurance Company ("American Home"), pursuant to Rule of Civil Procedure

56 and Local Rule 105, hereby file the following Memorandum of Points and Authorities in

Support of their Joint Motion for Summary Judgment:

TABLE OF CONTENTS
(pursuant to Local Rule 105.4)

I.    STATEMENT OF THE CASE                                                    1

II.   STANDARD OF DECISION                                                     2

III.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE                              2

      A.   PORTER HAYDEN'S HISTORICAL OPERATIONS                               2

      B.   THE NATIONAL UNION AND AMERICAN HOME
           POLICIES                                                           4

IV.   ARGUMENT                                                                6

      A.   TRIGGER OF COVERAGE                                                7

           1.   Writing the Rule: *Mitchell v. Maryland Casualty*             8

                a).  The Maryland Court of Appeals Adopted the Exposure
                     Trigger in *Mitchell v. Maryland Casualty*               8

                     (1). The Facts of the *Mitchell v. Maryland Casualty* Case
                          Are Substantially the Same as in the Present Action  8

                     (2). The *Mitchell* Court Methodically Established the
                          Parties' Contentions and the Factual Background for
                          its Decision                                        10

                     (3). The *Mitchell* Court Considered the Weight of National
                          Authority Interpreting the Standard Policy Definition
                          of "Bodily Injury" and Emphasized that the Exposure
                          Trigger was the One Element that all of the
                          Authorities Had in Common                           11

                     (4). The *Mitchell* Court Determined that "Bodily Injury,"
                          in the Context of Asbestos-Related Bodily Injuries,
                          Occurs Upon the Inhalation and Retention of Asbestos
                          Fibers, i.e., Upon Exposure                         12

                     (5). The Court of Appeals Concluded Its Opinion by
                          Adopting the Exposure Trigger of Coverage for
                          Asbestos-Related Bodily Injuries                     13

i

b). The *Mitchell* Court Rejected the Manifestation, Injury-In-Fact and Continuous Injury Triggers ........................ 14

    (1). The *Mitchell* Court's Determination that 'Bodily Injury' Occurs Upon Inhalation and Retention of Asbestos Fibers Excluded the Manifestation, Injury-In-Fact, and Continuous Injury Triggers .................... 14

    (2). The Mitchell Opinion Implicitly, but Repeatedly, Rejected the Manifestation, Injury-In-Fact, and Continuous Injury Triggers ........................ 16

    (3). Comparison of the Briefs Filed in *Mitchell* with the Court's Ruling Reveals its Rejection of the Continuous Injury Trigger ........................ 18

**2. The Next Chapter: *Owens-Illinois v. Armstrong*** ........................ 22

a). The *Armstrong* Court Confirmed that the Occurrence of a 'Bodily Injury' after the Statutory Date Would Trigger the Cap on Non-Economic Damages ........................ 22

b). The *Armstrong* Court Turned to the *Mitchell* Case to Determine when an Asbestos-Related Bodily Injury Occurs ........................ 23

**3. The Final Word: *John Crane, Inc. v. Scribner*** ........................ 25

a). The *Crane* Court Reaffirmed that the *Mitchell* Opinion Applied to the Issue of the Statutory Cap on Non-Economic Damages ........................ 25

b). The *Crane* Court Repeatedly, and Unequivocally, Characterized the *Mitchell* Opinion as Adopting the Exposure Trigger of Coverage ........................ 26

c). By the Time that the Court of Appeals Addressed *Crane*, the Continuous Injury Trigger Was Not Even Under Consideration ........................ 28

**B.  ALLOCATION AND COMPLETED OPERATIONS**                                                   29

    **1.  Maryland Law Concerning the Allocation and Completed
Operations Issues is Settled and followed by the Fourth
Circuit in *Jones v. Liberty Mutual***                                              30

        a).  The *Jones* Case Is "On All Fours" with the Present Action                30

        b).  The District Court Correctly Ruled Below that *Pro Rata*
Allocation and the Completed Operations Aggregate
Limits Would Apply                                                              32

        c).  The Fourth Circuit Affirmed the District Court's
Application of *Pro Rata* Allocation as Maryland Law                             33

        d).  The Fourth Circuit Affirmed the District Court's
Application of Maryland Law in Resolving the Completed
Operations Issue                                                                36

    **2.  The Fourth Circuit's Decision in *Jones* Controls the
Disposition of the Allocation and Completed Operations
Issues in the Present Case**                                                    38

**C.  BURDEN OF PROOF**                                                                        39

    **1.  Maryland Law on Burden of Proof Generally**                                     39

    **2.  Asbestos Bodily Injury Claimants Generally Bear the
Burden of Proof of the Dates of Their Alleged Exposure**                        40

    **3.  Porter Hayden and the Committee of Unsecured Creditors
Bear the Burden of Proof with Respect to Trigger of
Coverage**                                                                      41

    **4.  Porter Hayden and the Committee of Unsecured Creditors
Bear the Burden of Proof with Respect to Categorization of
Claims**                                                                        44

**V.  CONCLUSION**                                                                             46

## I.  STATEMENT OF THE CASE

Porter Hayden Company ("Porter Hayden") brought this declaratory judgment action in the Circuit Court of Maryland for Baltimore City in December of 2000.  Porter Hayden sought a declaration  as to coverage for tens of thousands of claims, brought by individuals seeking damages for alleged asbestos-related injuries, under two insurance policies issued by National Union and in effect from April 1, 1984 until April 1, 1986.

In March of 2002 Porter Hayden filed a petition for Chapter 11 bankruptcy, listing the potential coverage under these two policies as its primary asset.  In light of this filing, National Union removed the declaratory judgment action to the District Court as an adversary proceeding and, in concert with American Home, (together "the Insurers") brought a separate adversary proceeding to resolve any dispute concerning five additional policies issued by the Insurers to Porter Hayden.  Thereafter, the Official Committee of Unsecured Creditors of Porter Hayden ("the Committee") requested, and was granted, permission to intervene in both adversary proceedings.  Over the objection of the Insurers, the Committee has been allowed to litigate these claims on behalf of Porter Hayden.  At the Insurers' request, the reference of these adversary proceedings was withdrawn and the proceedings consolidated into the present action.

This dispute concerns the unbounded expanse of insurance coverage to which Porter Hayden claims to be entitled.  This Motion seeks to resolve three key legal issues concerning those claims: [1] the trigger of coverage to be applied to the policies; [2] the method by which any coverage must be allocated among any triggered policies; and, [3] whether such obligations will be subject to the completed operations aggregate limits of the policies.  The movants argue below that the established Maryland law controls the disposition of these issues.

1

## II.  STANDARD OF DECISION

Maryland law governs the construction of the National Union and American Home insurance policies.  Maryland treats an insurance policy as any other contract; the construction of a policy begins with the application of the terms of the policy.  Lloyd E. Mitchell, Inc. v. Maryland Casualty Co., 324 Md. 44, 595 A.2d 469 (1991); and, Pacific Indemnity Co. v. Interstate Fire & Casualty Co., 302 Md. 383, 488 A.2d 486 (1985).  Absent an intent to use words in a technical sense, the terms of a policy are afforded their customary, ordinary, and accepted meaning.  Id.  However, where a policy defines a particular term, that definition will control any construction of the policy.  Valliere v. Allstate Insurance Co., 324 Md. 139, 596 A.2d 636 (1991).  In any event, the policy is not construed automatically against the insurer unless it is ambiguous in some material sense and the ambiguity cannot be resolved by extrinsic or parol evidence.  Cheney v. Bell National Life Insurance Co., 315 Md. 761, 556 A.2d  1135 (1989).  Applying these principles, "it is the function of the court to interpret the policy and decide whether or not there is coverage."  Mitchell v. Maryland Casualty, 324 Md. at 56, 585 A.2d at 475.

## III.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.  PORTER HAYDEN'S HISTORICAL OPERATIONS

Porter Hayden's predecessors (H.W. Porter Company, a New Jersey corporation, and Reid-Hayden, Incorporated, a Maryland corporation) commenced operations in the mid-1920's.  See, *Porter Hayden's First Amended Complaint for Declaratory Relief*, Appendix of Exhibits, Tab 8, ¶9.  Soon thereafter H.W. Porter acquired Reid-Hayden and operated it as a subsidiary.  Id.  H.W. Porter and Reid-Hayden merged in 1966, changing name to Porter Hayden Company.

2

The new Maryland corporation maintained its headquarters in Baltimore from that time to the present.[1]  Id.

From its inception the operations of Porter Hayden were intimately connected with asbestos.  Porter Hayden installed industrial insulation containing asbestos from the 1920's until the mid-1970's.  Id. at ¶10.  In or about 1973, Porter Hayden ceased using insulation materials that, to its knowledge, contained asbestos.  Id.  Moreover, by the mid-1950's Porter Hayden developed a separate line of business selling insulation materials (manufactured by third parties) and other products without associated installation operations.  Id. at ¶14.  Prior to 1973 some of these products sold, handled, or distributed by Porter Hayden contained asbestos.  Id.  As with its operations, Porter Hayden stopped all selling, handling, or distributing asbestos-containing insulation in or about 1973.  Id.  Porter Hayden sold, handled, or distributed a few non-insulation asbestos-containing products until about 1982, but has not presented to the Insurers any claims arising specifically out of its sale, handling, or distribution of these products.  Id.

Porter Hayden has been named as a defendant in thousands of lawsuits brought by persons alleging bodily injury caused by exposure to asbestos.  Id. at ¶16.  At the time that Porter Hayden filed its Amended Complaint (i.e., in December of 2000) the number of such claims allegedly exceeded 70,000.  Id.  The Committee apparently represents the majority of these claimants.  The filing of Porter Hayden's Chapter 11 petition has mooted the question of whether the company may be entitled to a defense of any of these claims; therefore, the present action has been narrowed to the question of which, if any, of the claims against Porter Hayden engender any indemnity obligation on the part of the Insurers.

---

[1]  For the sake of clarity this Motion shall refer to "Porter Hayden" at all times, including the period prior to the 1967 incorporation.

B.        **THE NATIONAL UNION AND AMERICAN HOME POLICIES**

National Union issued four primary comprehensive general liability ("CGL") policies to

Porter Hayden from April 1, 1984 through April 1, 1988.  The policy numbers and effective

dates of these policies are summarized as follows:

| | |
|---|---|
| GLA 152 41 65 RA | 4/1/84 to 4/1/85 |
| GLA 194 03 85 RA | 4/1/85 to 4/1/86 |
| GLA 180 33 46 RA | 4/1/86 to 4/1/87 |
| GLA 501 05 70 RA | 4/1/87 to 4/1/88 |

Each of these policies contain standard form CGL policy language concerning the

Insuring Agreement and the definitions of the terms "occurrence" and "bodily injury".

Specifically, the policies provide that:

> The company will pay on behalf of the insured all sums which the
> insured shall become legally obligated to pay as damages because
> of
> A.  bodily injury or
> B.  property damage
> to which this insurance applies, caused by an occurrence, and the
> company shall have the right and duty to defend any suit against
> the insured seeking damages on account of such bodily injury or
> property damage.
> See, Appendix of Exhibits, Tabs 1-4.

Moreover, each policy defines 'occurrence' and 'bodily injury' as follows:

> Occurrence means an accident, including continuous or repeated
> exposure to conditions, which results in bodily injury or property
> damage neither expected nor intended from the standpoint of the
> insured.
>
> [and]
>
> Bodily Injury means bodily injury, sickness or disease sustained by
> any person which occurs during the policy period, including death
> at any time resulting therefrom.
> Id.

4

The primary policies provide $1,000,000 per occurrence and $1,000,000 aggregate limits of liability for claims falling under the Completed Operations hazard.  Each policy defines this hazard as:

> […] bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.  "Operations" include materials, parts or equipment furnished in connection therewith.  Operations shall be deemed completed at the earliest of the following times:
> (1)  when all operations to be performed by or on behalf of the named insured under the contract have been completed.
> (2)  when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
> (3)  when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
>
> Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.
>
> The completed operations hazard does not include bodily injury or property damage arising out of
> (a)  operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
> (b)  the existence of tool, uninstalled equipment or abandoned or unused materials, or
> (c)  operation for which the classification stated in the policy or in the company's manual specifies "including completed operations"
> Id.

In contrast, no aggregate limits of liability are specified for bodily injuries that occurred in the course of Porter Hayden's operations.  The per occurrence limits apply however, to all claims.

In addition to the four primary CGL policies, National Union and American Home issued three following-form, excess umbrella policies to Porter Hayden during the late 1970's:

| | | |
|---|---|---|
| <u>American Home</u>: | | |
| CE2751098 | 7/11/75 to 7/11/76 | |
| | | |
| <u>National Union</u>: | | |
| 1186636 | 7/11/76 to 5/26/77 | |
| 1186790 | 5/26/77 to 1/1/78 | |

Each of these policies provide 'second layer' excess umbrella coverage, as to which National Union and American Home contracted with Porter Hayden to extend coverage, subject to the limit of liability, after exhaustion of Porter Hayden's primary CGL policies and after exhaustion of a 'first layer' of excess policies issued by St. Paul Fire & Marine Insurance Company and First State Insurance Company respectively.  <u>Id.</u> Tabs 5-7.

## IV.  ARGUMENT

Asbestos-related bodily injury claims, such as have burdened Porter Hayden and brought about this coverage dispute, have represented a significant challenge for the legal systems of the various states and for the federal judiciary.  The challenge has arisen from the sometimes decades-long delay from the initial exposure of the claimant to asbestos fibers until the manifestation of a related disease and from the seemingly endless numbers of individual claimants.  This delay, typically involving continuing exposure to asbestos fibers for years and

even decades, implicates the potential for coverage under multiple liability policies.[2]  This

delayed manifestation not only implicates multiple policies covering any one defendant, but

asbestos bodily injury claimants typically sue dozens of defendants.  Consequently, issues of

insurance coverage, such as the trigger of coverage,  the allocation of coverage among multiple

policy years, and the application of aggregate limits, become areas of intense dispute between the

affected parties.

> A.       **TRIGGER OF COVERAGE**

The onset of the asbestos litigation crisis in the later 1970's engendered a long-running

dispute between insurers and policyholders over the provision of insurance coverage for the

burgeoning claims.  At the heart of the dispute lay uncertainties as to coverage for disease

processes with long latency periods, such as asbestosis and mesothelioma, extending across the

periods of numerous insurance policies.  When and how a claim of asbestos-related bodily injury

triggers coverage under a CGL policy was one of the early key issues in that dispute.  Four

competing theories emerged: (1) exposure during a policy period[3]; (2) injury-in-fact during a

policy period[4]; (3) continuous injury[5]; and, (4) manifestation during a policy period.[6]  Depending

on the trigger adopted, the breadth of coverage available could contract or expand significantly.

Exposure theory triggers coverage under those policies on the risk during the claimant's

exposure to asbestos fibers.  Injury-in-fact theory attempts, utilizing the opinions of expert

witnesses, to pinpoint the date upon which an asbestos-related disease or sickness first came into

---

[2]  Indeed, it may be rare to find a claim which implicates coverage under a single insurance policy.  A cursory review of the database of Angelos claimants by the undersigned did not reveal any claimant whose alleged exposure was limited to a single policy year.

[3]  E.g., <u>Insurance Co. of North America, et al. v. Forty-Eight Insulations, Inc.</u>, 633 F.2d 1212 (6th Cir. 1980).

[4]  E.g., <u>Maryland Casualty Co. v. W.R. Grace & Co., et al.</u>, 794 F. Supp. 1206 (S.D.N.Y. 1991).

[5]  E.g., <u>Keene Corp. v. Insurance Co. of North America, et al.</u>, 667 F.2d 1034 (D.C. Cir. 1982).

[6]  E.g., <u>Eagle-Picher Industries, Inc. v. Liberty Mutual Ins. Co., et al.</u>, 682 F.2d 12 (1st Cir. 1982).

being and triggers coverage for only the policy on the risk at that time.  Continuous injury

theory, also commonly referred to as exposure-in-residence or triple trigger, triggers all policies

from the date of first exposure to the date of manifestation of an asbestos-related disease or

sickness.  Manifestation theory fixes coverage under the policy on the risk when an asbestos-

related disease or sickness first manifests, differing from injury-in-fact in that the former fixes

the trigger date when the condition is clinically diagnosable and the latter when it is actually

diagnosed.

      1.       **Writing the Rule: *Mitchell v. Maryland Casualty***

            a).      The Maryland Court of Appeals Adopted the Exposure
                     Trigger in *Mitchell v. Maryland Casualty*

In <u>Lloyd E. Mitchell, Inc. v. Maryland Casualty Company</u> the Maryland Court of

Appeals adopted the exposure trigger theory.  324 Md. 44, 595 A.2d 469 (1991).  The <u>Mitchell</u>

court made this determination after careful examination of the different trigger theories, after

consideration of expert testimony on the physiological effects of inhaling asbestos fibers, and

after careful review of the leading authorities on the trigger of coverage issue.  Given the

importance of the trigger issue and the extensive review undertaken by the Court of Appeals, the

<u>Mitchell</u> opinion deserves a careful, step-by-step analysis and not a piecemeal selection of

'sound-bite' quotations taken out of context.

                (1).      The Facts of the *Mitchell v. Maryland Casualty*
                       Case Are Substantially the Same as in the Present
                       Action

For many years Lloyd E. Mitchell, Inc. ("Mitchell"), like Porter Hayden, sold, distributed

and installed asbestos-containing insulation materials.  595 A.2d at 470.  Mitchell ceased all

operations in 1976, a few years after Porter Hayden stopped its operations involving asbestos-

containing materials.  Id.  From 1955 to the late 1970's Maryland Casualty issued a series of

standard form primary CGL policies to Mitchell.  Id.  These Maryland Casualty policies

contained the same key language as the policies issued to Porter Hayden by National Union.[7]

The controversy with Maryland Casualty commenced when, in response to the filing of a

number of asbestos-related bodily injury claims in the 1980's, Mitchell turned to Maryland

Casualty for coverage.  Id.  Maryland Casualty denied any obligation on the ground that the

trigger of coverage in Maryland was manifestation and that none of the alleged bodily injuries

had manifested during any of its policies.  It filed a declaratory judgment action in 1988, seeking

a declaration that it had no duty to defend Mitchell.  Id.  Mitchell responded that exposure, at a

minimum, represented the appropriate trigger.  Id. at 470-471.

The Mitchell trial judge held for Maryland Casualty, ruling that Maryland precedent[8]

outside of the asbestos context mandated the application of the manifestation trigger for

asbestos-related bodily injury claims.  Id. at 472.  The trial court apparently concluded – and the

ruling of the Court of Appeals affirmed this part of the decision – that the critical question as to

coverage was whether an occurrence had caused bodily injury during the policy period.  Relying

on the precedent cited, however, the trial judge held that an occurrence causing asbestos-related

bodily injury 'occurs' on the date that the bodily injury is discovered or, in other words,

manifests.  Id.

---

[7] Compare, 595 A.2d at 470 with supra §III.B and Appendix of Exhibits, Tabs 1-4.
[8] Harford Mutual Ins. Co. v. Jacobson, 73 Md. App. 670, 536 A.2d 120 (1988)(applying manifestation trigger to lead poisoning-related bodily injury claims); Mraz v. Canadian Universal Ins. Co., Ltd., 804 F.2d 1325 (4th Cir. 1986)(applying manifestation trigger to buried hazardous waste property damage claims).

Mitchell simultaneously appealed to the intermediate appellate court and petitioned the

Maryland Court of Appeals for a writ of certiorari.  Before the intermediate court could take up

the case, the Court of Appeals issued the writ.

> (2).    The *Mitchell* Court Methodically Established the
>          Parties' Contentions and the Factual Background
>          for Its Decision

After summarizing the contentions of the parties and the decision of the trial judge, the

Mitchell court restated the issues presented in the appeal.  595 A.2d at 472.  In the court's view,

Mitchell's appeal raised two questions: 1) whether the trigger of coverage in asbestos-related

bodily injury cases should be exposure, continuous injury, or manifestation; and, 2) whether the

trial court erred in adopting the manifestation trigger.  Id.

The Mitchell court then detailed the competing contentions of the parties, including

lengthy characterizations of the expert medical testimony.  Id. at 472-75.  The court specifically

noted Maryland Casualty's reliance on Maryland precedent[9] for two key assertions (paraphrased

here): 1)  that the exact date of injury caused by exposure to asbestos cannot be fixed with

sufficient certitude until manifestation; and 2)  that the CGL policies in question focus on the

date of injury, not any precipitating event, as the trigger of coverage.  Id. at 475.  As shown

below, the Mitchell court would agree that the date of injury establishes the trigger of coverage,

but disagree that this date could not be established prior to manifestation.

After setting out the standard of decision, the court discussed the definition of bodily

injury under the standard form CGL policy, id. at 475-76, noting that the policy language defines

bodily injury to include 'injury,' i.e. damage or harm to the body, or sickness caused by such

---

[9]  See, *supra* note 8.

10

injury, or disease caused by such injury.  Id.  The Maryland Casualty policies, as well as the

National Union and American Home policies, conformed to this standard.  The court did not, at

this point, explicitly adopt a definition of the term 'bodily injury' in the context of asbestos

claims.  Nevertheless, this discussion of the standard definition is of critical importance as is

shown in the next section of the opinion.

> (3).   The *Mitchell* Court Considered the Weight of
> National Authority Interpreting the Standard Policy
> Definition of "Bodily Injury" and Emphasized that
> the Exposure Trigger Was the One Element that all
> of these Authorities Had in Common

The Mitchell court next flatly rejected the trial court's adoption of the manifestation

trigger as being, "at odds with the policy language and clear weight of authority in the country."

Id. at 476.  The court cited ten precedents, ranging from 1980 to 1987 and spanning seven

different federal circuits and states, all of which rejected the manifestation theory.[10]  Those ten

cases varied from exposure theory, to injury-in-fact theory, to continuous injury theory, and even

to one case that adopted a hybrid exposure-plus-injury-in-fact theory.[11]  No single theory

commanded the allegiance of a majority of these authorities, but all of these cases had in

common the inclusion of the exposure theory at a minimum.

---

[10]   Abex Corp. v. Maryland Casualty Co., 790 F.2d 119, 126 (D.C.Cir.1986)(injury-in-fact); Commercial Union Ins.
Co. v. Sepco Corp., 765 F.2d 1543 (11th Cir. 1985)(exposure); ACandS, Inc. v. Aetna Cas. and Sur. Co., 764 F.2d
968 (3d Cir. 1985)(exposure-in-residence); American Home Products Corp. v. Liberty Mut. Ins., 748 F.2d 760, 764
(2d Cir. 1984)(injury-in-fact); Keene Corp. v. Ins. Co. of North America, 667 F.2d 1034 (D.C. Cir. 1981) *cert.
denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982)(exposure-in-residence); Porter v. American Optical
Corp., 641 F.2d 1128 (5th Cir. 1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981)(exposure);
Ins. Co. of North America v. Forty-Eight Insulations, 633 F.2d 1212 (6th Cir. 1980), *clarified*, 657 F.2d 814, *cert.
denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981)(exposure); Lac D'Amiante Du Quebec v. Am. Home
Assur., 613 F. Supp. 1549 (D.N.J. 1985)(exposure-in-residence); Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co., 597
F. Supp. 1515 (D.D.C. 1984)(exposure-in-residence); Zurich Ins. Co. v. Raymark Industries, 118 Ill.2d 23, 112 Ill.
Dec. 684, 514 N.E.2d 150 (1987)(exposure, *as to injury*, injury-in-fact, *as to sickness*, manifestation, *as to disease*).
[11]   Zurich Ins. Co. v. Raymark Industries, 118 Ill.2d 23, 112 Ill. Dec. 684, 514 N.E.2d 150 (1987).

Here the phrase utilized by the Mitchell court, "a number of courts […] have concluded that bodily injury occurs when asbestos is inhaled into the lungs, and that, *at a minimum*, coverage […] is triggered by exposure," emphasized that the exposure theory represented the common thread running through all of these diverse authorities. 595 A.2d at 472. However, at this point in the opinion, the Mitchell court did not yet adopt any particular theory but, rather, only rejected the trial court's adoption of manifestation as the sole trigger of coverage.

> (4).    The *Mitchell* Court Determined that "Bodily
>         Injury," in the Context of Asbestos-Related Bodily
>         Injuries, Occurs Upon the Inhalation and Retention
>         of Asbestos Fibers, i.e., Upon Exposure

From the ten cited authorities, the Court of Appeals singled out the case of Zurich Insurance Company v. Raymark Industries, 118 Ill.2d 23, 112 Ill. Dec. 684, 514 N.E.2d 150 (1987), as "illustrative of the reasoning behind the adoption of the *exposure* theory of coverage in asbestos cases." Mitchell, 595 A.2d at 476 (emphasis added). The Zurich court noted that the medical evidence proffered was helpful, not to define the policy terms 'injury' or 'sickness' or 'disease', but rather to determine when injury occurs in an asbestos-related bodily injury context. Given that purpose, the Zurich court concluded that, notwithstanding differences in the opinions of pathologists and clinicians, injury occurs at or shortly after inhalation and retention of asbestos fibers in the lungs. Thus, exposure to asbestos fibers constitutes a bodily injury and therefore an occurrence within the policy period with the caveat – as the Mitchell court emphasized at this point in the opinion – that an asbestos-related disease or sickness must eventually result. 595 A.2d at 477 ("*[M]ere* exposure to asbestos, without injury, does not trigger coverage")(emphasis in original).

The Court of Appeal's own analysis of the medical evidence followed, albeit somewhat shorter than the <u>Zurich</u> opinion.  <u>Id.</u> at 477-78.  Citing consensus among the expert witnesses, proffered by both Mitchell and Maryland Casualty, and aligning itself with the 'overwhelming weight of authority in the country', the court held that injury occurs upon exposure to and retention of asbestos fibers in the lungs.  <u>Id.</u> at 62, 478.  In doing so, the <u>Mitchell</u> court rejected Maryland Casualty's assertion that the date of injury could not be fixed prior to manifestation of an actual asbestos-related disease or sickness.

> (5).   The Court of Appeals Concluded its Opinion by
> Adopting the Exposure Trigger of Coverage for
> Asbestos-Related Bodily Injuries and by Reversing
> the Lower Court's Decision

Following this alignment of Maryland with the authorities cited earlier, the <u>Mitchell</u> court returned to the questions presented.  As to the first question, the court held that "'bodily injury' occurs when asbestos is inhaled and retained in the lungs."  595 A.2d at 478.  Because injury occurs upon exposure – i.e., inhalation and retention of asbestos fibers – the court held that, "at a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure."  <u>Id.</u>

As to the second question presented, in light of these findings, the Court of Appeals overruled the adoption of manifestation as the sole trigger of coverage.  <u>Id.</u>  In reaching this conclusion, the court distinguished the cases relied upon by the trial judge, specifically not commenting on the viability of the manifestation triggers utilized therein.  <u>Id.</u> n.5.  The Court of Appeals directed the trial court to issue a declaration that Maryland Casualty must defend all

claims alleging exposure during a policy period and must indemnify all claims in which such exposure is proven.  Id.

        b).    The *Mitchell* Court Rejected the Manifestation, Injury-In-Fact and Continuous Injury Triggers

In opting for the exposure trigger, the Mitchell court necessarily rejected the three alternative  theories.  As laid out in Mitchell, the exposure trigger focuses on the nearly immediate changes that asbestos fibers cause in the lungs, changes that later develop into a sickness or disease.  The inhalation and retention in the lungs of asbestos fibers, which cause those changes, constitute bodily injury under the definition adopted by the Court of Appeals. The alternative theories, as discussed below, are all incompatible with this definition.  Once the court defined the term as it did, it no longer needed to consider the remaining theories.

        (1).    The *Mitchell* Court's Determination that 'Bodily Injury' Occurs Upon Inhalation and Retention of Asbestos Fibers Excluded the Manifestation, Injury-In-Fact, and Continuous Injury Triggers

Although each of the four trigger of coverage theories requires a bodily injury during the policy period as the triggering event, the theories differ on what constitutes an injury and when it occurs.  Manifestation theory triggers coverage only for that policy under which, during the policy period, an asbestos-related disease or sickness is actually diagnosed.  Under this trigger theory, the manifested disease or sickness itself constitutes the relevant bodily injury for insurance coverage purposes.

Injury-in-fact theory focuses on when the changes in the lungs progress to the point where the condition becomes a clinically diagnosable disease or sickness, even if it is not actually diagnosed for some time thereafter.  This theory triggers coverage under that policy

during which the disease or sickness first *could have been* diagnosed; a fact established, if at all, by expert testimony.  In a limited sense, the injury-in-fact theory is compatible with the manifestation theory, because it equates bodily injury with an existing asbestos-related disease or sickness.  Under injury-in-fact theory, and for that matter under the manifestation theory, pre-disease or pre-sickness changes in the lungs simply are not bodily injuries for the purposes of insurance coverage.

The continuous injury theory expands the definition of bodily injury in this context to its widest possible margins.  It first encompasses the exposure theory by equating bodily injury, initially, with inhalation of asbestos fibers, but goes on to posit a continuing bodily injury until manifestation of an actual asbestos-related disease or sickness.  Accordingly, the continuous injury theory triggers coverage under all policies from the date of initial exposure until the date of manifestation.

In stark contrast to all three of these alternatives, the Mitchell court held that the relevant bodily injury, for insurance coverage purposes, occurs "when asbestos is inhaled and retained in the lungs." Mitchell, 595 A.2d at 478.  In discussing the medical evidence introduced by Mitchell and by Maryland Casualty, the court focused upon the nearly immediate changes to the lungs caused by asbestos fibers.  Id. at 477.  Such changes, the court noted, may not develop into an actual disease or sickness for many years or even decades after all exposure to asbestos fibers ceased; however, the court stated, "the cases recognize from the medical evidence that inhalation of asbestos fibers starts the injurious chain of events which may culminate in an asbestos related disease." Id.  Therefore, the Court of Appeals found that inhalation and retention of asbestos fibers, *i.e.* exposure, comprises the bodily injury that triggers coverage.

15

Indeed, the very pre-disease and pre-sickness changes that the manifestation and injury-in-fact theories define as insufficient to trigger coverage actually constitute the triggering event under the exposure theory.  Moreover, where continuous injury theory requires only the retention of asbestos fibers to trigger a policy's coverage in that period between the last exposure and manifestation, the Mitchell definition of bodily injury requires *both* inhalation and retention of fibers to trigger a policy.  By adopting this definition of bodily injury, and rejecting the incompatible definitions found in the manifestation, injury-in-fact, and continuous injury theories, the Court of Appeals necessarily rejected all of these alternative triggers.

> (2).    The *Mitchell* Opinion Implicitly, But Repeatedly,
>          Rejected the Manifestation, Injury-In-Fact, and
>          Continuous Injury Triggers

In addition to adopting a definition of bodily injury incompatible with the alternative trigger theories, the Mitchell opinion contains a number of implicit rejections of those alternatives.  First, the Court of Appeal's treatment of the case of Zurich Ins. Co. v. Raymark implicitly rejects any application of the alternative theories in Maryland.  118 Ill.2d 23, 514 N.E.2d 150.  The court isolated the Zurich case as "illustrative of the reasoning behind the adoption of the *exposure* theory."  324 Md. at 59, 595 A.2d at 476 (emphasis added).  Yet the Zurich court applied exposure theory only to the injury component of the policy definition of bodily injury and not to the disease and sickness components.  See, 118 Ill.2d 23, 514 N.E.2d 150.  The Mitchell court ended its reliance on Zurich at the precise point where that case began to diverge into separate injury-in-fact and manifestation triggers for sickness and disease.  595 A.2d at 476-77.  This very specific use of Zurich to provide analytical support exclusively for the exposure theory can be explained only as a conscious decision, given the above quotation.

16

Moreover, the Mitchell court did not cite as particularly persuasive any case advocating the manifestation or continuous injury theories, even though several such cases were among the ten cited authorities.

Moreover, the overt adoption of exposure theory logically precludes the simultaneous adoption, *sub silentio*, of the continuous injury theory.  The exposure theory *can* exist independent of the continuous injury theory, but not *vice versa* because continuous injury theory begins with exposure and extends the trigger through to manifestation.  It would make no sense logically or grammatically to adopt first the exposure theory and then to go on to adopt continuous injury.  One need only elect the latter to include the former.  The Mitchell court crafted a very careful analysis of the issue and, well-aware of its several options, deliberately elected a single theory of trigger of coverage.  Had the court intended to adopt continuous injury or injury-in-fact, it need only have said so.  Nothing in the opinion or, indeed, in subsequent developments, supports such a strained reading.

In fact, it cannot be a coincidence that the Zurich court considered and flatly rejected the continuous injury theory.  514 N.E.2d 159-61.  Had the Mitchell court intended to extend the coverage trigger from exposure to continuous injury, it would not have chosen to highlight the Zurich case at all, and would not have chosen to highlight only those portions of the Zurich case that support exclusively the exposure theory.  Most obviously, the court could have, but did not, rely specifically upon Keene Corp. v. Ins. Co. of North America, 667 F.2d 1034, from the neighboring D.C. Circuit, the most notable of the cases applying the continuous injury trigger.

Finally, the Court of Appeals concluded by directing the trial court, *inter alia*, to require Maryland Casualty to defend Mitchell against all claims "by plaintiffs allegedly *exposed* to

Mitchell's asbestos products *during the policy period* [and to] … indemnify Mitchell, within

policy limits, for the amount of any judgments rendered against it, or which it may become

legally obligated to pay in connection with the asbestos-related claims." 595 A.2d at 478

(emphasis added). It is important to note that Mitchell's operations ceased in 1976 but the

Maryland Casualty policies extended until 1977 or 1978. Under a continuous injury trigger, such

latter policies would also be triggered for any claims where an asbestos-related disease or

sickness manifested at any time after 1976. Under the manifestation and injury-in-fact theories,

these policies would be triggered for any claims in which an asbestos disease or sickness was or

could have been diagnosed between 1976 and 1977 or 1978. Yet the <u>Mitchell</u> court did not

require that the insurance company defend or indemnify Mitchell for any such claims. By not

including those last one or two policies within the coverage block, the court implicitly rejected

the continuous injury theory.

> (3). Comparison of the Briefs Filed in *Mitchell* with the
> Court's Ruling Reveals its Rejection of the
> Continuous Injury Trigger

Between Mitchell, Maryland Casualty, and the *amici curiae*, a total of six briefs were

filed with the Court of Appeals. <u>Appendix of Exhibits</u>, Tabs 12-17. Together, these briefs

discussed all of the possible trigger theories. The court selected a discrete section of the Mitchell

brief advocating the exposure theory as the model for its own opinion. This deliberate choice

expressed an unspoken, yet pointed, rejection of the continuous injury theory.

Maryland Casualty espoused the manifestation trigger, arguing that it was consistent with

the policy language and supported by the established "discovery" rule in environmental cases.

<u>See</u>, <u>Appendix of Exhibits</u>, Tab 13, pp. 7 *et seq*. Mitchell, however, argued that the Court of

Appeals should adopt a continuous injury trigger but also propounded, as a fall-back position, the exposure trigger of coverage. Id., Tab 12, pp. 20 *et seq*. Utica Mutual filed an amicus brief in support of Maryland Casualty's position, devoting substantial effort to shoring up the "first-discovery" trigger (another term for manifestation) and to discrediting the continuous injury approach. Id., Tab 14, pp. 8 *et seq*. On the other side of the aisle, Bausch & Lomb and a consortium of fifteen Maryland counties ("the Counties") filed *amicus* briefs supporting the continuous injury trigger for both environmental and personal injury claims. Id., Tabs 16; 17. Neither Utica Mutual, Bausch & Lomb, nor the Counties were disinterested observers.[12]

The Court of Appeals, however, placed no reliance on any of the arguments presented by the various *amici*. It did not agree with the skin cancer analogy advanced by Utica Mutual. Id., Tab 14, pp. 8-9. It did not equate bodily injury claims with property damage claims as proposed, paradoxically, by both Utica Mutual and the Counties. Id., Tab 14, pp. 16 *et seq*.; Tab 16, pp.20 *et seq*. It did not opt to "maximize coverage" as urged by Bausch & Lomb. Id., Tab 17, pp. 22-24. It did not find any policy language ambiguous nor did it look to the drafting history of the CGL policy, as suggested by the Counties and by Bausch & Lomb. Id., Tab 16; Tab 17. Had the Mitchell court found any of these arguments in the least persuasive, then surely the opinion would have contained some mention of such grounds.

Rather, a comparison of the brief filed by Mitchell with the opinion issued by the Court of Appeals shows that the court borrowed heavily from Mitchell to adopt the exposure trigger,

---

[12]  At the time of the Mitchell appeal Utica Mutual and Bausch & Lomb were embroiled in their own coverage dispute concerning environmental damage claims. See, Utica Mutual Insurance Company v. Bausch & Lomb, Inc., 91 Md. App. 1, 603 A.2d 1241 (1992), aff'd in part, modified in part, remanded in part by, Bausch & Lomb, Inc. v. Utica Mut. Ins. Co., 330 Md. 758, 625 A.2d 1021 (1993).   In fact, the amici briefs were filed in Mitchell within weeks of the trial courts' issuance of its declaratory judgment in Utica Mutual v. Bausch & Lomb.  Moreover, a number of the Counties were involved in similar lawsuits at that time and, in fact, filed an amicus brief in Utica Mutual v. Bausch & Lomb.

and also reveals the court's rejection of the continuous injury trigger.  The opinion tracked the Mitchell brief quite closely, relying on the cases cited therein for the "clear weight of authority"[13], mirroring the emphasis given to the <u>Zurich</u> case[14], and borrowing or paraphrasing language from the brief.[15]  However, the court followed Mitchell's argument only up to a point. Over and again, Mitchell asserted that, *at a minimum*, the exposure trigger applied and that, *at the most*, the triple trigger, or continuous injury, should be adopted.  <u>See e.g.</u>, <u>Appendix of Exhibits</u>, Tab 12, 29-31.  The Court of Appeals agreed with the first half of this argument but rejected the latter part.

Indeed, in concluding the <u>Mitchell</u> opinion, although it purported to give Mitchell that which it had requested, the Court of Appeals pointedly gave with one hand while taking away with the other:

> We shall, therefore, vacate the declaratory summary judgment entered by the trial court in the insurer's favor and remand the case with directions that the court enter a declaratory judgment, *as sought by the insured*, that at a minimum coverage under the policy is triggered upon exposure to and inhalation of asbestos fibers during the policy period by a person who suffers bodily injury as a result of that exposure. The judgment shall contain a declaration that the insurer is required to provide a defense for Mitchell against all personal injury asbestos-related suits brought by plaintiffs allegedly exposed to Mitchell's asbestos products *during the policy period*, regardless of when the alleged asbestos-related injuries became manifest.

---

[13]  <u>Compare</u>, <u>Mitchell</u>, 595 A.2d at 476 ("[…] a number of courts, after considering evidence with respect to the development of asbestos-related diseases, have concluded that "bodily injury" occurs when asbestos is inhaled into the lung, and that, *at a minimum*, coverage under the policy is triggered by exposure to the insured's asbestos products during the policy period") <u>with</u> *Appellant's Brief*, <u>Appendix of Exhibits</u>, Tab 12, at 22-24; <u>see also</u>, <u>supra</u> note 9 (listing the ten cases cited by both Mitchell and the Court of Appeals).

[14]  <u>Compare</u>, <u>Mitchell</u>, 595 A.2d at 476 ("*Zurich Ins. Co., supra*, decided by the Supreme Court of Illinois, is illustrative of the reasoning behind the adoption of the exposure theory of coverage in asbestos cases") <u>with</u> *Appellant's Brief*, <u>Appendix of Exhibits</u>, Tab 12, at 24 ("[t]he recent <u>Zurich II</u> case, interpreting Illinois law, perhaps best explains the rationale for adopting, at a minimum, the 'exposure' trigger", *et seq.*).

[15]  <u>E.g.</u>, Mitchell argues throughout its brief that coverage is triggered "at a minimum" or "at the least" upon exposure to asbestos fibers.  <u>See, generally</u>, *Appellant's Brief*, <u>Appendix of Exhibits</u>, Tab 12

<u>Mitchell</u>, 595 A.2d at 478 (emphasis added).

Mitchell, indeed, had asked that the exposure trigger be adopted, *at a minimum*, but Mitchell had

further sought a declaration, *at the most*, that Maryland should adopt the 'triple' or continuous

injury trigger so as to maximize coverage:

> Based upon the record in this case and the foregoing authorities, Mitchell submits that, at the very least, Maryland should apply the "exposure" trigger of coverage in the asbestos-related insurance cases.  The medical evidence concerning immediate "injury" upon exposure to and inhalation of asbestos fibers, together with the definitions of "occurrence" and "bodily injury" in the CGL policies dictate such a result.
>
> […]
>
> With respect to the third possible trigger, the progression of the asbestos-related disease during this latency period between exposure and manifestation, the record in this case does not dictate adopting such a third trigger.  *However, as a matter of policy, and in order to promote uniformity of decisions nationally, Mitchell respectfully submits that this Court should adopt the 'triple trigger" theory of coverage* established in <u>Keene</u> and subsequent cases.
>
> Indeed, in order to best protect Maryland-based defendants, such as Mitchell, in the asbestos cases, and in order to best protect claimants having meritorious claims in the asbestos cases, Maryland should adopt as broad a theory of insurance coverage as has been adopted in the foregoing jurisdictions opting for the triple trigger coverage.  Otherwise, there is a significant likelihood that Maryland-based defendants, left without insurance coverage, will be forced into bankruptcy due to the asbestos cases, and Maryland-based claimants will be less likely to collect on judgments compared to citizens of other states which have adopted a broad view of insurance coverage in the asbestos litigation.
>
> […]
>
> In the present case, Mitchell respectfully urges this Court, in reversing the trial court, to require that Maryland Casualty provide a defense to Mitchell with respect to every asbestos-related

> personal injury claim which, based upon the allegations in the complaint or by implication, alleges or potentially could allege exposure during a policy period to any asbestos product supplied by Mitchell. *We also request that the duty to defend also extend to periods after exposure*, but before manifestation of the asbestos-related disease, and during which Mitchell had purchased CGL insurance coverage from Maryland Casualty.
> *Appellant's Brief*, <u>Appendix of Exhibits</u>, Tab 12, at 29-31 (emphasis added).

Thus, Mitchell even urged the Court of Appeals to give special consideration to defendants in the very position in which Porter Hayden now finds itself, to adopt the continuous injury trigger and to extend the coverage obligation beyond the period of the policies. This the Court of Appeals declined to do. Instead, the court's opinion and mandate diverged from Mitchell's brief at the precise point at which it begins its public policy-based advocacy of the continuous injury trigger. This divergence can hardly have been coincidence.

### 2.      The Next Chapter: *Owens-Illinois v. Armstrong*

Little more than six months after issuing the <u>Mitchell</u> opinion the Court of Appeals returned to the question of when bodily injury occurs in the context of exposure to asbestos. In <u>Owens-Illinois v. Armstrong</u>, the court took up a dispute over the application of Maryland's statutory cap on non-economic damages to cases alleging bodily injuries from asbestos exposure. 326 Md. 107, 604 A.2d 47 (1992), <u>cert. denied</u>, 506 U.S. 871, 121 L. Ed 2d 145, 113 S.Ct 204 (1992). This dispute presented the court with the same question it had just answered in <u>Mitchell</u>, *i.e.*, when does bodily injury occur in the context of exposure to asbestos?

22

a).    The *Armstrong* Court Confirmed that the Occurrence of a
'Bodily Injury' After the Statutory Date Would Trigger the
Cap on Non-Economic Damages

Chapter 11, Section 108 of the Courts and Judicial Proceedings Article of the Maryland Code limits the recovery of non-economic damages in actions for bodily injuries where the cause of action arose on or after July 1, 1986. MD. CODE ANN., [CTS. & JUD. PROC.], §11-108 (2002). It was well-established that a cause of action arose, for purposes of the statute, on the date that the bodily injury occurred. In the ordinary context of an automobile accident or botched surgery, this date of injury was susceptible to an easy answer. However, in the context of the long latency period between initial exposure and manifestation of asbestos-related bodily injuries, the easy answer would no longer suffice. Therefore, the Court of Appeals took up Armstrong to resolve this open question.

Owens-Illinois asserted that a cause of action for asbestos-related bodily injuries "arises" at the time that the claimant, using due diligence, discovers the injury. Armstrong, 604 A.2d at 53. Under such a test, the non-economic damages awarded to Armstrong, who had been exposed to asbestos-containing products from the 1940's until 1963 and was diagnosed with asbestosis in May of 1987, would be subject to the statutory cap. The Armstrong court rejected this formulation. It held that a cause of action arose, for purposes of the statute, when the last element required to support the action occurred. 604 A.2d at 54. Whether based upon negligence or strict liability, the court found that the fact of injury, *i.e.*, the date upon which the asbestos-related bodily injury occurred, comprised this last element. Id.

b).     The *Armstrong* Court Turned to the *Mitchell* Case to
        Determine When an Asbestos-Related Bodily Injury
        Occurs

At this point the Court of Appeals turned to its recently issued <u>Mitchell</u> opinion to

determine when bodily injury caused by asbestos occurs:

> In *Mitchell v. Maryland Casualty, 324 Md. 44, 595 A.2d 469
> (1991),* this Court addressed argument over when "bodily injury"
> due to asbestos exposure "occurred" for the purpose of triggering
> coverage under a standard form insurance policy
>
> [….]
>
> Chief Judge Murphy, writing for the Court, noted that despite the
> physicians' disagreement as to the time when a change in the lungs
> may be classified as disease "there was no disagreement that the
> inhalation and retention of asbestos fibers may cause immediate
> harm to the cells and tissues of the lung."
> <u>Armstrong</u>, 604 A.2d at 55-55, <u>quoting</u>, <u>Mitchell</u>, 595 A.2d at 477.

The <u>Armstrong</u> court then went on to find that it was unreasonable to conclude that

Armstrong's asbestosis "arose" between the statute date of July 1, 1986 and the diagnosis in May

of 1987.  Owens-Illinois' own expert had testified that asbestosis ordinarily develops within

approximately twenty years following exposure and noted that Armstrong's exposure period ran

from the 1940's to 1963.  Therefore, the <u>Armstrong</u> court affirmed the trial court's ruling that

Armstrong's injury arose prior to the 1986 statutory date.

The opinion in <u>Armstrong</u> is important because it indicates the Court of Appeals'

viewpoint regarding the <u>Mitchell</u> opinion *vis-à-vis* the issue of the statutory cap.  Though it did

not rely directly on <u>Mitchell</u> to affirm in favor of Armstrong – the factual circumstances did not

require it – the court found no difficulty in referring to the <u>Mitchell</u> opinion for the general

answer to the question of when bodily injury occurs in the asbestos context.  This ease of

24

reference to <u>Mitchell</u> becomes much more important ten years later, when the Court of Appeals took up a case in which the facts did not lend themselves to a conclusion based on hindsight.

    **3.**      **The Final Word:** ***John Crane, Inc. v. Scribner***

    In 2002 the Court of Appeals once again addressed the problem of when a bodily injury occurs, in the asbestos context, for purposes of the Maryland statutory cap on non-economic damages. The case of <u>John Crane, Inc. v. Scribner</u> raised this question anew, because of critical facts differing from the <u>Armstrong</u> case. 369 Md. 369, 800 A.2d 727 (2002). Scribner's exposure period ran from only 1971 to 1978. In March of 1995 Scribner was diagnosed with mesothelioma, an asbestos-related disease for which the expert testimony established a latency period of twenty to fifty years, with the average being thirty to forty years. Therefore, because reasonable persons could disagree whether Scribner's injury arose before or after July 1, 1986 in the absence of a clear standard, the *ad hoc* approach employed in <u>Armstrong</u> could not suffice. The <u>Crane</u> court turned again to <u>Mitchell v. Maryland Casualty</u> to provide a standard.

        a).      The *Crane* Court Reaffirmed that the *Mitchell* Opinion
                   Applied to the Issue of the Statutory Cap on Non-Economic
                   Damages

    The <u>Crane</u> court commenced its discussion of the appropriate standard with a recounting of the decision of the <u>Armstrong</u> court, including its less-than-completely dispositive ruling. 800 A.2d at 735, *et seq*. The court went on to outline the confused and sometimes contradictory approaches taken in the Maryland Court of Special Appeals after the <u>Armstrong</u> opinion was issued. The court concluded its examination of the state of the law by identifying three possible resolutions: (1) manifestation, (2) exposure, and (3) "the *Grimshaw* approach which, as to

25

disease, looks to when the disease itself first arose in the body [*i.e.*, injury-in-fact]."  800 A.2d at

736, citing, Anchor Packing v. Grimshaw, 115 Md. App. 134, 692 A.2d 5 (1997).

Before discussing Armstrong at any length, however, and before addressing the line of

cases from the Court of Special Appeals, the Crane court turned to Mitchell for guidance.  The

court devoted two paragraphs to recounting the Mitchell opinion, including an explicit statement

of what it left implicit in Armstrong: that "our decision in that case [Armstrong] was driven to

some extent by our holding in *Mitchell v. Maryland Casualty*."  Id. at 735.  The court again

found no difficulty in applying the lessons of Mitchell to the problem of the cap statute.

> b).  The *Crane* Court Repeatedly, and Unequivocally,
> Characterized the *Mitchell* Opinion as Adopting the
> Exposure Trigger of Coverage

Throughout this discussion the Court of Appeals characterized Mitchell, repeatedly and

explicitly, as adopting the exposure trigger.  First, the Court of Appeals provided a succinct

restatement of its holding in Mitchell:

> Adopting [in Mitchell] what we regarded as the majority rule
> around the country, we rejected the insurer's manifestation theory
> and held that, for purposes of insurance coverage, "'bodily injury'
> occurs when asbestos is inhaled and retained in the lungs."
> Crane, 800 A.2d at 735, quoting, Mitchell, 595 A.2d at 478.

Second, the court's acknowledgement of the limitations of the Armstrong case also

conveyed an explicit characterization of the standard adopted in Mitchell as being the exposure

trigger:

> Although in *Armstrong* we confirmed our rejection of the
> "manifestation" test for determining the onset of a latent disease,
> we did not expressly adopt any alternative test, including the
> "exposure" test adopted in *Mitchell*, as there was no reason in that
> case for us to do so.
> Id. at 736.

Third, in the course of clarifying the <u>Armstrong</u> omission, the Court of Appeals expressly

adopted, from <u>Mitchell</u>, the exposure approach for purposes of the statutory cap.  In doing so,

<u>Crane</u> even expounded somewhat on the merits of the exposure trigger:

> The exposure approach is consistent with our holdings in *Mitchell*
> and *Murphy v. Edmunds, 325 Md. 342, 601 A.2d 102 (1992)*[16], and,
> if carefully delineated, is both theoretically supportable and
> workable.
>
> […]
>
> Given the practical impossibility of ascertaining with any degree of
> precision when that onset [of an asbestos-related disease] actually
> occurred, <u>we consider it to be more reasonable to look back to the
> exposure that ultimately produced the disease, which cannot, of
> course, be later than the last exposure, than to engage in
> "guesstimates" of when the first cell became diseased</u>,
> "guesstimates" based on contradictory expert testimony - the
> plaintiffs' experts invariably moving the date back and the
> defendants' experts just as invariably moving it forward - all of
> which, in any event, seems to be founded upon uncertain
> assumptions. *See, Ins. Co. North America v. Forty-Eight
> Insulations, 633 F.2d 1212, 1218 (6th Cir. 1980), clarified, 657
> F.2d 814, cert. denied, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d
> 650 (1981)*(noting that "it is almost impossible for a doctor to look
> back and testify with any precision as to when the development of
> asbestosis 'crossed the line' and became a disease" and, <u>as we did
> in *Mitchell*</u>, adopting the exposure approach to determine when a
> bodily injury occurred for insurance coverage purposes).
> 800 A.2d at 741 (emphasis added).

These passages effectively put to rest any uncertainty or speculation about the meaning of

the <u>Mitchell</u> opinion.  At any point the Court of Appeals could have stated that the <u>Mitchell</u> case

adopted the continuous injury or exposure-in-residence trigger, or even any other conceivable

trigger, yet it pointedly declined to do so.  Instead, at each opportunity the <u>Crane</u> court reiterated

---

[16] <u>Murphy v. Edmunds</u> upheld the constitutionality of the statutory cap on non-economic damages and noted that
the legislative purpose of the statute was to ensure affordable liability insurance to the public.

its commitment to the exposure theory as *the* trigger both for the purposes of insurance coverage

of asbestos-related bodily injuries and the application of the cap on non-economic damages.  In

fact, the parenthetical reference to the INA v. Forty-Eight Insulations case, in the long block

quotation above, said it all: "[Mitchell] adopt[ed] the exposure approach to determine when a

bodily injury occurred for insurance coverage purposes."  800 A.2d at 741.

> c).      By the Time the Court of Appeals Addressed *Crane*, the
> Continuous Injury Trigger Was Not Even Under
> Consideration

The Crane court apparently disposed of any consideration of the continuous injury theory

before it even drafted its opinion.  As noted above, the court identified what it viewed as the

*three* trigger options before it: the manifestation theory, the exposure approach, and an injury-in-

fact theory developed by the Court of Special Appeals in the Grimshaw case.  Crane, 800 A.2d at

739.  The court, as we know, selected the second option, the exposure trigger:

> Before us, in essence, are three possible approaches for
> determining when a cause of action arises for purposes of § 11-
> 108(b)(1): (1) the manifestation approach, which is the latest in
> time and looks to when the disease sued upon first becomes either
> symptomatic or diagnosed, (2) the exposure approach, which is the
> earliest in time and looks to when the plaintiff first inhaled
> asbestos fibers that caused cellular changes leading to the disease,
> and (3) the *Grimshaw* approach, which, as to disease, looks to
> when the disease itself first arose in the body. None of these
> approaches are problem-free, but the one that presents the fewest
> significant problems and is most consistent with the statutory
> language is the second.
> Id.

The court continued in the next two paragraphs to analyze and reject the manifestation

and injury-in-fact (Grimshaw) theories before beginning its analysis leading to the adoption of

the exposure theory and ending in the citation to the INA v. Forty-Eight Insulations case as

quoted above.  Significantly, it makes no mention of the continuous injury theory, much less any serious consideration given to it, by the <u>Crane</u> court.  In fact, in the paragraph citing the <u>Forty-Eight Insulations</u> case, the court explicitly limited its test as to the occurrence of bodily injury to the period of exposure to asbestos.  "[W]e consider it to be more reasonable to look back to the exposure that ultimately produced the disease, *which cannot, of course, be later than the last exposure*."  800 A.2d at 741 (emphasis added).  The test adopted by the <u>Crane</u> court, and derived from the <u>Mitchell</u> opinion, excluded from the trigger anything beyond the last date of exposure. Thus, by the time the Court of Appeals took up the <u>Crane</u> case the continuous injury theory was no longer considered even an option.

### B.   <u>ALLOCATION AND COMPLETED OPERATIONS</u>

Because delayed manifestation claims may trigger coverage under multiple years of liability policies, courts across the nation have had to determine how such coverage must be allocated among the triggered policies.  Different jurisdictions have developed very different approaches to the allocation issue.  <u>See generally</u>, 1 BARRY R. OSTRAGER AND THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES §9.04 (12th Vol. 2004)(discussing the primary methods of allocation).  However, two main, diametrically-opposed theories have emerged.  Under "all sums" or joint and several allocation each triggered policy is liable for the entire loss associated with a claim, with the insurers relegated to bringing claims among themselves for contribution.  In contrast, under *pro rata* allocation each insurer is liable only for its proportionate share of the total liability.  <u>Id.</u>

Once it is determined that a claim has triggered a liability policy and that the policy must indemnify for all or some proportionate part of the claim, an issue arises as to whether any

aggregate limits of the policy will apply.   For many years liability insurance policies provided

aggregate limits – finite amounts beyond which the policy would have no coverage – for claims

arising out of products liability and/or the completed operations of the insured, but no aggregate

limit for claims arising out the insured's premises or operations liability.  See generally, 1

OSTRAGER AND NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES §7.02.  In short,

coverage was limited for completed operations and, for all intents and purposes, unlimited for

operations.  This issue has been commonly termed the "completed operations issue."

> 1.    **Maryland law Concerning the Allocation and Completed Operations Issues is Settled and followed by the Fourth Circuit in *Jones v. Liberty Mutual***

In Jones v. Liberty Mutual (In re: Wallace & Gale Company), 385 F.3d 820, 2004 U.S.

App. LEXIS 20877, a unanimous panel of the Fourth Circuit Court of Appeals addressed the

allocation and completed operations issues in the context of Maryland law.  The Wallace & Gale

court affirmed Judge Messitte's application of existing Maryland law concerning these issues in

a case nearly identical in its facts to the present action.

> a).    The *Wallace & Gale* Case Is "On All Fours" with the Present Action

With a single exception,[17] the facts and circumstances of the Wallace & Gale case are

virtually identical to the present action.  The policyholder, the Wallace & Gale Company, was an

insulation contractor in the mid-Atlantic region based in Maryland, engaged in the installation of

asbestos-containing insulation materials.  385 F.3d at 823.  Wallace & Gale ceased using these

materials in the 1970's and, in 1984, filed for bankruptcy in the District of Maryland due to its

---

[17]  This exception involves a stipulation between the Wallace & Gale parties as to the causation of asbestos-related bodily injuries.  385 F.3d at 828.  There is no such stipulation in the present case.

increasing asbestos liabilities.  Id.  During the decades that Wallace & Gale installed insulation it purchased comprehensive general liability policies and excess policies from numerous insurers. Id. at 824-825.  In 1994 Travelers Insurance Company brought a declaratory judgment action, as an adversary proceeding in the bankruptcy action, to resolve disputes over the applicability and extent of coverage provided by the insurance policies that Wallace & Gale had purchased.  Id. at 825.

A number of those persons having bodily injury claims against Wallace & Gale intervened in the adversary proceeding and interjected the issues of allocation and completed operations.  385 F.3d at 825.  The intervenors contended that each separate insurance policy in question should be liable for the entirety of the asbestos liabilities of Wallace & Gale and that these liabilities should not be subject to the aggregate limits of the completed operations hazard. Id.  In short, the intervenors asserted that the court must apply "all sums" allocation with no aggregate limit, just as Porter Hayden and the Committee have asserted in the present action. See, *First Amended Complaint for Declaratory Relief of Porter Hayden*, ¶¶24-27; *Plaintiff-Intervenor Official Unsecured Creditors Committee of Porter Hayden Company's Complaint for Declaratory Relief*, ¶¶28-31(alleging all sums liability); and see, *First Amended Complaint for Declaratory Relief of Porter Hayden*, ¶¶30-34; *Plaintiff-Intervenor Official Unsecured Creditors Committee of Porter Hayden Company's Complaint for Declaratory Relief*, ¶¶34-38 (alleging inapplicability of completed operations aggregate limits).

The Wallace & Gale insurers retorted that defense and indemnity payments under their policies should be made on a *pro rata* basis and that the aggregate limits of the completed operations coverage of their policies should apply to injuries that occurred after Wallace & Gale

31

completed its installation operations.  385 F.3d at 825.  The insurance companies here, National

Union and American Home, advance the same assertions with respect to allocation and

completed operations.

>   b).   The District Court Correctly Ruled in *Wallace & Gale* that
>   *Pro Rata* Allocation and the Completed Operations
>   Aggregate Limits Would Apply

The Wallace & Gale intervenors and insurers filed cross-motions for summary judgment.

With respect to allocation, Judge Messitte held initially that each had presented reasonable

arguments as to the language of the policies and that, given this "tie," resolution of the issue

must be in favor of the insureds.  See, Aetna Casualty & Surety Company v. Wallace & Gale

Company (In Re: Wallace & Gale Co.), 275 B.R. 223, 236 (D. Md. 2002); and, Jones v. Liberty

Mutual, 385 F.3d 820, 826.  With respect to the completed operations issue, Judge Messitte

agreed with the insurers that the claims of those persons who were initially exposed to asbestos

after Wallace & Gale completed its installation would be subject to the aggregate limits of the

completed operations hazard.  See, Aetna Cas. & Sur. Co. v. Wallace & Gale Co., 275 B.R. at

241; and, Jones, 385 F.3d 820, 826.  Judge Messitte ruled that those insurers who issued policies

to Wallace & Gale for periods after the company ceased its asbestos installation would only be

liable to the extent of the aggregate limits of their policies.  275 B.R. at 250; 385 F.3d at 826.

The decision to apply "all sums" allocation was made by Judge Messitte in large part

because Maryland had not spoken definitively on the issue.  275 B.R. at 236; 385 F.3d at 826.

While the adversary proceeding was still before Judge Messitte, however, the Maryland Court of

Special Appeals issued Mayor and City Council of Baltimore v. Utica Mutual Insurance

Company, 145 Md. App. 256, 802 A.2d 1070 (2002), adopting *pro rata* allocation as the law of

Maryland.  385 F.3d at 827.  In light of this holding, and the insurers' request to reconsider.

Judge Messitte reversed himself and held that *pro rata* allocation would apply to the insurer's

policies.  See, Aetna Cas. & Sur. Co. v. Wallace & Gale Co., 284 B.R. 557, 559 (D. Md. 2002);

and, Jones v. Liberty Mutual, 385 F.3d at 827-828.  It was this decision that the Wallace & Gale

intervenors appealed to the Fourth Circuit.

            c).      The Fourth Circuit Affirmed the District Court's
                   Application of *Pro Rata* Allocation as Maryland Law

Taking up the appeal of the Wallace & Gale intervenors, the Fourth Circuit first turned to

the language of the policies at issue.  The court noted:

> The language of the standard form general comprehensive liability
> insurance policies purchased by Wallace & Gale from 1962 until
> 1984 is similar:
>
> The company will pay on behalf of the insured all sums which the
> insured shall become legally obligated to pay as damages because
> of
> bodily injury or
> property damage
> to which this insurance applies, caused by an occurrence
> […][18]
> 385 F.3d at 829.

The court then noted the policies definitions of "bodily injury" and "occurrence:"

> "bodily injury" is defined as bodily injury, sickness or disease
> sustained by any person which occurs during the policy period,
> including death at any time resulting therefrom.[18]
>
> [and]
>
> "Occurrence" is defined as an accident, including continuous or
> repeated exposure to conditions, which results in bodily injury or
> property damage neither expected nor intended from the standpoint
> of the insured.[18]

---

[18]  This policy language is identical to the corresponding language of the National Union policies.  See, *infra*, §III.B.

33

Id.

After determining that Maryland law controlled, the Wallace & Gale court addressed

each of the errors assigned by the intervenors to Judge Messitte's adoption of *pro rata* allocation.

First, the court found that – contrary to the intervenors' assertions – *pro rata* allocation was the

settled law of Maryland that the federal courts were obliged to follow.  Citing Assicurazioni

Generali, S.p.A. v. Neil, 160 F.3d 997 (4th Cir. 1998), the court found that the decision of the

intermediate appeals court of Maryland to apply *pro rata* allocation must be followed by the

federal courts unless there were persuasive data that the state's highest court would decide

otherwise.  Jones, 385 F3d at 830-831.  The Jones court held, consistent with the Assicurazioni

ruling, that a mere grant of certiorari by the Maryland Court of Appeals was not persuasive data

upon which a federal court could choose not to follow the decision of the lower state court.  385

F.3d at 831; see, Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d at 1003 ("although a grant of

certiorari surely does indicate that some of the judges on the high court wish to hear a case, it

does not, in itself, constitute a decision on the merits. Indeed, more frequently than not, a grant of

certiorari in Maryland does not even result in reversal by the high court").[19]

The Wallace & Gale court likewise rejected the intervenors next argument, *i.e.* that the

Mitchell v. Maryland Casualty case indicated that the Maryland Court of Appeals would

overturn Utica Mutual if given the chance.  Mitchell had addressed the issue of trigger of

coverage for asbestos-related bodily injuries, holding that "defense and indemnification of the

insured is triggered upon exposure to the insured's asbestos products during the policy period by

---

[19]  The Fourth Circuit went on to reject the related argument that the district court could substitute its thoughts as to
what the state law ought to be for the actual pronouncement of the intermediate state court.  385 F.3d at 831; see,
Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d at 1003 ("a federal court cannot refuse to follow an intermediate
appellate court's decision simply because it believes the intermediate court's decision was wrong, bad policy, or
contrary to the majority rule in other jurisdictions").

a person who suffers bodily injury."  Jones, 385 F.3d at 831.  This ruling, the court found, was

consistent with the *pro rata* allocation scheme adopted in Utica Mutual, and therefore rejected

the reasoning of the intervenors.  Id.

       To the argument that Judge Messitte should have followed the decision of the District of

Columbia Court of Appeals in Keene Corporation v. Insurance Company of North America, 215

U.S. App. D.C. 156, 667 F.2d 1034 (D.C. Cir. 1981) the Wallace & Gale court responded that

the Court of Special Appeals of Maryland considered and explicitly rejected that contention.  385

F.3d at 832.  In Keene, the District of Columbia had concluded that "all sums" allocation was

mandated by the language of standard form CGL policies.  However, Maryland, as the Jones

court emphasized, rejected not only the Keene holding but also the "all sums" and "joint and

several" approaches to allocation in general.  Id.

       The Fourth Circuit likewise rejected the intervenors' contention that *pro rata* allocation

violated Maryland's statutory insurance regulation scheme.  385 F.3d at 832-833.  By statute,

Maryland does not permit strict indemnity policies, in which the insured is required to pay claims

or judgments prior to any obligation of the insurance company.  MD. CODE ANN. [INS.], §19-

102(a) (2004).  As the court noted, modern CGL policies such as those at issue in Wallace &

Gale, and in the present case, do not offend this statute.  385 F.3d at 832-833.  Moreover, the

court held, the *pro rata* allocation adopted in Utica Mutual, applied in the context of a

bankruptcy adversary proceeding, does not violate section (b)(1) of this statute by releasing the

insurer from liability.  Id. at 833.  Instead, as the court noted, any *pro rata* allocation of liability

to the insured would be for those periods for which the insured had no insurance policy or for

which there is no coverage in any event.  Id.

Finally, the Wallace & Gale court addressed the intervenors' argument that fairness and equity compelled a reversal of the decision of Judge Messitte.  To this argument the court responded:

> [T]he answer is that it is neither equitable nor fair to require an insurance company to pay for coverage during a period for which no effective coverage is in force.  For the coverage periods in which effective policies are in force, liability of the insurance carrier is decided favorably to the intervenors by *Utica Mutual*.
> 385 F.3d at 833.

Having rejected every argument offered by the intervenors, the Jones court unanimously affirmed the application of *pro rata* allocation as the settled law of Maryland.

> d).      The Fourth Circuit Affirmed the District Court's
>           Application of Maryland Law in Resolving the Completed
>           Operations Issue

Reaching the intervenors' assertions of error as to Judge Messitte's ruling on the completed operations issue, the Wallace & Gale court returned to the language of the policies. 385 F.3d at 833.  Judge Messitte had held that certain claims would be subject to the aggregate limits of the completed operations hazard:

> If a claimant's initial exposure occurred while Wallace & Gale was still conducting operations, policies in effect at that time will not be subject to any aggregate limit.  If, however, initial exposure is shown to have occurred after operations were concluded or if exposure that began during operations continued after operations were complete, then the aggregate limits of any policy that came into effect after operations were complete will apply.   Where a given claimant falls within this framework will have to be considered on a case by case basis.
> 385 F.3d at 833; Aetna Cas. & Sur. Co. v. Wallace & Gale Co.,
> 275 B.R. 223, 241.

Judge Messitte derived this solution to the completed operations issue by the simple and direct method of actually reading the insurance policies in question.  Id.  Affirming this

approach, the Wallace & Gale court noted that well-settled Maryland law concerning insurance policy construction requires that the plain and unambiguous terms of the policy must be applied. 385 F.3d at 834.  The court found no ambiguity in the policy provisions relating to the completed operations issue and found no inconsistency between the plain terms of the policies and the decision of Judge Messitte:

> [T]he literal terms of the policy provide that for the bodily injury there mentioned, such damage under the completed operations hazard shall not exceed the "aggregate," as stated in the schedule. This construction is entirely in accord with the decision of the district court we have quoted above at *275 B.R. 241*, and we so hold.
> Id.

Maryland law provides an extensive body of precedent concerning the construction of insurance policies, which Judge Messitte and the Fourth Circuit found controlling.  Maryland treats an insurance policy as any other contract, applying the plain terms of the policy, and where a policy provides a definition of a particular term, that definition controls the construction.  385 F.3d at 834, quoting, Bausch & Lomb v. Utica Mutual, 330 Md. 758, 625 A.2d 1021, 1031 (1993).[20]  Neither Judge Messitte nor the Fourth Circuit deviated from this established law or pronounced any new formulation of the law of Maryland.  Rather, each court applied settled law to new facts in a manner consistent with and well within the boundaries of that law.  The Wallace & Gale court merely affirmed Judge Messitte's application of existing Maryland principles of insurance policy construction.

---

[20]  See generally, *infra*, §II, for citations to cases relied upon by Bausch & Lomb for Maryland principles of insurance policy construction.

2.    **The Fourth Circuit's Decision in *Wallace & Gale* Controls the
      Disposition of the Allocation and Completed Operations Issues
      in the Present Case**

The disposition of the allocation and completed operations issues by Judge Messitte, as

affirmed by the Wallace & Gale court, governs the disposition of these issue in the present case

through the operation of the doctrine of *stare decisis*.  The doctrine of *stare decisis* controls

decisions of lower courts.  See generally, 18 *Moore's Federal Practice*, §134.02[2] (Matthew

Bender 3d ed.)("[t]he district courts in a circuit owe obedience to a decision of the court of

appeals in that circuit and ordinarily must follow it until the court of appeals overrules it").  The

doctrine constitutes a fundamental pillar of our system of justice and adherence to *stare decisis*

promotes stability and certainty in the law:

> [W]hen a court has laid down a principle of law as applying to a
> certain set of facts, it will adhere to that principle and apply it to all
> future cases where the facts are substantially the same.  The rule of
> stare decisis is a judicial policy, based on the principle that, absent
> powerful countervailing considerations, like cases should be
> decided alike.
> 20 AM. JUR. 2D *Courts* §147 (2004).

The facts in Wallace & Gale and in the present case are substantially the same.  As

discussed above, the circumstances of the parties, the asbestos liabilities, and, especially, the

language of the standard form CGL insurance policies at issue are identical as between Wallace

& Gale and the present action.  The various allegations and assertions of the parties hereto, with

respect to the scheme of allocation that must be employed and the applicability *rel non* of the

aggregate limits of the completed operations hazard, were advanced with equal vigor in the

Wallace & Gale case.  Wallace & Gale did not announce any new state law, but rather affirmed –

as a matter of law – Judge Messitte's application of settled Maryland law to these facts.  Under these circumstances the decision of the Fourth Circuit is binding on all lower courts.

### C.   **BURDEN OF PROOF**

Porter Hayden and the Committee cannot meet their burden of proving an entitlement to coverage under any of the National Union or American Home insurance policies and cannot prove, even if some number of claims are shown to trigger a policy's coverage, that those claims should not fall under the aggregate limits of the completed operations hazard.

### 1.   **Maryland Law on Burden of Proof Generally**

In an insurance coverage action, under Maryland law, the insured bears the burden of proof of entitlement to the coverage it seeks.  E.g., CSX Transportation v. Continental Insurance Company, 343 Md. 216, 680 A.2d 1082 (1996)(insured bore burden of proof of the meaning of 'occurrence' and number of occurrences); Cannon v. Southland Life Insurance Company, 263 Md. 463; 283 A.2d 404 (1971)(alleged insured had burden to prove eligibility to coverage); Haynes v. Metropolitan Life Insurance Company, 262 Md. 255, 277 A.2d 251 (1971)(beneficiary of life insurance policy had burden of proof of death of subject of the policy).

On the other hand, where the insurer seeks to rescind or void the policy, or seeks to apply an exclusion to coverage, the insurer bears the burden of proving such contentions.  E.g., Van Horn v. Atlantic Mutual Life Insurance Company, 334 Md. 669, 641 A.2d 195 (1990(insurer has burden to prove materiality of misrepresentation on application for insurance); Pressman v. State Accident Fund, 246 Md. 406; 228 A.2d 443 (1967)(insurer has burden of proof that it gave insured proper notice of policy cancellation).

These holdings of Maryland law are consonant with the precepts of insurance law generally.  First, the burden of proof falls upon the party relying upon the issue to its benefit. See, COUCH ON INSURANCE 3d. §254:4 (2001).  Second, the burden falls more often upon the party having greater access to the material evidence.  Id. §254:5.  Third, the burden of proof often follows the duty of pleading the issue.  Id. §254:6.   Synthesizing these rules, it can be said that the insured bears the burden with respect to facts tending to support coverage, while the insurer bears the burden as to facts tending to deny coverage.  Compare COUCH §254:11 (insured bears burden of showing coverage) with §254:12 (insurer bears burden of showing applicability of exclusion, exception or other affirmative defense).  Moreover, it is generally the rule that the burdens of proof remain the same whether the action is brought for breach of contract or for declaratory judgment.  Id. §254:19.

**2.      Asbestos Bodily Injury Claimants Generally Bear the Burden of Proof of the Dates of Their Alleged Exposure and the Occurrence of Their Alleged Injuries**

Two cases involving the applicability of the Maryland statutory cap on non-economic damages, although not directly controlling, provide substantial guidance for the allocation of the burden of proof of occurrence of an asbestos-related bodily injury.  See, Owens-Corning v. Walatka, 125 Md. App. 313, 725 A.2d 579 (1999), and, John Crane, Inc. v. Scribner 369 Md. 369, 800 A.2d 727 (2002).  As discussed above, Maryland's statutory cap on non-economic damages limits recovery for bodily injuries arising after July 1, 1986.  MD. CODE ANN., [CTS. & JUD. PROC.], §11-108 (2002).  In Walatka the Court of Special Appeals held that the claimant, usually the plaintiff in a bodily injury action, must bear the burden of proving that his or her cause of action arose prior to the statutory date. 125 Md. App. 313, 725 A.2d 579.  The court

40

grounded this decision in part upon the public policy underlying the statute.  Id. 324, 584.

However, the Walatka court held further that the common law principles regarding burden of

proof supported that result.  Id. at 325, 585; see, id. at 327, 585 ("[i]n the first place, the plaintiffs

have unique knowledge about the times and extent of the injured person's exposure to asbestos,

and whether it occurred at more than one period during his life"); and, id. at 327, 586 ("if the

defendant were to have the burden, it would be its obligation to prove the negative fact that the

injured party did not have the disease prior to the effective date of the statutory cap").

    In Crane v. Scribner the Court of Appeals approved of the intermediate court's allocation

of the burden of proof.  369 Md. 369, 395, 800 A.2d 727, 742 ("for the reasons well stated by

Judge Adkins in that case [Walatka], we conclude that the burden is on the plaintiff to establish

that his or her cause of action arose prior to the effective date of the applicable cap").  Crane,

however, also established that the claimant's cause of action arose upon the occurrence of the

bodily injury and that, as it had held in Mitchell, bodily injury occurs upon the inhalation and

retention of asbestos in the lungs or, in other words, exposure.  Id. at 397, 741; see, supra §4.A.3,

et seq.  Therefore, Crane approved but also modified the Walatka holding by clarifying that the

fact that must be proved by the claimant was his or her dates of exposure.

### 3.    Porter Hayden and the Committee of Unsecured Creditors Bear the Burden of Proof with Respect to Trigger of Coverage

    In the case at bar Porter Hayden and the Committee bear the burden of showing their

entitlement to coverage for the alleged asbestos liabilities.  As noted above, the insured must

shoulder the burden of proving first that it is entitled to the coverage that it seeks.  CSX v.

Continental Ins. Co., 343 Md. 216, 680 A.2d 1082 (1996); and, COUCH §254:4 and §254:52

("[a]s per the usual rule, the burden is upon the insured to show that the loss sustained comes

within the terms of a public liability policy, including that the injury forming the basis for the claim against the insured occurred during the coverage period of the policy").  This distribution of the burden is consistent with the holdings of the Walatka and Crane cases.  Porter Hayden and the Committee must prove, as a threshold matter, that the asbestos-related bodily injury claims arose out of exposure during the period of any National Union or American Home policies.

It follows that those claims for which Porter Hayden and the Committee cannot make this showing must necessarily fail.  It is undisputed that Porter Hayden ceased using asbestos-containing insulation materials in its operations and stopped selling, handling, or distributing asbestos-containing insulation materials containing asbestos in or about 1973.  See, *Porter Hayden's First Amended Complaint for Declaratory Relief*, ¶11, 14, Appendix of Exhibits, Tab 8, and, *Plaintiff-Intervenor Official Unsecured Creditors Committee of Porter-Hayden Company's Complaint for Declaratory Relief*, ¶13, 16, Id., Tab 9.  The American Home excess policy became effective on July 11, 1975.  Id., Tab 5.  The National Union excess policies commenced, respectively, on July 11, 1976 and May 26, 1977.  Id., Tabs 6-7.  The National Union primary CGL policies were effective from April 1, 1984 to April 1, 1988.  Id. Tabs 1-4.

In discovery taken while the original action was in the Circuit Court for Baltimore City, Porter Hayden admitted that it could produce no documents showing that Porter Hayden installed any asbestos-containing insulation after 1975.  *Deposition of Gardner Duvall, Vol.2, March 4, 2002*, Appendix of Exhibits, Tab 18, pp. 211-212.  Indeed, it was the position of Porter Hayden, notwithstanding the allegations of the underlying complaints, that it did not install any asbestos-containing products after 1975 at the latest.  Id., pp. 213-214.  Moreover, Porter Hayden ceased the sale of asbestos-containing insulation materials by 1973 and the sale of non-insulation,

42

asbestos-containing products by 1982.  Id. Tab 9, ¶14; Tab 10, ¶16; and, Tab 18, pp. 225-229.

As for "tie-in" operations after the mid-1970's, Porter Hayden admitted that there was no

evidence that it undertook such operations in the mid-1980's.  Id. Tab 18, pp. 229-233.  In fact,

there has never been any evidence, to Porter Hayden's knowledge, of operational exposure in the

mid-1980's:

> Q:   Can you identify, as you sit here today, a claim or lawsuit
>      where the claimant has demonstrated exposure to asbestos
>      fibers during an operation performed by Porter Hayden
>      between April 1, '84 and April 1, '86?
>
> A:   No.  I think that to the extent that there are allegations of
>      exposure, that is contained within the database information
>      that we've provided to you, but I have no recollection of
>      any – any claim ever actually being discovered that
>      contains those facts.
>
> Id. pp. 234-235.

Not only has no claimant ever presented documented or verifiable facts showing an

exposure to a Porter Hayden operation in the 1980's, the company itself has admitted that it has

no records of such operations.  In response to an interrogatory propounded by National Union,

requesting that the company identify the beginning and ending dates of its installation projects,

Porter Hayden stated (in relevant part):

> Porter Hayden does not possess any business records related to its
> insulation installation operations.  Porter Hayden does not maintain
> a central list or database that contains information identifying the
> project at issue in each of the underlying claims, or when and
> where the installation project at issue took place.  Accordingly,
> Porter Hayden cannot provide precise information regarding the
> specific locations at which insulation installation operations
> occurred or the precise dates upon which each installation project
> was commenced or completed.
> *Porter Hayden's Answers to National Union Fire Insurance
> Company of Pittsburgh, PA's First Set of Interrogatories to Porter
> Hayden Company*, Appendix of Exhibits, Tab 19, No. 6.

In the absence of evidence proffered by Porter Hayden or the Committee, proving an exposure to a Porter Hayden operation or a Porter Hayden product during the policy periods of an American Home or National Union policy, the claim for any coverage whatsoever must fail. Even in the event such evidence could be proffered as to any specific claims, all claims for which there was no such evidence would necessarily fail.

> **4.      Porter Hayden and the Committee of Unsecured Creditors Bear the Burden of Proof with Respect to Categorization of Claims Under the Differing Coverage Hazards**

Likewise, Porter Hayden and the Committee cannot meet their burden of proving under which policy hazard the proffered claims would fall.  As the Wallace & Gale court recognized the standard form CGL policies in that case – like the National Union policies – provided a number of types of coverages, or hazards, each containing somewhat different terms, limits, and exclusions.  Bearing the burden of proof of entitlement to coverage, Porter Hayden and the Committee must prove which claims fall under which hazard.

The standard established by the Fourth Circuit in Wallace & Gale states simply:

> [T]he insurers who issued general liability policies to Wallace & Gale for time periods wholly after Wallace & Gale completed its asbestos installation work will only be liable to the extent of the aggregate limit contained in the policy.  Policies issued to Wallace & Gale for time periods in which Wallace & Gale was installing asbestos will not be subject to the aggregate limit of liability contained in the policies.
> Jones v. Liberty Mutual, 385 F.3d 820, 826 (citations omitted).

Accordingly, the dates of Porter Hayden's asbestos installation operations and the effective dates of the National Union policies must be established.  These dates will determine whether any claims that might trigger one or more of the National Union primary CGL policies

44

will fall under the operations or completed operations hazards.  Porter Hayden and the

Committee must first bear the burden of proof of the effective dates of the National Union

primary CGL.  This burden, at least, has been met since it is undisputed that these policies were

in effect from April 1, 1984 until April 1, 1988.  See, Appendix of Exhibits, Tabs 1-4.

However, Porter Hayden and the Committee cannot meet their burden of proof that Porter

Hayden was, in the words of the Wallace & Gale court, "installing asbestos" during the period of

any National Union policy.  Porter Hayden and the Committee established the outside date of

Porter Hayden's operations, as discussed extensively above, in their pleadings.

> Some of the materials installed by Porter Hayden and its
> predecessors between the mid-1920s and approximately 1973
> contained asbestos. Porter Hayden ceased using insulation
> materials that to its knowledge contained asbestos in its operations
> in about 1973.
> Id., Tab 8, ¶11.

The Committee parroted this assertion of fact in its Intervention-Complaint:

> Some of the materials installed by Porter Hayden and its
> predecessors between the mid-1920s and approximately 1973
> contained asbestos. Porter Hayden ceased using insulation
> materials that to its knowledge contained asbestos in its operations
> in about 1973.
> Id., Tab 9, ¶13.

This date, 1973, does not correspond with any of the Insurer's policies.

Nevertheless, Porter Hayden and the Committee alleged that Porter Hayden *may* have

been required, *at times*, to remove pre-existing insulation or otherwise tie new insulation into old

insulation during the 1980's.  See, Appendix of Exhibits, Tab 8, ¶12 and, Tab 9, ¶14.

Hypothetical allegations of this kind cannot suffice to avoid summary judgment.  Porter Hayden

and the Committee must prove that Porter Hayden conducted operations involving asbestos-

45

containing insulation at specific times during the effective periods of one or more National

Union policies.  This burden must be met by proof of specific facts and not by alleged

hypothetical facts.  As discussed in the previous section, Porter Hayden has never been presented

with any claim that satisfies this burden.  *Deposition of Gardner Duvall, Vol.2, March 4, 2002*,

Appendix of Exhibits, Tab 18, pp. 234-235.  Yet, even if such facts existed as to some number of

claims, the remainder of the claims would fall under the aggregate limit of the completed

operations hazard.  In light of the failure to prove exposure to a Porter Hayden operation during

the effective period of a National Union policy, the claims against Porter Hayden must be

categorized under the completed operations hazard of the policies.

### V.  CONCLUSION.

The Maryland Court of Appeals settled any question of the trigger of coverage to be

applied in the context of asbestos-related bodily injury claims by issuing its opinions in Mitchell,

Armstrong, and Crane.  Of the four possible theories, the Mitchell court adopted the exposure

trigger.  The court again rejected the manifestation trigger in Armstrong and, though not

explicitly adopting any alternative trigger, indicated again its approval of exposure theory.

Finally, engraving the final word on this issue in Crane, the court explained, repeatedly and in no

uncertain terms, that Mitchell stood for the exposure trigger as the sole trigger of coverage.

Likewise, the issues of allocation among multiple-triggered insurance policies and the

application of the completed operations aggregate limits are established matters of Maryland

law.  The facts of the Wallace & Gale case are substantially the same as the operative facts

herein.  The Fourth Circuit's unanimous affirmation of the application of Maryland law to these

issues must control the disposition of the identical issues in the present case.

46

Dated:  April 22, 2005                    Respectfully Submitted,

                                          **JACKSON & CAMPBELL, P.C.**


                                          _____/s/_____
                                          Brian C. Malone, Esquire
                                          Fed. Bar No. 16025
                                          Timothy R. Dingilian, Esquire
                                          Fed. Bar No. 15444
                                          1120 20th Street, N.W.
                                          South Tower
                                          Washington, D.C. 20036
                                          (202) 457-1664
                                          (202) 457-1678 (f)

47

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of April, 2005, I caused a copy of the Memorandum of Points and Authorities in Support of National Union's and American Home's Joint Motion for Summary Judgment to be served, by first class mail, postage pre-paid or via the Court's electronic case filing system, to:

Mark H. Kolman, Esquire
Dickstein, Shapiro, Morin
  & Oshinsky, LLP
2101 L Street, N.W.
Washington, D.C. 20037

Deborah H. Devan, Esquire
Neuberger, Quinn, Gielen,
  Rubin & Gibber, PA
One South Street, 27th Floor
Baltimore, Maryland 21202

Paul Nussbaum, Esquire
Cameron J. Macdonald, Esquire
Whiteford, Taylor & Preston
7 Saint Paul Street
Baltimore, Maryland 21202

Robert E. Johnston, Esquire
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005

Phillip E. Milch, Esquire
Campbell & Levine, LLC
1700 Grant Building
310 Grant Street
Pittsburgh, PA  15219

Armand J. Volta, Jr., Esquire
Law Offices of Peter G. Angelos
One Charles Center
100 N. Charles Street
22nd Floor
Baltimore, Maryland 21201

_____/s/_____
Brian C. Malone

48