UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, *et al.*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:03-CV-03408-AMD (Consolidated with: 1:03-cv-03414-AMD) |
| PORTER-HAYDEN COMPANY, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

**PORTER-HAYDEN COMPANY'S OPPOSITION TO NATIONAL UNION AND
AMERICAN HOME'S JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mark Kolman (Federal Bar # 00424)
Leslie R. Cohen
Michael R. Engleman
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY LLP
2101 L Street, NW
Washington, DC  20037-1526
(202) 785-9700

Insurance Coverage Counsel for Official
Committee of Unsecured Creditors of
Porter-Hayden Company, on behalf of
Porter-Hayden Company

June 24, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ......................................................................... 1

I.    COUNTERSTATEMENT OF FACTS ..................................................... 4

    A.    The Relevant Policy Language Extends Coverage To Liabilities Arising Out of Bodily Injury During The Policy Period, Regardless Of When The Event Causing That Injury Took Place ................................................... 4

        1.    The Primary Policies ................................................... 5

        2.    The Excess Policies ..................................................... 7

    B.    The Policy Drafters Expressly Rejected An Exposure-Only Trigger And Proration of Coverage ............................................... 8

    C.    Asbestos Bodily Injury Is Progressive And Continuous From First Inhalation Through At Least Manifestation Of Those Injuries, Regardless Of The Period Of External Exposure ..................................... 11

    D.    Porter-Hayden Operations Giving Rise To Asbestos Claims .............................. 15

ARGUMENT ................................................................................................. 18

I.    THE STANDARDS OF REVIEW ........................................................... 18

    A.    The Insurers Bear The Burden Of Proof On This Motion For Summary Judgment And On The Applicability Of The Aggregate Limit Of Liability ........ 19

    B.    Under Maryland Law, The Court Must Interpret Insurance Policy Language In Accordance With The Parties Intentions And Expectations ........... 21

II.    THE INSURERS ARE NOT ENTITLED TO SUMMARY JUDGMENT IMPOSING AN EXPOSURE-ONLY TRIGGER ........................................... 23

    A.    The Maryland Court Of Appeals Has Not Adopted An Exposure-Only Trigger Of Coverage ................................................... 24

    B.    As Courts Throughout The Country, Including  The Maryland Intermediate Appellate Court, Have Held, The Policies Are Triggered By Injury During The Policy Period ..................................... 28

III.   QUESTIONS OF FACT INHERENT IN THE DRAFTING HISTORY OF THE
       OCCURRENCE FORM PRECLUDE SUMMARY JUDGMENT ON THE
       ALLOCATION ISSUE..................................................................................................... 32

IV.    THE INSURERS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
       THE APPLICATION OF THE COMPLETED OPERATIONS AGGREGATE ............ 35

CONCLUSION.................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*AC and S, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968 (3d Cir.1985)...................................24, 25

*Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119 (D.C.Cir.1986) ................................25, 31

*American Home Products Corp. v. Liberty Mut. Ins.*, 748 F.2d 760 (2d Cir.1984) ....................25

*Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974) ..........................................................................24

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) ......................19

*Commercial Union Ins. Co. v. Sepco Corp.*, 765 F.2d 1543 (11th Cir. 1985) ............................25

*In re Wallace & Gale Co.*, 275 B.R. 223 (D. Md.), *vacated in part on other grounds*, 284 B.R. 557 (D. Md. 2002), *affirmed in part*, 385 F.3d 820 (4th Cir. 2004)..................35, 36

*In re Wallace & Gale Co.*, 385 F.3d 820 (4th Cir. 2004) ......................................................*passim*

*Ins. Co. of North America v. Forty-Eight Insulations*, 633 F.2d 1212 (6th Cir.1980) ................25

*Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 1007 (1982) ......................................................15, 21, 24, 25

*Ketona Chem. Corp. v. Globe Indem. Co.*, 404 F.2d 181 (5th Cir. 1968) ...................................36

*Lac D'Amiante Du Quebec v. Am. Home Assur.*, 613 F. Supp. 1549 (D.N.J.1985) ....................25

*Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515 (D.D.C. 1984)................24, 25

*Pan Am World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098 (S.D.N.Y. 1973) ......................................................................................34

*Perdue Farms, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F. Supp. 2d 370 (D. Md. 2002) ..........................................................*passim*

*Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S. Ct. 686, 70 L .Ed......................................................25

*Warfield-Dorsey Co., Inc. v. Travelers Cas. & Sur. Co. of Ill.*, 66 F. Supp. 2d 681 (D. Md. 1999)..........................................................................20

*Young Women's Christian Assoc. v. Allstate Ins. Co.*, 275 F.3d 1145 (D.C. Cir. 2002) ..............31

## STATE CASES

*Aerojet-General Corp. v. Transport Indem. Co.*, 948 P.2d 909 (Cal. 1997) ................................ 34

*Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001)...................................................... 34

*Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 951 P.2d 250 (Wash. 1998)............... 34

*Associated Aviation Underwriters v. Wood*, 98 P.3d 572 (Ariz. App. 2004) .............................. 31

*Bausch & Lomb, Inc. v Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (1993)...................... 22

*Bentz v. Mutual Fire, Marine & Inland Ins. Co.*, 83 Md. App. 524, 575 A.2d 795
   (1990) ...................................................................................................................................... 22

*Carter-Wallace, Inc. v. Admiral Ins. Co.*, 712 A.2d 1116 (N.J. 1998)........................................ 20

*Cheney v. Bell Nat'l Life*, 315 Md. 761, 766-67, 556 A.2d 1135, 1138 (1989) .................... 21, 22

*Finci v. Am. Cas. Co. of Reading, Pa.*, 323 Md. 358, 593 A.2d 1069 (1991) ............................. 20

*Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 769 N.E.2d 835
   (Ohio 2002) ............................................................................................................................. 34

*Harford Co. v. Hartford Mut. Ins. Co.*, 327 Md. 418, 610 A.2d 286
   (1992) ................................................................................................................................. 29, 30

*Hercules Inc. v. AIU Ins. Co.*, 784 A.2d 481 (Del. 2001)............................................................ 34

*Hough v. Contributory Ret. Appeal Bd.*, 36 N.E.2d 415 (Mass. 1941) ....................................... 36

*J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502 (Pa. 1993)................... 24, 25, 34

*John Crane, Inc. v. Scribner*, 369 Md. 369, 800 A.2d 727 (2002)........................................ 27, 28

*Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.*, 324 Md. 44, 595 A.2d 469 (1991) .............. passim

*Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256,
   802 A.2d 1070 (2002) .................................................................................................. 29, 30, 33

*Monsanto Co. v. C.E. Heath Compensation and Liability Ins. Co.*, 652 A.2d 30
   (Del. 1994) .............................................................................................................................. 34

*Montrose Chemical Corp. v. Admiral Ins. Co.*, 913 P.2d 878 (Cal. 1995)............................ 29, 31

*Mut. Fire Ins. Co. of Calvert County v. Ackerman*, 162 Md. App. 1,
   872 A.2d 110 (2005) ............................................................................................................... 20

*Owens-Illinois, Inc. v. Armstrong*, 326 Md. 107, 604 A.2d 47 (1992) .......................................... 27

*Owens-Illinois v. United Ins. Co.*, 650 A.2d 974 (N.J. 1994) ....................................................... 24

*Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 940 (Colo. 1999) ................................. 33

*Sachs v. Am. Cent. Ins. Co.*, 230 N.Y.S.2d 126, 128-129 (N.Y. Sup. 1962),
    *aff'd*, 238 N.Y.S.2d 508 (N.Y. App. Div. 1963) ......................................................................... 20

*Sullins v. Allstate Insurance Co.*, 340 Md. 503, 667 A.2d 617 (1995) .................................. *passim*

*Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 517 A.2d 730 (1986) ........................................ 22

*Zurich Ins. Co. v. Raymark Industries*, 514 N.E.2d 150 (Ill. 1987) ................................. 15, 25, 34

## STATUTES AND RULES

Jud. Prc. Cod. Ann. § 12-603 ........................................................................................................ 34

Md. Code Ann. § 11-108 (2005) ................................................................................................... 28

Fed. R. Civ. P. 30(b)(6) ................................................................................................................ 15

## MISCELLANEOUS

Lee H. Ogburn, *"The Progression Of Trigger Litigation in Maryland – Determining The
    Appropriate Trigger Of Coverage, Its Limitations, and Ramifications,"* 553 Md. L.
    Rev. 220 (1994) ....................................................................................................................... 27

29A Am. Jur. § 1854 (1962) ......................................................................................................... 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, *et al.*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:03-CV-03408-AMD (Consolidated with: 1:03-cv-03414-AMD) |
| PORTER-HAYDEN COMPANY, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## PORTER-HAYDEN COMPANY'S OPPOSITION TO NATIONAL UNION AND AMERICAN HOME'S JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT

Porter-Hayden Company ("Porter-Hayden"), by and through the Official Committee of Unsecured Creditors ("the Committee"), submits this memorandum of law in opposition to the Motion for Partial Summary Judgment filed by National Union Fire Insurance Company of Pittsburgh, Pennsylvania and American Home Assurance Company (collectively, the "Insurers").

## PRELIMINARY STATEMENT

The linchpin of the Insurers' motion is their assertion that, as a matter of law and undisputed fact, coverage for the underlying asbestos claims at issue here is limited *solely* to those insurance policies in force during the time that the underlying claimant was exposed to an external source of asbestos. Because that assertion is wrong, all of the other portions of the Insurers' motion, including their purported allocation methodology, and their assertion that the underlying claims necessarily fall under the completed operations hazard's aggregate limits, necessarily must fail.

That critical linchpin of the pending motion is contrary to the plain language of the policy language, which provides coverage for bodily injury during the policy period, regardless

of when the event which gives rise to that injury takes place.  As set forth in the accompanying affidavit of insurance drafting history expert Richard E. Stewart, it also is contrary to the drafting history, which shows that the industry organizations that drafted the standard-form policy language expressly rejected an exposure-only trigger.  In addition, as set forth in the accompanying affidavit of medical expert Edward Gabrielson, M.D., it is contrary to the physical reality of asbestos-in-residence in the body, which does not cease its effects when external exposure ends, but continues to create new bodily injury thereafter as additional cells are exposed to the asbestos fibers existing in the body.  It is contrary to the weight of recent authority, which holds that asbestos bodily injury claims trigger every liability insurance policy sold to the policyholder from the date of first exposure through at least the date that the underlying claimants' injuries became known.  At the very least, the record in this case and on this motion raises substantial questions of fact as to how the policies were intended to apply, and as to their proper application to the specific facts of the asbestos bodily injury claims at issue.

Apparently recognizing this, the Insurers attempt to side-step those issues of fact by arguing that the trigger issue already has been decided as a matter of law by the Maryland Court of Appeals in *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,* 324 Md. 44, 58, 595 A.2d 469, 476 (1991) (*"Mitchell"*).  That argument drastically distorts *Mitchell,* which holds only that "*at a minimum* coverage under the policy is triggered upon exposure to and inhalation of asbestos fibers during the policy period." 324 Md. at 63, 595 A.2d at 478 (emphasis added).  As much as the Insurers wish it were otherwise, the simple fact is that the Maryland Court of Appeals has *not* adopted an exposure-only trigger, and the question of whether that trigger is appropriate cannot be decided on this motion for summary judgment.

Nor are the Insurers entitled to summary judgment holding that they are liable only for a pro-rated share of the liabilities that trigger their policies.  That assertion is based almost

exclusively on the Fourth Circuit's decision in *In re Wallace & Gale Co.,* 385 F.3d 820, 830-31 (4th Cir. 2004) (*"Wallace & Gale"*), in which the Fourth Circuit held that there was no evidence that the Maryland Court of Appeals would disagree with a Maryland intermediate appellate ruling prorating coverage among triggered policies.  However, neither the Fourth Circuit nor that intermediate appellate court were presented with the drafting history of the standard-form policy language at issue here.  That history shows that insurers *understood that the policy language at issue here did not provide for proration, and that it would, instead, operate* <u>*precisely*</u> *as policyholders assert*, making each triggered policy jointly and several liable for the full amount of the loss.  As the Maryland Court of Appeals has held repeatedly, most notably in *Sullins v. Allstate Insurance Co.,* 340 Md. 503, 515, 667 A.2d 617, 623 (1995) ("*Sullins*"), a showing that the drafters of policy language agreed with a given interpretation of that language provides persuasive evidence that the interpretation is reasonable and, therefore, enforceable.  The drafting history of the occurrence form thus, at the very least, raises significant questions of fact as to whether the Maryland Court of Appeals would prorate coverage among all triggered policies.

Porter-Hayden submits that the Court also should reject the Insurers' attempt to evade the burden of proof they bear on this motion for summary judgment.  Contrary to their strained contention, the Insurers, not Porter-Hayden, bear the burden of proving which claims, if any, are subject to the coverage limitations imposed on claims relating to the completed operations hazard.  The Insurers cannot meet that burden, for at least three reasons.  First, of course, is the fact that the Insurers' arguments regarding the scope of the completed operations hazard depend upon the application of an exposure-only trigger of coverage; because the application of that trigger is contrary to Maryland law, the Insurers cannot bear their burden of showing that they are entitled to judgment as a matter of law.  Second, even if an exposure-only trigger were

applicable here, the record in this case, including the affidavits submitted herewith of eyewitnesses to Porter-Hayden's operations, demonstrates that disputed issues of material fact remain as to whether the operations which give rise to Porter-Hayden's underlying liability were "completed," precluding a ruling on summary judgment that all of the underlying claims fall under the completed operations hazard.  Third, there are disputed issues of fact regarding whether the asbestos which caused the underlying claimants' injuries falls within an exception to the completed operations definition because it constituted "abandoned or unused" materials. Those disputed issues of material fact would require denial of the Insurers' motion on the completed operations issues even if an exposure-only trigger were erroneously applied in this case.  A proposed Order denying the Insurers' motion is attached hereto.

I.      **COUNTERSTATEMENT OF FACTS**

   A.   **The Relevant Policy Language Extends Coverage To Liabilities Arising Out of Bodily Injury During The Policy Period, Regardless Of When The Event Causing That Injury Took Place**

   The central question on this motion is the trigger of coverage – what is it that must happen during the policy period in order to trigger the insurance company's obligation to respond to the loss?  Under the most basic principles of insurance law, the "first stop" in the search for that answer is the language of the insurance policies themselves.  Yet, after quoting some – but not all – of the relevant policy language on the trigger issue in their statement of facts, *the Insurers make no further mention of that language.*  The reason for that omission is simple:  the plain language of the policies will not support the limitation of coverage to only those claims involving exposure to asbestos during the policy period.  Under that language, the only timing issue relevant to trigger is whether bodily injury took place during the policy period. At the very least, that language does not unambiguously provide for an exposure-only trigger, precluding summary judgment on that issue.

4

### 1.   The Primary Policies

Nation Union issued four primary comprehensive general liability ("CGL") policies to

Porter-Hayden covering the policy periods from April 1, 1984 through April 1, 1988.[1]  The basic

insuring agreement of each of these policies promises to pay on behalf of Porter-Hayden all sums

which Porter-Hayden becomes legally obligated to pay caused by bodily injury:

> The company will pay on behalf of the insured all sums which the insured
> shall become legally obligated to pay as damages because of
>
> A.  bodily injury. . . .
>
> To which this insurance applies, caused by an occurrence.

N.U. App., Tabs 2-5.  Both "bodily injury" and "occurrence" are defined in the policy.  While

those definitions require that "bodily injury" take place during the policy period, *there is no*

*concomitant limitation on the timing of the occurrence that results in that bodily injury:*

> Bodily Injury means bodily injury, sickness or disease sustained by any
> person *which occurs during the policy period*, including death at any time
> resulting therefrom
>                                    * * *
>
> Occurrence means an accident, including continuous or repeated exposure
> to conditions, which results in bodily injury or property damage neither
> expected nor intended from the standpoint of the insured.

*Id.*

---

[1]      The Appendix hereto will be cited to as "App.," followed by the tab letter of the
referenced exhibit.  Exhibits to National Union's and American Home's Joint Motion for
Summary Judgment will be cited to as "N.U. App.," followed by the referenced tab number.

Policy No. GLA 152 41 65 RA covers the policy period from April 1, 1984 through
April 1, 1985 (attached as Tab 2 to the Appendix of Exhibits to National Union's and American
Home's Joint Motion for Summary Judgment ("N.U. App."); Policy No. GLA 194 03 85 RA
covers the policy period from April 1, 1985 through April 1, 1986 (*id.*, Tab 3); Policy No. GLA
180 33 46 RA covers the policy period from April 1, 1986 to April 1, 1987 (*id.*, Tab 4); and
Policy No. GLA 501 05 70 RA covers the policy period from April 1, 1987 to April 1, 1988 (*id.*,
Tab 5).

The primary policies provide $1,000,000 in coverage for each occurrence. For certain specified types of liabilities, the coverage also is subject to an aggregate limit of $1,000,000. *Id.* Regardless of the number of separate occurrences or claimants, for those types of coverage subject to the aggregate limit, National Union's obligations end when it has paid $1,000,000 in settlements or judgments relating to that coverage. The only type of bodily injury liabilities subject to the aggregate limit are those arising out of the "products – completed operations coverage." *Id.* Thus, for those bodily injury claims which fall under the policies' product-completed operations hazard, National Union's coverage is limited to a total of $1,000,000; for those that do not, there is no aggregate limit, and National Union is obligated to provide coverage up to the $1,000,000 per occurrence limit on each such claim.

The completed operations hazard is defined in the policies as follows:

> "Completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs *after such operations have been completed or abandoned* and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith.

*Id.* The policy provides that operations shall be deemed complete at the earliest of three points: (1) when all operations to be performed under the contract have been completed; (2) when all operations to be performed by or on behalf of the named insured have been completed; or (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor working on the same project. *Id.* In addition, operations which require further service, maintenance or correction, but which are otherwise complete, are to be deemed completed. *Id.*

There are several exceptions to the completed operations hazard, one of which is significant for purposes of this motion. The policy provides that the completed operations

6

hazard does not include bodily injury or property damage arising out of "the existence of tools, uninstalled equipment, or abandoned or unused materials." *Id.* Bodily injury claims relating to such materials thus do not fall within the terms of the hazard, and are not subject to an aggregate limit of liability.

### 2.  The Excess Policies

The other National Union/American Home policies at issue here are three excess policies covering the policy periods from July 11, 1975 to January 1, 1978.[2] The first two of these policies "follow form" [3] to an underlying umbrella excess policy sold to Porter-Hayden by St. Paul Fire & Marine Insurance Company ("St. Paul") (attached hereto as Tab A to the Appendix To Porter-Hayden Company's Opposition To National Union And American Home's Joint Motion For Partial Summary Judgment ("App."). The last follow form to an underlying umbrella excess policy sold to Porter-Hayden by First State Insurance Company ("First State"). Those policies, in turn, were excess to the primary layer of coverage.

Like the later National Union primary policies, the policies underlying the American Home and National Union excess policies require that bodily injury – not the occurrence which results in that injury – take place during the policy period. Indeed, in addition to containing the same definitions of "bodily injury" and "occurrence" as those set forth above, the St. Paul policy in particular contains the following "Policy Period – Territory" provision, clearly stating that the only relevant "timing" question is whether there has been bodily injury during the policy period:

---

[2]    American Home Policy No. CE2751098 covers the policy period from July 11, 1975 to July 11, 1976 (N.U. App., Tab 6); National Union Policy No. 1186636 covers the policy period from July 11, 1976 to May 26, 1977 (*id.*, Tab 7); and National Union Policy No. 1186790 covers the policy period from May 26, 1977 to January 1, 1978 (*id.*, Tab 8).

[3]    When a policy "follows form," its terms and conditions, to the extent not otherwise stated, mirror those of another policy as stated, normally of the policy insuring the insured in the level of coverage directly below that of the insurer following form. *See, e.g*., *Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 197 F. Supp. 2d 370, 374 n.7 (D. Md. 2002).

This policy applies to personal injury, property damage, or advertising offense which occurs anywhere during the policy period.

App., Tab A (St. Paul Policy No. 519XA5044), at Bates-numbered page PHIC 49520.[4]

### B. The Policy Drafters Expressly Rejected An Exposure-Only Trigger And Proration of Coverage

Standard-form insurance policy provisions such as those at issue here are drafted by industry organizations called rating bureaus. The use of standard language, rather than language drafted by each individual insurer, benefits the insurance industry by, among other things, providing a homogenous database for the analysis of losses essential to rate making, controlling underwriting and marketing of policies, and simplifying the process of underwriting and selling reinsurance and excess insurance. *See generally* App., Tab B (Affidavit of Richard E. Stewart ("Stewart Aff.")), ¶¶ 15-20. Committees of the various rating bureaus charged with the task of developing policy language create a large written record generally referred to as the "drafting history," which reflects their interpretations, intent and expectations with respect to the policy provisions they drafted. *Id.*, ¶¶ 26-30. In this case, the drafting history of the standard form CGL occurrence policy shows both that the drafters understood that the standard-form policy language at issue here did not limit coverage to the period of exposure, and that it would allow a policyholder to seek coverage under any triggered policy to the full extent of limits, without the requirement of proration of the loss among triggered policies.

Early CGL policies required that the underlying claimant's injury be "caused by accident," which may originally have been an attempt to tie coverage to events and causes of injury that were limited in time. *Id.*, ¶¶ 39-42. In 1966, the American insurance industry changed the standard CGL insurance policy from an "accident" to an "occurrence" form in order

---

[4]     The St. Paul policy defines "personal injury" to include "bodily injury, mental injury, mental anguish, shock, sickness [and] disability." App., Tab A (St. Paul Policy No. 519XA5044), at Bates-numbered page PHIC 49522.

to make clear that it would respond to liability for injury taking place over extended periods of time.  Under that form language, as set forth above, coverage was tied not to the event which caused the injury, but to the suffering of injury or damage itself.  The main reason for that change was competitive; the major American insurers wanted to match policies offered by Lloyds of London and a few American insurers that were broader than the standard form accident policies.  *Id.,* ¶¶ 43-47.

During the approximately twenty years of drafting history leading to the adoption of the occurrence language, the insurance industry experts who drafted the new standard form understood that if the policy clearly responded to injury over time, a series of policies would be triggered.  They also knew that, unless the policy contained a provision to the contrary, the limits of those policies would add up or cumulate.  For example, in 1961, one of the members of the Joint Drafting Committee noted that occurrence policies presented "two basic problems," one of which was cumulation of liability under all triggered policies.  *Id.,* ¶ 56, Ex. 2, at 2.  The drafters tried at least four different restrictive wordings, including proposals both to limit coverage to the last year of exposure and to prorate the damages over the years of injury.  In 1959, in fact, the drafters devoted a two-day meeting to the issue, the minutes of which show that objections were raised to each of the proposals under consideration – including a last-exposure trigger and proration:

> The Subcommittees resumed discussion of the intent of "caused by accident" vs. "occurrence" as respects Products Liability.  At the February 3-4, 1959 meeting the subcommittees considered and agreed to discuss with their claims people the following approaches to when an "accident" should be considered as having taken place in order to avoid duplication of coverage for a single accident under more than one policy:
>
> (1)  The date the inured party institutes the claim,
>
> (2)  The date the injury manifests itself, and
>
> (3)  The last day of the last exposure to the condition causing the injury.

9

In opening the discussion, a member suggested a fourth approach that the accident be pro rated over the period of the exposure i.e. the length of the exposure would apply rather than a specific date.  Various companies covering within the exposure period would pro rate the total claims.

After a lengthy discussion on the various approaches the meeting agreed to consider each approach by listing the objections.

The objections were:

1.  When the Claim is Brought

    a)     Injury may be in one policy period and claim in another policy period (this is foreign to the insurance concept.)

    b)     Possibility of collusion

2.  Date Injury Manifestes [sic] Itself

    a)     Inconsistent with what we mean by "caused by accident[.]"  This approach may not be adaptable to the "sudden" accident e.g. a stairway accident resulting in a back injury which does not manifest itself for six months.

3.  Last Day of Exposure

    a)     Principal exposures would often be in other policy period

    b)     Not possible to determine when the policy coverage terminates

4.  Pro Rate

    a)     General objectionable, even with language of the following type to prevent pyramding [sic] of claims and limits:  "but in no event shall the coverage be in excess of the highest limits under any policy individual [sic] covering the accident."

*Id.*, ¶ 58, Ex. 7 at 1-2 (emphasis added).  The meeting concluded that none of the four proposals would accomplish the desired result.  *Id.*

While the standard CGL form was being revised, Liberty Mutual introduced an "amendatory endorsement" for its own CGL policies, occasionally picked up by other companies, that effectively used the last injurious exposure as the trigger of coverage.  *Id.*, ¶ 66.  The endorsement accomplished that by providing that all injury caused by an injurious exposure

spanning more than one policy period "shall be deemed to occur only on the last day of the last exposure." *Id.,* Ex. 12. *See also id.*, Ex. 13. Significantly, this language was not included in the final version of the standard form CGL policy. *Id.*, ¶ 69.

The drafters clearly understood not only that coverage would be triggered under the occurrence form by injury during the policy period, but also that the policy language did not provide for dividing or prorating coverage among triggered policies. In 1958, the General Liability Rating Committee, to which the drafters reported, was asked, "suppose injury occurs during two policy periods, shall both policies apply and if so shall limits of both policies apply with damages pro rated or the limits under one policy apply with damages pro rated." *Id.*, ¶ 72, Ex. 14 at 4. The Committee responded that, "it was possible for more than one policy to be said to apply to an injury in cases where the injuries occur during more than one policy period," but that "nothing could be done about this, that the situation had to exist if companies were to avoid placing of renewals in different companies in order to obtain the application of separate limits." *Id.*, ¶ 73, Ex. 15 at 5. Five years later, George Katz, one of the three drafters of the occurrence form, noted that "prorating cannot be effectuated between the insurer and the claimant." *Id.*, ¶ 75, Ex. 16 at 11. Finally, when the standard occurrence form was about to go on the market in 1965, another of its drafters noted that it purposely did not provide for pro-ration: "there is no pro-ration formula in the policy, as it seemed impossible to develope [sic] a formula which would handle every possible situation with complete equity." *Id.*, ¶ 76, Ex. 17 at 6.

### C. Asbestos Bodily Injury Is Progressive And Continuous From First Inhalation Through At Least Manifestation Of Those Injuries, Regardless Of The Period Of External Exposure

National Union's argument for an exposure trigger suggests that the event which triggers coverage under the plain policy language – bodily injury – takes place only while the claimant is exposed to and inhales an external source of asbestos. That argument, however, is at

odds with the medical reality of asbestos injury.  At the very least, the medical evidence of the

nature and progression of asbestos injury raises question of fact material to the issue of whether

policies in place after external exposure to asbestos ends, but before manifestation of any injury,

must respond to the underlying asbestos bodily injury claims.

Asbestos fibers, once inhaled, repeatedly cause injury to tissue at the cellular and

molecular level.  *See* App., Tab C (Affidavit of Edward Gabrielson, M.D. ("Gabrielson Aff.")),

¶ 5.  The diseases resulting from asbestos exposure and inhalation, including asbestosis, non-

malignant pleural diseases, and asbestos-caused cancers, all result from multiple and virtuously

continuous injuries.  These injuries begin well before patients present with symptoms.  *Id.*

Asbestosis, for example, is initiated by specialized "caretaker" cells in the lungs,

known as macrophages, ingesting asbestos fibers.  *Id.*, ¶ 17.  The macrophages release oxygen

free radicals and biologically active cytokines, such as platelet-derived growth factor (PDGF), in

response to these ingested fibers.  *Id.*,  Both of these substances contribute to fibrosis, or scarring

of the lungs.  Thus, asbestosis is a permanent disease that is the cumulative manifestation of

multiple injuries at the cellular level, which have occurred in multiple locations throughout the

lungs and over a period of many years, causing scarring of the lung tissue.  *Id.*, ¶ 22.

These injuries begin very soon after initial inhalation of asbestos fibers.  *Id.*, ¶ 22.

Additional injuries occur as a result of new fibers being inhaled by an individual, leading to

additional fibrosis and advancement of the disease process.  *Id.*,  Most significantly for purposes

of this motion, however, because asbestos fibers are chemically stable, additional injuries also

occur as a result of fibers that persist in lung tissue after external exposure has ceased.  As Dr.

Gabrielson states, "it is important to recognize that asbestosis can progress in severity even after

inhalation of new fibers by an individual has ceased, as a result of residual fibers in the lungs

causing new injuries." *Id.*, ¶ 24.  Consequently, beginning with the first inhalation of asbestos,

and continuing for the remainder of life, an individual who has inhaled asbestos fibers continuously suffers injuries. *Id.*, ¶ 22.

In addition to scarring of the lung tissue, leading to asbestosis, asbestos fibers also cause injury to lung membranes, called the pleura. *Id.*, ¶ 25. Scarring of the pleura can restrict pulmonary function. *Id.* Injuries to the pleura also can cause fluid to leak into the pleura space, ultimately resulting in a pleural effusion. Asbestos pleural effusions can occur within the first decade of exposure to asbestos, or at a later date. A pleural effusion, when large, can decrease lung volume and restrict pulmonary function. Pleural scarring develops in a manner similar to the development of asbestosis: macrophages are penetrated by asbestos fibers, produce cytokines in response to this injury, and thus stimulate adjacent fibroblasts to proliferate and produce collagen. *Id.*, ¶ 27. As with asbestosis, pleural fibrosis is irreversible. Also as with asbestosis, pleural fibrosis and related pleural disease develop over a prolonged period of time, as a result of numerous, continuous injuries to the pleura at the cellular level from both newly-inhaled asbestos, and asbestos already in residence in the lungs. *Id.*, ¶ 29.[5]

Asbestos also is well recognized to be an important cause of cancer, most notably, mesothelioma and lung cancer. Asbestos produces critical genetic changes required for the production of cancerous cells by physically and chemically injuring chromosomes. This injury results in chromosomal breaks and rearrangements. *Id.*, ¶ 36. In addition, asbestos injury contributes to the carcinogenesis process by functioning as a tumor promoter, both by stimulating cells, including the genetically altered cells, to replicate, and by resulting in

---

[5]     Yet another form of pleural disease caused by asbestos is pleural plaque. Pleural plaques are dense, flat nodules of scar tissue that generally occur on the parietal pleura (*i.e.*, the membrane that covers the inner surface of the chest wall) or the top of the diaphragm. The mechanism by which pleural plaques develop is not well understood, but it is generally thought to involve response of fibroblasts to growth factors produced by macrophages that are injured by asbestos fibers. *Id.*, ¶ 30.

cytotoxicity (cell killing) to some cells, with a greater cytotoxic effect on normal cells than on cells with genetic alterations related to cancer.  *Id.*, ¶ 37.

Many years – typically 20 to 50 – are required for the development and growth of a clinically recognized cancer after the onset of asbestos exposure.  *Id.*, ¶ 39.  This long latency period is largely a result of the lengthy carcinogenesis processes, which requires multiple genetic alterations and selective expansions of the genetically altered cell populations.  *Id.*,  In addition, there is a lengthy period of time required for the expansion of a single fully malignant cell to a clinically relevant tumor, which typically has approximately one million million cells. *Id.*, ¶ 40. Injury to an individual with cancer does not cease when a malignant cell arises from the carcinogenesis process.  *Id.*, ¶ 43.  In fact, as a cancer grows and invades surrounding normal tissue, additional injuries occur. *Id.*,  Thus, the clinical disease of cancer is ultimately a manifestation of multiple asbestos injuries that occurred over many years prior to diagnosis.  *Id.*, ¶ 42.

Although Maryland courts have not had occasion to explain the entire, progressive nature of asbestos-related diseases, the courts have commented upon the nature of asbestos-related diseases.  For instance, although the parties in *Wallace & Gale* stipulated to some effects of the disease, the Fourth Circuit addressed the issue:

> Maryland courts have held that asbestos-related injury begins with exposure, carries forward while the asbestos fibers are in residence and continues through to manifestation of the disease.  The parties, moreover, have stipulated that it cannot be said with certainty when injury actually occurs or to what degree.  Quite possibly, therefore, actual injury could occur in whole or part during any one or more policy periods, including those coming after Wallace & Gale completed its operations.[6]

---

[6]     *See Wallace & Gale*, 385 F.3d at 828.

Additionally, the Court in *Mitchell* noted that a bodily injury related to an asbestos-related disease takes place during any localized abnormal condition of the living body.  *See Mitchell,* 324 Md. at 59, 595 A.2d at 476.  Further, the Court confirmed its understanding that, "once inhaled, 'asbestos fibers cause physical and biochemical injuries to the cells of the lung at or shortly after inhalation.'"  324 Md. at 60, 595 A.2d at 477, *citing Zurich Ins. Co. v. Raymark Indus.,* 514 N.E.2d 150, 159-60 (1987).  That Court found that injury takes place "when asbestos fibers are inhaled and retained in the lung."  *Id*.  Further, the *Mitchell* Court noted that, "cases recognize from the medical evidence that inhalation of asbestos fibers starts the injurious chain of events which may culminate in asbestos-related disease."  324 Md. at 61, 595 A.2d at 477, *citing Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1047 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 1007 (1982) ("*Keene"*).  Significantly, however, none of the experts who submitted affidavits in *Mitchell* offered the opinion that additional asbestos-related bodily injury takes place as a result of "exposure in residence" to the already-inhaled asbestos after additional external exposure to asbestos has ceased.  *Mitchell*, 324 Md. at 64-68, 595 A.2d at 478-81 (Appendix A to decision).

### D.   Porter-Hayden Operations Giving Rise To Asbestos Claims

Porter-Hayden's operations began in the 1920s, when it operated as an industrial insulation contractor.  The company both sold and installed asbestos-containing insulation until the mid-1970s.  Even after it stopped selling and installing asbestos-containing insulation, however, it did not cease operations which are alleged to have resulted in the release of asbestos-containing materials.  Until it ceased operations altogether in 1989, for example, Porter-Hayden continued to perform "tie-ins," a process of installing non-asbestos-containing insulation in locations that already had  asbestos insulation.  In addition, the company's operations after the mid-1970s continued to include performing tear-outs of asbestos-containing insulation.  As

Gardner Duvall, Porter-Hayden's corporate representative, explained, the tie-in work was continual:

> A tie in would be part of just about any job that you ever did.  Any time you connect the two, they – connected either with a new system or new installation on an old system, you know it was just – it was a day's work for everybody.

N.U. App., Tab 18 (Duvall Dep.) at 232: 12 - 20.

Duvall's testimony is consistent with the experience of underlying claimants at job sites well into the late-1980s.  For example, two claimants, Ron Allowat, Sr. and Frank Francese, whose affidavits are at Tabs D and E of the Appendix hereto, attest that they were present during and witnessed ongoing Porter-Hayden operations that resulted in the release of asbestos fibers. Allowat, for example, attests that Porter-Hayden was one of the largest outside contractors engaged at the Sparrows Point Bethlehem Steel plant where he worked, and that "from the early 1970's until the late 1980's Porter-Hayden insulators were constantly at work performing insulation work at the Steel Mill."  App., Tab D (Affidavit of Ron Allowat, Sr. ("Allowat Aff.")), ¶ 9.  Allowat further attests that the ongoing work being performed by Porter-Hayden at that time resulted in the release of asbestos fibers:

> As indicated above, I was constantly moving throughout the Plant and am able to state unequivocally that the presence of Porter Hayden insulators going about their pipecovering, tear out and relining duties, specifically working with asbestos containing material, was an ongoing process between 1975 and 1989, unfortunately resulting in the release of asbestos dust at every job location.  On countless occasions, I witnessed the replacement of asbestos containing pipecovering being performed by Porter Hayden on sections of pipe.

*Id.,* ¶ 13.  Similarly, Francese attests that he worked in various plant locations between 1976 and 1986, and that:

> While at those locations, I worked in the vicinity of Porter Hayden employees removing asbestos-containing materials.  The removal of these materials created visible dust on a regular basis which I and all others in the vicinity breathed.

App., Tab E (Affidavit of Frank Francese ("Francese Aff.")), ¶ 9.

Those affidavits are consistent with Duvall's testimony that the tie-in operations continued, and likely resulted in the release of asbestos fibers, until Porter-Hayden ceased operations in 1989:

Q: All right.  Just for the record, can you give us your definition of what a tie-in operation consisted of?

A: *Essentially you're looking at work in a facility that has operational systems in place already.  So either the owner of the facility would put in new systems or would have a need for new insulation on old systems, and any place that new insulation had to join existing insulation, you had to tie them together.*

Q.  How were asbestos fibers released during such an operation, if at all?

A.  *I'm not sure I can give you any more detail, except to say that the manipulation of in-place asbestos insulation might release fibers.*

Q.  Well, is there a way to tie in to an existing system without releasing asbestos fibers?

A.  *I am not an insulator, I really don't – I don't know the answer to that question.  I don't know that anybody who has ever had an executive position with Porter-Hayden could answer that question.*

Q. Well, is it fair to say, based on your knowledge, that in planning or performing a tie-in operation involving a preexisting asbestos containing system that one would anticipate that asbestos fibers would be released?

A.  *It certainly is the testimony from the experts in the tort litigation that it's essentially impossible to do any kind of manipulation of asbestos-containing insulations without liberating fibers.*

Q.  Do you agree with that?

A.  *I don't know of anyone who disagrees with it.*

Q.  Does Porter-Hayden agree with that?

A.  *I don't know that Porter-Hayden has a way to disagree.  I mean, at the lowest levels of release, it's a completely invisible process.  So, you know, unless you can prove that – sometimes by air sampling, there was no release and go on and prove in all instances there was no release, it*

*becomes kind of pointless to argue about whether or not it's possible.  You
don't have the evidence to show that it's impossible.*

Q.  Did Porter-Hayden perform any tie-in operations, as you've defined
them, involving a preexisting asbestos material between April 1984 and
April 1986?

A.  *Given the documents in the insurance underwriting, you could only
conclude they did.*

Q.  Other than those documents, are you aware of any documentary
evidence?

A.  *No.*

Q.  Are you aware of any deposition testimony given by any Porter-
Hayden or union employees or anybody else about a tie-in operation that
was performed during that time period?

A.  *The testimony doesn't get really that focused. Unless you were
building something from scratch, a tie-in would be part of just about any
job that you ever did.  Any time you connect the two, they – connected
either with a new system or new installation on an old system, you know, it
was just – it was a day's work for everybody.  They testified about their
doing work, not particularly about tying in.*

N.U. App., Tab 18 at 229: 11 - 232: 21 (emphasis added).

As a result of these activities, Porter-Hayden has now been sued in tens of thousands

of underlying asbestos bodily-injury actions, which it has submitted to the Insurers for payment.

## ARGUMENT

### I.      THE STANDARDS OF REVIEW

There are two sets of standards crucial for the review and resolution of the Insurers'

motion.  First is the standard for the burden of proof.  Contrary to the Insurers' disingenuous

attempt to shift the burden of proof to Porter-Hayden, the Insurers bear the burden of establishing

as a matter of law and undisputed fact that all of the underlying claims fall within the completed

operations hazard as they assert.  Second, the Insurers' motion requires the Court to apply

Maryland substantive insurance law to determine whether there are disputed issues of material

fact regarding the scope and application of the insurance policies at issue.  Yet the standards for

the interpretation and application of insurance policy language under Maryland law are given but passing mention, and no real application, in the Insurers' brief.

### A. The Insurers Bear The Burden Of Proof On This Motion For Summary Judgment And On The Applicability Of The Aggregate Limit Of Liability

The Insurers argue at length in their brief that Porter-Hayden "cannot meet their burden of proving an entitlement to coverage under any of the National Union or American Home insurance policies," and that it "cannot prove, even if some number of claims are shown to trigger a policy's coverage, that those claims should not fall under the aggregate limit." That argument turns the burden of proof on this motion for summary judgment on its head. The Insurers, as the parties seeking summary judgment, have the burden of proving their entitlement to the judgment they seek – both with respect to their assertion that none of the underlying claims trigger their policies, and their assertion that all claims which do trigger the policies fall under the aggregate limit applicable to the completed operations hazard. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) ("Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact.").

Moreover, the Insurers' assertion that Porter-Hayden ultimately will bear the burden of proving which claims, if any, fall under the completed operations hazard, is erroneous. As set forth herein, the policies are triggered by bodily injury during the policy period, not exposure; accordingly, because asbestos continues to cause new bodily injuries from the first date of exposure through manifestation even if external exposure to asbestos has ceased, Porter-Hayden need not show that there has been an exposure during the policy period in order to meet its burden of showing that the policies are triggered. Rather, any claim that involves exposure to

asbestos prior to the policy period through manifestation will trigger the Insurers' policies.[7]  It will then be up to the Insurers, if they can, to show that the claim in question falls within the limitation of coverage imposed by the aggregate limits applicable to the completed operations coverage.

Whether written as a complete exclusion to coverage or as a limitation on the otherwise non-aggregated nature of the policies in question, the completed operations hazard definitions in these policies act as a limitation on coverage.  As such, the Insurers bear the burden of proving their applicability.  *See generally Warfield-Dorsey Co., Inc. v. Travelers Cas. & Sur. Co. of Ill.*, 66 F. Supp. 2d 681, 689 (D. Md. 1999) (holding that insurers have burden of proving any exclusions or coverage limitations within the policy); *Finci v. Am. Cas. Co. of Reading, Pa.,* 323 Md. 358, 394, 593 A.2d 1069, 1087 (1991).[8]  Even if a provision that limits or excludes coverage is included with the provisions allegedly providing coverage, such as the completed operation hazard definition at issue, that provision is considered an exclusion or limitation that must be proven by the insurer, because it limits available coverage for a certain type of loss.  *See Mut. Fire Ins. Co. of Calvert County v. Ackerman*, 162 Md. App. 1, 872 A.2d 110, 113 (2005) (insurer had burden of proving that a building was not a "dwelling," even though that term was used in the section granting coverage, because the allegation was in the nature of an affirmative defense); *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 712 A.2d 1116, 1127 (N.J. 1998) ("We agree that exclusions do not shed their essential character when they are moved

---

[7]     Notably, the Insurers do not suggest that they can establish as a matter of law and undisputed fact that none of the underlying claims involve exposure only prior to their policy period, or only prior to the cessation of Porter-Hayden's operations.

[8]     *See*, *e.g.*, 29A Am. Jur. § 1854 (1962) ("[T]he principle generally applied by the courts is that if proof is made of a loss apparently within a contract of insurance, the burden is upon the insurer to prove that the loss arose from a cause of loss which is excepted or for which it is not liable, or from a cause which limits its liability.") (*quoted in Sachs v. Am. Cent. Ins. Co.*, 230 N.Y.S.2d 126, 128-129 (N.Y. Sup. 1962), *aff'd*, 238 N.Y.S.2d 508 (N.Y. App. Div. 1963)).

from one section of a policy and are crafted as part of that policy's grant of coverage.  We

therefore decline to adopt a rule of law governing burden of proof the application of which

would depend merely on the location of a provision in an insurance contract.").  *See also Keene,*

667 F.2d at 1052, n.42 (insurer bears burden of proving that underlying asbestos claim *did not*

trigger its policy period; "We recognize that the insured generally bears the burden of proving

coverage.  The injuries at issue in these cases, however, are unique and traditional procedural

rules cannot be allowed to defeat Keene's or its insurers' substantive rights under the policies.").

Accordingly, as both a matter of procedural summary judgment law and substantive

Maryland insurance law, the Insurers bear the burden of proving which underlying claims, if any,

are subject to the aggregate limits of the completed operations hazard.

> ### B.     Under Maryland Law, The Court Must Interpret Insurance Policy Language In Accordance With The Parties Intentions And Expectations

The Insurers give but short shrift to the standards under Maryland law for the review

of insurance policy language, and then wholly fail to apply those standards.  The reason for that

omission is clear:  under the review required by Maryland courts, there are, at the very least,

disputed questions of fact regarding whether the strained construction for which the Insurers

argue can stand.

The methods, criteria and standards for determining the proper scope of insurance

policy language were directly addressed and discussed at length by the Maryland Court of

Appeals in *Sullins*.  The *Sullins* starting point, of course, is the basic rule of Maryland insurance

law that insurance policies "are construed as a whole to determine the parties' intentions," and

that, in that construction, "words are given their customary, ordinary and accepted meaning."

340 Md. at 508, 667 A.2d at 619, *citing Cheney v. Bell Nat'l Life*, 315 Md. 761, 766-67, 556

A.2d 1135, 1138 (1989).  But the Court in *Sullins* also recognized three essential corollaries to

that basic rule.  First, the Court held that a word's "ordinary" meaning is that which a reasonably

prudent layperson would attach to the term:  "If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous."  *Id., citing Bausch & Lomb, Inc. v Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993).  Second, the Court recognized that the determination of whether policy language is ambiguous cannot be made in a vacuum simply by looking at whether the words used are "clear."  Rather, the question is whether the language is reasonably susceptible of two meanings with respect to the specific underlying claim at issue:  "A term which is clear in one context may be ambiguous in another." *Id., citing Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 74, 517 A.2d 730, 732 (1986) and *Bentz v. Mut. Fire, Marine & Inland Ins. Co.*, 83 Md. App. 524, 537, 575 A.2d 795, 801 (1990). Finally, the Court reaffirmed the longstanding Maryland rule that if an ambiguity exists which is not resolved by resort to extrinsic or parol evidence, "it will be construed against the insurer as the drafter of the instrument."  *Sullins*, 340 Md. at 509, 667 A.2d at 619, *quoting Cheney*, 315 Md. at 766-67, 556 A.2d at 1138.

 Moreover, the factors used by the *Sullins* Court in applying these standards are instructive here.  First, the Court recognized that the fact that other courts have interpreted the policy language in more than one way should be considered on the question of ambiguity:

>  We hold that conflicting interpretations of policy language in judicial opinions is not determinative of, but is a factor to be considered in determining the existence of ambiguity.  In interpreting an insurance policy, we must follow the rules of contract construction set out in part II of this opinion.  However, **if other judges have held alternative interpretations of the same language to be reasonable, that certainly lends some credence to the proposition that the language is ambiguous and must be resolved against the drafter.**

340 Md. at 518, 667 A.2d at 624 (emphasis added).

 Second, the Court held that the history of the language, and its intended purpose, must be considered in determining how a reasonably prudent policyholder would interpret the language.  For example, the Court noted that, because the pollution exclusion before it arose out

of the insurance industry's desire and repeated attempts to avoid providing coverage for claims of environmental pollution, a reasonably prudent policyholder could conclude that it did not extend beyond such claims:

> It appears from the foregoing discussion that the insurance industry intended the pollution exclusion to apply only to environmental pollution. That supports our conclusion that a reasonably prudent layperson may interpret the terms "pollution" and "contamination" in the case now before us as not encompassing lead paint, a product used legally and intentionally.

340 Md. at 515-16, 667 A.2d at 623.

A final factor considered by the *Sullins* Court in analyzing the policy language was the availability to the insurance company of language which would have put the matter beyond dispute. Where the insurance company in question could have, but chose not to, include language which specifically resolved the matter at issue, the Court held that failure weighs heavily against the insurer, as drafter of the policy:

> To be sure that lead paint poisoning claims were excluded from coverage, Allstate could have included a provision, such as those included in [other] policies . . . explicitly excluding such claims.

340 Md. at 518 n. 3, 667 A.2d at 624 n. 3.

These standards effectively are ignored by the Insurers in their brief. Indeed, the Insurers' desperate – and erroneous – argument that the Maryland Court of Appeals has already adopted an exposure-only trigger of coverage reflects that fact that the Insurers are aware that the applicable *Sullins* standards will not support such a trigger.

## II.     THE INSURERS ARE NOT ENTITLED TO SUMMARY JUDGMENT IMPOSING AN EXPOSURE-ONLY TRIGGER

As the Insurers are well aware, an exposure-only trigger is not supported by the plain policy language, the policy drafting history, the nature of asbestos injury and the weight of recent precedent around the country. Accordingly, in the hope of keeping this Court from recognizing

those factual issues, the Insurers argue that the Maryland Court of Appeals in *Mitchell* has already determined that an exposure-only trigger applies to asbestos bodily injury claims.  The fact that the Insurers must spend fourteen pages of their brief explaining how the Court really meant to say "exposure only" when it said "exposure at a minimum" shows only too clearly that their reading of *Mitchell* is at odds with what the Court of Appeals actually intended and held.

### A.   The Maryland Court Of Appeals Has Not Adopted An Exposure-Only Trigger Of Coverage

In *Mitchell*, the Maryland Court of Appeals faced two conflicting theories of how and to what extent asbestos bodily injury claims trigger insurance policies.  The insurer argued that coverage for such liabilities is available only under those insurance policies on the risk at the time the disease or injury becomes manifest.  The policyholder originally argued that those policies on the risk at the time of exposure to asbestos were triggered, presumably because an exposure trigger was sufficient to provide all of the coverage it needed to respond to the underlying claims.  In support of that argument, the policyholder submitted the affidavit of a medical expert who opined that asbestos injury commenced immediately, or nearly immediately upon inhalation of asbestos fibers.  The expert also opined, however, that injury would not continue after exposure ceased.[9]  Thus, when the policyholder decided to argue for a broader trigger of coverage, invoking every policy on the risk from first exposure to manifestation, it was forced to concede that, "[w]ith respect to the third possible trigger, the progression of the asbestos-related disease during the latency period between exposure and manifestation, the

---

[9]     That opinion is contrary to the near-universal recognition in the literature and in the case law that "asbestos-in-residence," that is, previously inhaled asbestos, continues to cause new injuries as long as it remains in the body.  *See generally* App., Tab C (Gabrielson Aff.).  *See also AC and S, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968, 972-73 (3d Cir.1985); *Keene*, 667 F.2d 1034; *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974); *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515, 1520-21 (D.D.C. 1984); *Owens-Illinois v. United Ins. Co.*, 650 A.2d 974, 983-84 (N.J. 1994); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 506-507 (Pa. 1993).

record in his case does not dictate adopting such a third trigger." N.U. App., Tab 12 at 29-30. Nonetheless, the policyholder asked the court to consider adopting such a trigger despite the lack of a medical record for doing so "as a matter of public policy." *Id.*

Contrary to the Insurers' strained construction, the *Mitchell* Court did not "reject" an injury-in-fact or continuous trigger of coverage. Rather, the decision clearly reflects the Court's determination to limit its decision to the trigger that could be supported by the medical affidavits before it, and for which the policyholder had originally argued. Indeed, when setting forth the "clear weight of authority" rejecting the manifestation trigger for which the insurers argued, the Court emphasized that that authority holds that, "*at a minimum,* coverage . . . is triggered by exposure" (emphasis in original), and cited with approval all of the seminal cases adopting an injury-in-fact or continuous trigger, including *Keene, Lac D'iamante* and *Owens-Illinois*:

> The trial court's determination that the policy now before us provides coverage *only* after an asbestos-related disease becomes manifest during the policy period is an interpretation at odds with the policy language and the clear weight of authority in the country. In considering the meaning of "bodily injury" alleged to have resulted from exposure to asbestos, a number of courts, after considering evidence with respect to the development of asbestos-related diseases, have concluded that "bodily injury" occurs when asbestos is inhaled into the lung, and that, *at a minimum,* coverage under the policy is triggered by exposure to the insured's asbestos products during the policy period. *See e.g., Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 126 (D.C.Cir.1986); *Commercial Union Ins. Co. v. Sepco Corp.,* 765 F.2d 1543 (11th Cir. 1985); *AC and S, Inc. v. Aetna Cas. and Sur. Co.,* 764 F.2d 968 (3d Cir.1985); *American Home Products Corp. v. Liberty Mut. Ins.,* 748 F.2d 760, 764 (2d Cir.1984); *Keene Corp. v. Ins. Co. of North America,* 667 F.2d 1034 (D.C. Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S. Ct. 1644, 71 L.Ed.2d 875 (1982); *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S. Ct. 686, 70 L .Ed. 2d 650 (1981); *Ins. Co. of North America v. Forty-Eight Insulations,* 633 F.2d 1212 (6th Cir.1980), *clarified,* 657 F.2d 814, *cert. denied,* 454 U.S. 1109, 102 S. Ct. 686, 70 L.Ed.2d 650 (1981); *Lac D'Amiante Du Quebec v. Am. Home Assur.,* 613 F. Supp. 1549 (D.N.J.1985); *Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co.,* 597 F. Supp. 1515 (D.D.C.1984); *Zurich Ins. Co. v. Raymark Industries,* 118 Ill.2d 23, 112 Ill. Dec. 684, 514 N.E.2d 150 (1987). These cases have based their determination on scientific or medical evidence that exposure to, and inhalation of asbestos fibers results in "bodily injury"

within the contemplation of the policy, even though the injury may not
manifest itself until many years later.

324 Md. at 58-59, 595 A.2d at 476 (all emphasis in original).

Again and again, the *Mitchell* Court made it clear  that exposure *is one possible point*
at which coverage is triggered, and that its decision not to address what other trigger points
might exist resulted from the policyholder's originally limited request, and the limited medical
evidence before the Court.[10]  Thus, after discussing the relevant authorities and the statements
contained in the medical affidavits, the Court held:

> Considering the plain meaning of the term "bodily injury," as used in
> the policy, and in light of the medical evidence concerning the
> development of asbestos-related diseases, we align ourselves with the
> overwhelming weight of authority in the country and conclude that
> "bodily injury" occurs when asbestos is inhaled and retained in the
> lungs. . . .  *On the record developed in this case we conclude that, at a*
> *minimum,* coverage under the policy to provide a defense and
> indemnification of the insured is triggered upon exposure to the insured's
> asbestos products during the policy period by a person who suffers bodily
> injury as a result of that exposure.

324 Md. at 62, 595 A.2d at 478 (emphasis added).

Similarly, in its direction to the lower court on remand, the Court again emphasized
both that exposure was just one possible triggering event, and that its holding was limited only
because the policyholder had not sought or supported – and apparently did not require – a ruling
that additional events might also trigger the policy:

> We shall, therefore, vacate the declaratory summary judgment entered
> by the trial court in the insurer's favor and remand the case with directions
> that the court enter a declaratory judgment *as sought by the insured, that*
> *at a minimum* coverage under the policy is triggered upon exposure to and
> inhalation of asbestos fibers during the policy period by a person who
> suffers bodily injury as a result of that exposure.  The judgment shall
> contain a declaration that the insurer is required to provide a defense for
> Mitchell against all personal injury asbestos-related suits brought by
> plaintiffs allegedly exposed to Mitchell's asbestos products during the

---

[10]     Indeed, to highlight that limited evidence, the Court took the fairly unusual step of
publishing the substantive portions of the expert affidavits as an Appendix to its decision.

> policy period, regardless of when the alleged asbestos-related injuries became manifest.  In this regard, Mitchell is entitled to a declaration that the insurer pay its attorney fees, costs, and expenses incurred in litigating the coverage issue and in defending against the asbestos-related personal injury claims.  The judgment must also contain a declaration that the insurer shall indemnify Mitchell, within policy limits, for the amount of any judgments rendered against it, or which it may become legally obligated to pay in connection with the asbestos-related claims.

324 Md. at 63, 595 A.2d at 478 (emphasis added).

There simply is no way to construe *Mitchell* as holding that exposure is the only event that will trigger coverage for asbestos bodily injury claims.[11]  Had the Maryland Court of Appeals intended to adopt an exposure-only trigger, it had the repeated opportunity to say so. Instead, at every one of those opportunities, it coupled its reference to the exposure trigger with the clear indication that exposure is merely one event that can trigger coverage for asbestos bodily injury claims.  Indeed, the Court emphasized that the court below had erred *not* in holding that coverage was triggered by manifestation, but in holding that coverage could *only* be triggered by manifestation: "we hold that the trial judge erred in adopting, as the *sole* trigger of coverage, the 'manifestation' trigger of coverage."  324 Md. at 62, 595 A.2d at 478.

If the Insurers' interpretation of *Mitchell* is strained, their depiction of the "next chapters" in the trigger "story" borders on the disingenuous.  The Insurers suggest that *Owens-Illinois, Inc. v. Armstrong,* 326 Md. 107, 604 A.2d 47 (1992) ("*Armstrong*") and *John Crane, Inc. v. Scribner,* 369 Md. 369, 800 A.2d 727 (2002) ("*Crane*") "confirm" that *Mitchell* adopted an exposure-only trigger of insurance coverage.  The biggest problem with that analysis is that neither *Armstrong* nor *Crane* has anything to do with the trigger of coverage under an insurance policy.  Instead, both of those cases addressed the question of when a cause of action for asbestos

---

[11]    Indeed, at least one commentator has stated that, in *Mitchell*, the Court of Appeals "abandoned the 'manifestation' theory for determining when a policy is triggered *and replaced it with the 'injury-in-fact' theory*."  Lee H. Ogburn, "*The Progression Of Trigger Litigation in Maryland -- Determining The Appropriate Trigger Of Coverage, Its Limitations, and Ramifications*," 53 Md. L. Rev. 220, 220 (1994) (emphasis added).

injury *first* arises, in order to determine whether the causes of action in question had arisen before the effective date of a Maryland statute limiting recovery of non-economic damages. *See* Md. Code Ann. § 11-108 (2005) (limiting recovery of damages other than economic damages in actions for bodily injuries where the cause of action arose on or after July 1, 1986). Thus, the only issue in those cases was the date of first injury; not the second, third or one hundredth.[12] The opinions' citation to *Mitchell* for the proposition that a claimant's first asbestos bodily injury coincides with his or her first exposure neither negates nor even addresses whether additional bodily injuries occur after that first injury, and whether those additional injuries entitle the policyholder to coverage from the insurance companies on the risk when those additional injuries are suffered.

Thus, contrary to the Insurers tortured attempts to show otherwise, the Maryland Court of Appeals has not adopted an exposure-only trigger with respect to asbestos bodily injury claims. Indeed, as set forth below, there are, at the very least, significant questions of fact regarding whether such a trigger is supportable given the basic rules of Maryland insurance law and the nature of asbestos injury.

**B.     As Courts Throughout The Country, Including  The Maryland Intermediate Appellate Court, Have Held, The Policies Are Triggered By Injury During The Policy Period**

Strangely – or perhaps not so strangely – while the Insurers spend pages discussing cases which do not address the proper trigger of coverage under a comprehensive general liability policy, they simply choose to ignore the fact that the Maryland intermediate appellate

---

[12]     For that reason, the Insurers' statement that, "by the time the Court of Appeals addressed *Crane,* the continuous injury trigger was not even under consideration," misses the point entirely. The *Crane* court was involved in a search for the *first* injury, and thus considered only whether that first injury should be identified with exposure, manifestation or injury-in-fact.

court has, in fact, applied an injury-in-fact or continuous[13] trigger to long-tail, asbestos-related

damage claims.  In *Mayor & City Council of Baltimore v. Utica Mutual Insurance Co.*, 145 Md.

App. 256, 301-307, 802 A.2d 1070, 1097-1100 (2002) ("*Utica Mutual*"), a case decided eleven

years after *Mitchell,* the Maryland intermediate appellate court addressed the proper trigger of

coverage for asbestos property damage claims.  The *Utica Mutual* court considered each

potential trigger method, and was quite specific in its holding:  "[w]e reject trigger theories that

are based exclusively on exposure to harm or manifestation of injury."  145 Md. App. at 302,

802 A.2d at 1098.  The Court went on to note that:

> *Neither the initial exposure* (in this case the installation of asbestos in the
> City's [buildings]), nor the discovery (manifestation) of the injurious
> effects of [asbestos containing building materials], comports with the
> "occurrence" language of the CGL policies which is predicated in part on
> "the continuous or repeated exposure to conditions" that is implicated by
> the continuing presence of asbestos in the City's buildings.

145 Md. App. at 303, 802 A.2d at 1098 (emphasis added).

Similarly, in *Harford County v. Hartford Mutual Insurance Co.¸* 327 Md. 418, 435-

36, 610 A.2d 286, 294 (1992) ("*Harford*"), the Court rejected insurer assertions that

environmental property damage claims triggered only those policies in effect at the time the

property damage became known to the policyholder.  In so doing, it specifically noted that

coverage would be triggered under any policy in place during a period when property damage

took place:

---

[13]     Any theoretical difference between an injury-in-fact trigger and a continuous trigger has
no practical meaning in the context of asbestos bodily injury claims.  "In the context of
continuous or progressively deteriorating injuries, the injury-in-fact trigger, like the continuous
injury trigger, affords coverage for continuing or progressive injuries occurring during
successive policy periods subsequent to the established date of the initial injury-in-fact."
*Montrose Chem. Corp. v. Admiral Ins. Co.,* 913 P.2d 878, 894 (Cal. 1995) ("*Montrose*").  Given
the continuous, indivisible nature of asbestos bodily injuries, the injury-in-fact and continuous
triggers are effectively the same with respect to claims arising from such injuries.

> Nothing in the language of the policies, affording words their ordinary and accepted meanings, requires that the claimed property damage actually be discovered or manifested during the policy period; rather, it is whether property damage, as defined in the policies, "occurred" within the policy period and within the meaning of the word "occurrence" in the policies.

327 Md. at 435, 610 A.2d at 294.

The *Utica Mutual* and *Harford* rejection of an exposure-only trigger comports with the policy language.  As set forth above, the plain policy language specifically contemplates that an "occurrence" may be a continuous or repeated event.  It therefore explicitly ties the trigger of coverage not to the event which *caused* the bodily injury at issue, but to the bodily injury itself.  By their very terms, the Insurers' policies promised to respond to claims arising out of bodily injury during the policy period, regardless of when the causative event leading to that injury takes place.  Given the nature of asbestos bodily injuries, which do not cease when external exposure ends, the plain policy language thus precludes adoption of an exposure-only trigger.

That conclusion is supported by the drafting history which, under the *Sullins* standards, should be considered in determining whether the policyholder's understanding of the policy language is reasonable.  In this case, the policyholder's understanding that coverage does not end when exposure ends is not only reasonable, but is in perfect accord with what the policy drafters understood the language to mean.  As already discussed, the drafters not only understood that continuous injuries over one or more policy periods would trigger coverage in each of those policy periods, but spent years searching unsuccessfully for some way to limit coverage, or at least to divide it among triggered policy years.  In the end, they chose the financial benefits of the marketplace, and sold policies containing language they knew and understood to be triggered by any injury during the policy period, with no provision for limiting or allocating coverage among triggered carriers.  They cannot now be heard to argue that there is no question of law or fact regarding whether the policies should be read to include a limitation they consciously chose *not* to include in the policies they sold.

The overwhelming majority of recent authority supports that view, and recognizes that standard form comprehensive general liability insurance policies are triggered by injury during the policy period, regardless of when the causative event which led to that injury took place.  In particular, for injuries that develop over time as a result of exposure to asbestos or other harmful substances, courts have rejected insurer arguments that coverage ceases when exposure ceases.  *See, e.g.  Associated Aviation Underwriters v. Wood*¸ 98 P.3d 572, 602 (Ariz. App. 2004) ("We interpret 'bodily injury' to include the cellular damage caused by TCE exposure *and,* even after exposure has ceased, the continuing injurious process initiated thereby. In other words, both exposure and exposure-in-residence occurring during the policy period will trigger insurance coverage.") (emphasis in original); *Young Women's Christian Ass'n v. Allstate Ins. Co.*, 275 F.3d 1145, 1151-52 (D.C. Cir. 2002) ("[T]he policy language provides that it is the property damage and not the exposure to it that must occur during the policy period.  The language is thus consistent with the continuous trigger theory, which defines damage broadly to include the entire process of damage from exposure to manifestation when the damage is of a continuous and progressive nature."); *Montrose,* 913 P.2d at 890 ("This policy language unambiguously distinguishes between the causative event – an accident or 'continuous and repeated exposure to conditions' – and the resulting 'bodily injury or property damage.'  It is the latter injury or damage that must 'occur' during the policy period"); *Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 127 (D.C. Cir. 1986) ("The CGL policies expressly distinguish exposure from injury; to equate the two . . . is to ignore this distinction.").

As these courts have recognized, the plain policy language, when applied to continuous, progressive injuries that continue to spread even after exposure to the cause of those injuries has ceased, is wholly inconsistent with an exposure-only trigger.  The policies tie coverage to bodily injury during the policy period, not exposure.  In this case, unlike in *Mitchell*¸

the medical evidence raises significant, material questions of fact regarding whether the underlying claimants suffered bodily injury during the policy period even after exposure had ceased. Those questions preclude summary judgment holding that the policies are triggered only with respect to those claims involving exposure during the policy period.

### III.     QUESTIONS OF FACT INHERENT IN THE DRAFTING HISTORY OF THE OCCURRENCE FORM PRECLUDE SUMMARY JUDGMENT ON THE ALLOCATION ISSUE

The Insurers' policies state that they are responsible for and will pay "all sums" which Porter-Hayden "shall become legally obligated to pay as damages because of bodily injury . . . to which the insurance applies, caused by an occurrence." The policies do not contain a pro rata allocation formula, or any other language suggesting that a pro rata allocation is proper. Moreover, the drafting history set forth above shows that the lack of an allocation formula in the policies was no accident – for years before beginning to sell the occurrence-form policy, the insurance industry recognized both that the policies contained no proration formula, and that in the absence of such a formula, they would not be allowed to impose an allocation on the policyholder. At the very least, that drafting history raises material question of fact regarding the reasonableness *both* of insurance company claims that the polices require proration, and policyholder claims that they do not.

Nonetheless, citing *Wallace & Gale,* the Insurers argue that even if any of the underlying asbestos bodily injury claims triggered their policies, they would be liable only for a pro-rata share of the liabilities associated with those claims. In *Wallace & Gale*, the Fourth Circuit noted that the Maryland Court of Special Appeals had applied a pro-rata allocation in *Utica Mutual*. It refused to certify the allocation question, and adhered to *Utica Mutual's* prorata allocation, because it found no "persuasive data" that the Maryland Court of Appeals would rule otherwise. 385 F. 3d at 830-31.

This record, however, provides the persuasive data that was not presented to the courts in *Wallace & Gale* or *Utica Mutual*: the drafting history of the policy language. That drafting history is particularly significant on this issue, because the *Utica Mutual* court based its decision in part on its conclusion that it was not "reasonable" to believe that the policies allowed the stacking of limits: "At the time [the insured] purchased each individual insurance policy, we doubt that [it] could have had a reasonable expectation that each single policy would indemnify [it] for liability related to property damage occurring due to events taking place years before and years after the term of each policy." 802 A.2d. at 1103, *quoting Pub. Serv. Co. of Colo. v. Wallis & Cos.,* 986 P.2d 924, 940 (Colo. 1999) (brackets in original). What neither the *Utica Mutual* nor the *Wallace & Gale* courts knew, however, was that *the insurance industry had understood for years before putting the occurrence policy on the market that that is precisely how the language would work.* As set forth in the accompanying Stewart Affidavit and the exhibits annexed thereto, the insurance industry drafters tried for years to find a solution to what they called the "stacking of limits" that would be the necessary result of the occurrence language they drafted. Finally, they gave up, and chose to reap the competitive benefits of selling occurrence-based coverage instead of the fiscal safety of a policy form that would not permit such stacking. That deliberate choice is a factor which, under *Sullins*, must be taken into account in interpreting and applying the policy language.

The drafting history also raises substantial questions of fact as to the reasonableness of the *Insurers'* interpretation of the policies. At the very least, Porter-Hayden should be allowed to argue as a matter of fact that it is *not* reasonable for the insurance industry to argue for an interpretation diametrically opposed to the drafters' express understanding of how the policies would work. It also should be allowed to argue that the drafting history showed that those who wrote the occurrence language understood that it was, at the very least, ambiguous

with respect to the allocation issue.  *See Pan Am World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098, 1118 (S.D.N.Y. 1973) (interpreting ambiguous policy language in favor of the insured where "these insurers themselves recognized the ambiguities in their ancient, boiler-plate clauses and themselves exhibited the consequent uncertainties.")

In *Sullins*, the Maryland Court of Appeals held that policy drafting history may be a crucial factor in determining whether a policyholder's interpretation of disputed policy language is reasonable.  Despite that, the intermediate appellate court in *Utica Mutual* evaluated the reasonableness of the parties' respective allocation positions without having access to drafting history showing that the insurance industry drafters *agreed* with the policyholders' interpretation and *disagreed* with that of the Insurers.  At the very least, the inability of the courts in *Utica Mutual* and *Wallace & Gale* to consider and address that drafting history raises a substantial issue of fact as to whether the Maryland Court of Appeals would adhere to *Utica Mutual*, or would, instead, apply an allocation method consistent with both the "all sums" policy language and the drafters' understanding and intent, as have the highest courts of states across the country.[14]  Those issue of fact preclude summary judgment on the allocation issue.[15]

---

[14]     *See, e.g. Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 769 N.E.2d 835, 840-42 (Ohio 2002); *Hercules Inc. v. AIU Ins. Co.*, 784 A.2d 481, 489-91 (Del. 2001); *Monsanto Co. v. C.E. Heath Compensation and Liability Ins. Co.*, 652 A.2d. 30 (Del. 1994) (applying Missouri law); *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1058-59 (Ind. 2001); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507-9 (Pa. 1993); *see also Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co. Inc.*, 951 P.2d 250, 256-57 (Wash. 1998); *Aerojet-General Corp. v. Transport Indem. Co.*, 948 P.2d 909, 919-20 (Cal. 1997); *Zurich Ins. Co. v. Raymark Indus., Inc.*, 514 N.E.2d 150, 165 (Ill. 1987).

[15]     Moreover, both the trigger and allocation questions involve, at their heart, analysis and predictions about what the Maryland Court of Appeals has ruled or would rule.  Thus the Insurers would not be entitled to summary judgment even absent the myriad material disputes of fact which, as shown, are implicated by their motion, because the Insurers cannot show that they are entitled to judgment as a matter of law on either issue.  Thus, even were summary judgment not barred here by disputed issues of material fact, rather than guess how the Maryland Court of Appeals would interpret the policy provisions at issue, this Court should certify those inherently state-law questions to the Court of Appeals for resolution pursuant to Md. Code Ann, Cts. & Jud. Proc. § 12-603 (2005.

**IV.      THE INSURERS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE APPLICATION OF THE COMPLETED OPERATIONS AGGREGATE**

The Insurers' arguments with respect to trigger and allocation are the set up for their real goal on this motion – obtaining a ruling that, under the interpretation of the completed operations hazard set forth in *Wallace & Gale,* the only claims that could possibly trigger their policies arise under the completed operations hazard, and are, therefore, subject to an aggregate limit of liability.  In *Wallace & Gale,* the Fourth Circuit affirmed the district court determination that the completed hazard definition in the policy applies to asbestos bodily injury claims as follows:

> If a claimant's initial exposure occurred while Wallace & Gale was still conducting operations, policies in effect at that time will not be subject to any aggregate limit.  If, however, initial exposure is shown to have occurred after operations were concluded or if exposure that began during operations continued after operations were complete, then the aggregate limits of any policy that came into effect after operations were complete will apply.

385 F.3d at 833 (quoting the district court opinion).  Under this analysis, when any of the exposure to asbestos, whether first exposure or subsequent exposure, takes place after the policyholder's operations were completed, the resulting liability is subject to the aggregate limits imposed on the completed operations hazard coverage.  However, when the injuries result from exposure only prior to the time the operations were completed, the aggregate limits are inapplicable, because the claim does not fall within the completed operations hazard.[16]

---

[16]      The lower court in *Wallace & Gale* had stated that, even if an underlying claimant had been exposed only during a period when operations were ongoing, progressive injuries suffered in later policy periods when the operations were complete would be subject to the completed operations limits.  *In re Wallace & Gale Co.,* 275 B.R. 223, 239-40 (D. Md.), *vacated in part on other grounds*, 284 B.R. 557 (D. Md. 2002), *affirmed in part*, 385 F.3d 820 (4th Cir. 2004).  Significantly, however, the Fourth Circuit expressly (and repeatedly) stated that it was adopting the passage of the lower court opinion quoted in the text above, which does not address how later injuries arising from claims relating only to "ongoing operations" exposures should be treated under policies in place after the operations were completed.  In fact, in response to the appellant's assertion that the lower court had erred in applying the completed operations hazard to such

*(Footnote continued)*

Significantly, the court recognized that this analysis would be highly fact-intensive: "Where a given claimant falls within this framework will have to be considered on a case-by-case basis." *Id.*

Despite the Fourth Circuit's express recognition that this determination is intensely fact-based, the Insurers argue that this Court can determine as a matter of law that all of the claims against Porter-Hayden which might trigger the Insurers' policies are subject to the completed operations hazard. They attempt to eliminate the inherent questions of fact in the application of *Wallace & Gale* by positing the following syllogism: 1) under the exposure trigger, only those claims that involve exposure during the Insurer's policy periods trigger the Insurers' policies; 2) during those policy periods, all of Porter-Hayden's asbestos-related operations were completed; and therefore 3) under *Wallace & Gale*, asbestos liabilities arising out of those operations necessarily fall within completed operations hazard aggregate limits.

---

*(Footnote continued from previous page)*
claims, the Fourth Circuit stated that "the argument, however, is far broader on its face than the district court's decision we have just quoted above from 275 B.R. at 241." *Id.* at 833.

To the extent that the Insurers argue that the broader analysis of the lower court, rather than its more narrow construction by the Fourth Circuit, applies here, that analysis is wholly at odds with the policy language. Whether an injury falls within the "completed operations hazard" turns strictly on the cause of the injury. This focus on the cause giving rise to a long-term, continuing injury in classifying claims to fall within the various defined hazards is inherent in the Insurers' use of the term "hazard." A hazard in an insurance policy "is the source from which an accident may arise, or 'a danger or risk lurking in a situation which by chance or fortuity develops into an active agency of harm.'" *Ketona Chem. Corp. v. Globe Indem. Co.*, 404 F.2d 181, 185 (5th Cir. 1968) ("*Ketona*") (*quoting Hough v. Contributory Ret. Appeal Bd.*, 36 N.E.2d 415, 418 (Mass. 1941)). The hazard definitions focus on the cause giving rise to the policyholder's liability. *Ketona*, 404 F.2d at 185 (citation omitted).

Simply put, the completed operations hazard addresses injuries caused by Porter Hayden's completed operations, not injuries from its ongoing operations. To the extent a claimant was only exposed to Porter Hayden's ongoing operations, he or she was never "in hazard" from Porter Hayden's completed operations, and his or her claim thus does not fall within the completed operations hazard.

Unfortunately for the Insurers, each of the those three propositions is fundamentally flawed.  First, as set forth above, the Insurers' policies are triggered not by exposure alone, but by bodily injury during the policy.  Accordingly, the Insurers' policies can be triggered by the continuing injuries suffered by individuals whose only exposure took place when even the Insurers concede Porter-Hayden's operations were ongoing.  Even were there no dispute regarding whether Porter-Hayden's operations were complete during the Insurers' policy periods, therefore, that would not end the matter.  The Insurers still would bear the burden of showing whether and to what extent claims alleging bodily injury during their policy period also involve actual exposure during that period.  If they fail to make that showing with any given claim that otherwise triggers their policy – and on this motion for summary judgment they have not even attempted to make such a showing – the claim will not be subject to the completed operations hazard's aggregate limits.

Second, there are, in fact, disputed issues of material fact with respect to whether Porter-Hayden's operations were "completed" even during the Insurers' policy periods.  Again, the Insurers seek to avoid these factual questions, in this case by implying that Porter-Hayden's asbestos liabilities relate solely to the period during which it was an asbestos supplier and installer.  Because Porter-Hayden had "completed" all of its asbestos sales or installations prior to the Insurers' policy periods, the Insurers claim that all exposures during their policy periods must have resulted from Porter-Hayden's completed operations.

The record in this case will not support that conclusory assumption.  Even after it ceased installing asbestos-containing insulation, Porter-Hayden continued to conduct "tie-ins" and asbestos removals until it ceased operations altogether in 1989.  The Duvall testimony, and the Allowat and Francese affidavits, make clear not only that Porter-Hayden's operations were ongoing over long periods at various facilities, but that all of those operations – not merely the

installation of asbestos insulation – resulted in the release of asbestos fibers inhaled by those present.  At the very least, on this record there are material disputes of fact as to whether and to what extent the underlying claims arise out of operations that were not "completed" during the policy period.

Third, questions of fact remain as to whether an exception to the definition of "completed operations" applies here.  As noted above, excluded from that definition are bodily injuries or property damage arising out of  "the existence of tools, uninstalled equipment, or abandoned or unused materials."  The policyholder in *Wallace & Gale* argued on appeal that the asbestos fibers released during their operations constituted "abandoned or unused materials" and were thus excluded from the definition of a completed operations hazard.  The Court refused to address that contention only because it had not been raised during any of the proceedings below. 385 F.3d at 835.

The asbestos liabilities Porter-Hayden faces now fall squarely within the exception to the completed hazards definition.  Had a Porter-Hayden installer left a chunk of asbestos-containing insulation behind at a plant, injuring a customer who tripped over it, there would be no dispute that the resulting liability would fall under the "abandoned or unused" materials exception to the completed operations definition.  It is no less true that the asbestos fibers and dust released during and left behind after installations, tie-ins or tear-outs were "abandoned," and "unused."  The mere fact that they were microscopically small, or that their physical impact took place through inhalation does not alter that fact, and does not serve to bring them within the completed operations definition.

In short, try as they might, the Insurers cannot avoid *Wallace & Gale's* clear admonition that the application of the completed operations definition is an inherently factual issue.  They have failed to meet their burden of establishing as a matter of law and undisputed

fact that all of the claims which trigger their policies necessarily fall within the completed operations hazard, and their motion in that regard should be denied in all respects.

## **CONCLUSION**

For the foregoing reasons, Porter-Hayden respectfully requests that this Court deny the Insurers' motion for partial summary judgment in all respects.


Dated:  June 24, 2005                                    Respectfully submitted,


                                        By:    /s/Leslie R. Cohen_____
                                               Mark Kolman (Federal Bar # 00424)
                                               Leslie R. Cohen
                                               Michael R. Engleman
                                               DICKSTEIN SHAPIRO MORIN
                                                 & OSHINSKY LLP
                                               2101 L Street, NW
                                               Washington, DC  20037-1526
                                               (202) 785-9700

                                               Insurance Coverage Counsel for Official
                                               Committee of Unsecured Creditors of
                                               Porter-Hayden Company, on behalf of
                                               Porter-Hayden Company

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)


| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:03-CV-03408-AMD |
| | ) | (Consolidated with: 1:03-cv-03414-AMD) |
| PORTER-HAYDEN COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER**

Upon consideration of National Union's and American Home's Joint Motion for

Summary Judgment and Porter-Hayden Company's Opposition thereto, it is hereby Ordered, this

___ day of _____, 2005, that said motion is hereby DENIED.


_____
The Honorable Andre M. Davis