IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL UNION FIRE            :
INSURANCE COMPANY OF           :
PITTSBURGH, PA, et al.,        :
    Plaintiffs             :
                           :
v.                             :    Civil No. AMD 03-3408
                           :    (Consolidated with AMD 03-3414)
PORTER HAYDEN COMPANY, et al., :
    Defendants             :
                           :
               ...o0o...

MEMORANDUM OPINION

This is an insurance coverage action involving the applicability of two insurance companies' policies to the third-party, asbestos-related, bodily injury liability claims pending and likely to be brought against Porter Hayden Company ("Porter Hayden"), the insured. National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") and American Home Assurance Company ("American Home") (together, "the insurers") have filed a joint motion for partial summary judgment regarding three key issues as to the scope of coverage: (1) the trigger of coverage; (2) the method by which any coverage is to be allocated among any triggered policies; and (3) the application of "completed operations" aggregate limits. I have carefully reviewed the parties' submissions and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, I shall deny the insurers' motion as to trigger of coverage, grant the insurers' motion as to allocation, and grant in part the insurers' motion as to completed operations.

I. Facts and Procedural History

Porter Hayden's predecessors (H.W. Porter Company, a New Jersey corporation, and Reid-Hayden, Inc., a Maryland corporation) commenced operations in the mid-1920s. Shortly thereafter, H.W. Porter acquired Reid-Hayden and operated it as a subsidiary. The two corporations merged in 1966 and became Porter Hayden Company, a Maryland corporation, which has maintained its headquarters continuously in Baltimore.

From inception, Porter Hayden and its predecessors conducted operations intimately connected with asbestos. Porter Hayden and its predecessors installed insulation containing asbestos from the 1920s until approximately 1973. In or about 1973, Porter Hayden ceased using insulation materials that, to its knowledge, contained asbestos. After it ceased installing new insulation containing asbestos, Porter Hayden may have continued to remove or work with pre-existing insulation containing asbestos in connection with the installation of replacement non-asbestos insulation, through the 1980s.

By the mid-1950s, Porter Hayden had developed a separate line of business in which it "sold, handled, or distributed" (as that phrase is used in the insurance policies) asbestos-containing insulation materials manufactured by third parties, and other products, without associated installation operations. As with its installation operations, Porter Hayden ceased selling, handling, and distributing asbestos-containing insulation in or about 1973.[1]

Porter Hayden stopped accepting new insulation installation contracts in about 1989

---

[1]Porter Hayden sold, handled, and distributed a few non-insulation products containing asbestos until about 1982. As of the filing of its amended complaint for declaratory relief in the Circuit Court for Baltimore City in 2002, Porter Hayden alleged it was not aware of any claims against it arising out of its sale, handling, or distribution of these products.

and, since about 1992, has had no ongoing operations as an installer of insulation.

Since 1976, Porter Hayden has been sued by thousands of persons alleging bodily injury caused by exposure to asbestos. In December 2000, Porter Hayden brought a declaratory judgment action in the Circuit Court for Baltimore City seeking a declaration as to the meaning of certain provisions in two insurance policies issued by National Union to Porter Hayden in the mid-1980s (in effect from April 1, 1984 to April 1, 1986) with regard to the third-party, asbestos-related, bodily injury liability claims pending and expected to be brought against it.[2] That state court declaratory judgment action proceeded toward resolution in state court.

In March 2002 Porter Hayden filed for Chapter 11 bankruptcy in the bankruptcy court of this district. National Union then removed the declaratory judgment action to this court as an adversary proceeding related to the Porter Hayden bankruptcy. National Union and American Home then brought a second declaratory judgment action as an adversary proceeding within the Porter Hayden bankruptcy case. The second declaratory judgment action concerned five additional policies issued by the insurers to Porter Hayden. The bankruptcy court granted leave to the Official Committee of Unsecured Creditors of Porter Hayden ("the Committee") to intervene in both adversary proceedings, and the Committee

---

[2] By January 2002, when Porter Hayden filed its amended complaint, the number of pending claims brought by persons expressly or implicitly alleging bodily injury in the period April 1, 1984 to April 1, 1986 exceeded 70,000.

is now litigating these cases on behalf on Porter Hayden.[3] At the parties' request, and after conferring with the bankruptcy court, I withdrew the reference of these matters to the bankruptcy court and consolidated the two adversary proceedings in the present action.

The seven insurance policies at issue include four primary comprehensive general liability ("CGL") policies issued by National Union to Porter Hayden from April 1, 1984 to April 1, 1988.[4] Each of these policies contains standard form CGL policy language concerning the insuring agreement. Specifically, the policies provide that:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
> A. bodily injury . . .
> to which this insurance applies, caused by an occurrence[.]

"Bodily injury" and "occurrence" are defined in the policies as follows:

> Bodily Injury means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.
>
> ***
>
> Occurrence means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The primary policies provide $1,000,000 per occurrence. Claims falling under the

---

[3]For ease of reference, I will refer to the Committee and Porter Hayden together, in their role as litigants in this action, as simply "Porter Hayden."

[4]Policy No. GLA 152 41 65 RA covers the period from April 1, 1984 to April 1, 1985; Policy No. GLA 194 03 85 RA covers the period from April 1, 1985 to April 1, 1986; Policy No. GLA 180 33 46 RA covers the period from April 1, 1986 to April 1, 1987; Policy No. GLA 501 05 70 RA covers the period from April 1, 1987 to April 1, 1988.

"completed operations hazard" are subject to an aggregate limit of $1,000,000. The completed operations hazard is defined in the policies as follows:

> "Completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith.

The policies provide that operations shall be deemed complete at the earliest of three points:

> (1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,
> (2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
> (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

In addition, "[o]perations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed." Among other exceptions to the completed operations hazard, such hazard does not include bodily injury arising out of "the existence of tools, uninstalled equipment, or abandoned or unused materials."

National Union and American Home also issued to Porter Hayden three excess

policies covering the policy periods from July 11, 1975 to January 1, 1978.[5] Each of these policies "follows form"[6] to an underlying umbrella excess policy sold to Porter Hayden.[7] Thus, each of these policies provides a second layer of excess umbrella coverage, supplying coverage after exhaustion of Porter Hayden's primary CGL policies and exhaustion of a first layer of excess policies issued by other companies. The three excess policies at issue contain the same definitions of "bodily injury" and "occurrence" as the primary policies.

## II. Summary Judgment Standard

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matshushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). A party moving for summary judgment is entitled to a grant of summary judgment

---

[5]American Home Policy No. CE2751098 covers the period from July 11, 1975 to July 11, 1976; National Union Policy No. 1186636 covers the period from July 11, 1976 to May 26, 1977; and National Union Policy No. 1186790 covers the period from May 26, 1977 to January 1, 1978.

[6]A policy that "follows form" has the same terms and conditions as another policy, typically the policy insuring the insured in the level of coverage directly below that of the insurer following form. *See, e.g., Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F. Supp. 2d 370, 374 n.7 (D. Md. 2002).

[7]The first two of these policies follow form to an umbrella excess policy issued by St. Paul Fire & Marine Insurance Company and the third policy follows form to an umbrella excess policy issued by First State Insurance Company.

only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir. 1995), *rev'd on other grounds*, 517 U.S. 308 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy*, 929 F.2d at 1012.

## III. Applicable Law

The parties agree that Maryland law governs the construction of the insurance policies

at issue.[8] Maryland treats an insurance policy as any other contract. The construction of a policy begins with the application of the terms of the policy. *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44, 56 (1991). Unless there is an indication that the parties intended to use words in a technical sense, the terms of a policy are afforded their customary, ordinary, and accepted meaning. *Id*. Where a policy defines a particular term, that definition will control any construction of the policy. *Valliere v. Allstate Ins. Co.*, 324 Md. 139, 142 (1991). Unlike many other jurisdictions, Maryland does not follow the rule that an insurance policy is to be construed against the insurer. *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 779 (1993). In the event of an ambiguity in the policy, courts may consider extrinsic or parol evidence as to the meaning of policy language. *Id*.

IV. Analysis

A. Trigger of Coverage

The first area of dispute between the parties is the so-called "trigger of coverage," *i.e.*, what it is that must happen during the policy period in order to trigger the insurance company's duty to defend and indemnify the insured. Courts faced with insurance coverage disputes in asbestos-related bodily injury cases have identified at least four theories for

---

[8]Indeed, Porter Hayden has been unrelenting in its efforts to persuade both the bankruptcy court and this court to remand the removed declaratory judgment action to state court or, alternatively, to certify the policy coverage issues arising in this case to the Maryland Court of Appeals. While I strongly agree that state law issues are best determined by state courts, in the context of our federal system and the large role that removal jurisdiction plays in federal caseloads, it unavoidably and with great frequency falls to federal courts to resolve issues of state insurance law. In the case at bar, remand is not warranted, and as the discussion of *In re The Wallace & Gale Company*, 385 F.3d 820 (4th Cir. 2004), *infra*, shows, it would constitute an abuse of discretion for this court to certify issues of state law to the Maryland Court of Appeals that the Fourth Circuit specifically declined to certify in that case.

determining when coverage is triggered under standard form policies: (1) the exposure theory;[9] (2) the injury-in-fact theory;[10] (3) the manifestation theory;[11] and (4) the continuous trigger theory.[12] Some explication of these competing theories is useful in the context of the instant case.

Under the exposure theory, a policy is triggered if it is in effect during a claimant's exposure to asbestos fibers. Under the manifestation theory, a policy is triggered if it is on the risk when the asbestos-related disease first manifests, which is considered to be the earlier of when the claimant has actual or constructive knowledge of the disease or when the disease is diagnosed. Under the injury-in-fact theory, a policy is triggered when an injury exists, regardless of the time of exposure or discovery.[13] Finally, the continuous trigger theory triggers all policies on the risk from the date of initial exposure to the date of manifestation. The continuous trigger theory, which is the most expansive, is also referred to as the "triple trigger" theory or "exposure-in-residence" theory because three stages – exposure, exposure in residence (the stage between exposure and manifestation when

---

[9]*E.g.*, *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980).

[10]*E.g.*, *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760 (2d Cir. 1984).

[11]*E.g.*, *Eagle-Picher Industries, Inc. v. Liberty Mutual Ins. Co.*, 682 F.2d 12 (1st Cir. 1982).

[12]*E.g.*, *Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1982).

[13]Some courts adopting the injury-in-fact trigger consider it to be the time when an injury *first* comes into being, and expert testimony is required to pinpoint this date. *See*, *e.g.*, *Uniroyal v. Home Ins. Co.*, 707 F. Supp. 1368, 1387-90 (E.D.N.Y. 1988) (holding that coverage was triggered only at that point in time one week after each claimant was exposed to the toxic product).

asbestos fibers reside in the lung), and manifestation – trigger coverage.

The Court of Appeals of Maryland considered the trigger-of-coverage issue in the context of asbestos-related bodily injury claims in *Lloyd E. Mitchell, Inc. v. Maryland Casualty Company*, 324 Md. 44 (1991). Lloyd E. Mitchell, Inc. ("Mitchell") was a mechanical contractor engaged in the sale, distribution, and installation of asbestos-containing products. Mitchell ceased all business operations in 1976. Between 1955 and 1977,[14] Mitchell was insured by the Maryland Casualty Company under a series of standard form CGL policies. Like the insurance policies at issue in the instant case, the insurer's policies required it to pay on behalf of the insured "all sums which the insured shall become legally obliged to pay as damages because of . . . bodily injury . . . caused by an occurrence." The policies contained the same definitions of "bodily injury" and "occurrence" as the policies in the instant case. After the Maryland Casualty policies expired, individuals who were exposed to Mitchell's asbestos products sued the company for personal injury damages. Maryland Casualty refused to defend or indemnify Mitchell on the ground that the claims were not covered by the policies.

In a declaratory judgment action, Maryland Casualty moved for summary judgment, contending that it was obligated to provide coverage only for bodily injuries caused by an "occurrence" and that an "occurrence" is the date when injury first manifests. *Mitchell*, 324 Md. at 48. Mitchell also moved for partial summary judgment, asserting that Maryland

---

[14]The insurer argued that the last policy expired on January 1, 1977, while Mitchell asserted that the last policy expired on January 1, 1978. *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44, 46 n.1 (Md. 1991).

Casualty had the duty to defend and indemnify it in connection with all asbestos-related personal injury suits "where the claimants allegedly were exposed to allegedly asbestos containing products supplied by Mitchell, wherein the exposure or exposures occurred during any of the policy periods in which said insurance policies were in effect." *Id.* at 48. Mitchell attached to its motion a pathologist's affidavit describing the development of the asbestos-associated diseases of asbestosis, bronchogenic carcinoma, and mesothelioma, in which exposure to asbestos fibers causes injuries to cells, tissues, and/or organs, injuries that "may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time." In its opposition to Mitchell's motion, Maryland Casualty submitted the affidavit of a clinician who asserted that the disease of asbestosis does not constitute a "disease" until there is a manifested functional impairment to the activity of the lung. The trial court granted the insurer's motion for summary judgment and denied Mitchell's motion. The Court of Appeals granted certiorari to consider the trigger-of-coverage issue prior to consideration of the appeal by the intermediate appellate court.

Mitchell expanded its argument before the Court of Appeals, asserting that the court should, "as a matter of policy, and in order to promote uniformity of decisions nationally," adopt as broad a theory of coverage as the continuous trigger theory. Mitchell conceded that "the record in this case does not dictate adopting such a third trigger," Br. of Appellant, at 29-30, presumably because Mitchell's medical expert failed to opine explicitly that injuries continue after exposure to asbestos ceases, or possibly because an exposure trigger was

sufficient to provide coverage for all of the underlying claims.[15] Mitchell did argue that the medical evidence concerning immediate injury upon exposure to and inhalation of asbestos fibers, along with the policy definitions of "occurrence" and "bodily injury," dictate the application of an exposure trigger, "at the very least." *Id.* at 29.

After examining the policy language and surveying the approaches taken by courts in other jurisdictions with regard to the trigger of insurance coverage in asbestos-related bodily injury cases, the Court of Appeals concluded that the trial court's adoption of the manifestation theory as the sole trigger of coverage is "an interpretation at odds with the policy language and the clear weight of authority in the country." *Id.* at 58. The court observed that "a number of courts . . . have concluded that 'bodily injury' occurs when asbestos is inhaled into the lung, and that, *at a minimum*, coverage under [a standard form CGL] policy is triggered by exposure to the insured's asbestos products during the policy period." *Id.* (emphasis in original) (citing cases adopting an exposure trigger, a continuous trigger, and an injury-in-fact trigger). The court in essence adopted Mitchell's argument that, at a minimum, exposure triggers coverage. Specifically, the court stated:

> Considering the plain meaning of the term "bodily injury," as used in the policy, and in light of the medical evidence concerning the development of asbestos-related diseases, we align ourselves with the overwhelming weight of authority in

---

[15]It appears that the court was not required, on the record before it, to address whether policies in effect at any time between a claimant's exposure to asbestos and his or her manifestation of an asbestos-related disease were triggered, as Mitchell ceased operations in 1976 and the last policy expired on either January 1, 1977 or January 1, 1978. The probability that the court was not required to address such factual scenarios is bolstered by the fact that Mitchell originally argued for only an exposure trigger.

the country and conclude that "bodily injury" occurs when asbestos is inhaled and retained in the lungs. In this regard, for purposes of policy coverage, it is not important that [the two medical experts] may disagree as to the time when changes in the lungs may be classified as a disease. On the record developed in this case, we conclude that, at a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure. Accordingly, we hold that the trial judge erred in adopting, as the *sole* trigger of coverage, the "manifestation" theory of coverage, namely, that coverage is not afforded until harm actually becomes manifest.

*Id*. at 62. The court vacated the trial court's ruling and remanded the case with directions that the trial court enter a declaratory judgment, "as sought by the insured, that at a minimum coverage under the policy is triggered upon exposure to and inhalation of asbestos fibers during the policy period by a person who suffers bodily injury as a result of that exposure." *Id*. at 63. The lower court's judgment also was to contain a declaration, *inter alia*, that Maryland Casualty provide a defense for Mitchell against all personal injury asbestos-related suits brought by plaintiffs allegedly exposed to Mitchell's asbestos products during the policy period, regardless of when the injuries became manifest. *Id*.

The insurers in the instant case contend that *Mitchell* is dispositive on the trigger of coverage issue in their favor. The insurers maintain that the *Mitchell* court adopted what might be termed an "exposure-only" theory, *i.e.*, that an insurer is required to defend and indemnify its insured only for claims brought by plaintiffs exposed to the insured's asbestos products during the policy period. Plainly, however, this was not the holding of *Mitchell*.

The court held simply that manifestation is not the sole trigger of coverage, and that, *at a minimum*, exposure triggers coverage. *Id*. at 62  As discussed *supra*, the court cited with approval cases adopting not only an exposure trigger, but injury-in-fact and continuous triggers as well. The *Mitchell* opinion thus does not compel, or even support, a conclusion as a matter of law that Maryland's Court of Appeals would adopt the theory urged by the insurers in this case.

The critical question for the *Mitchell* court, as it is for this court in determining the meaning of the policy language, was a determination of when, in the context of asbestos-related diseases, "bodily injury"occurs, as bodily injury during the policy period is what triggers insurance coverage.[16] Based on the undisputed medical evidence before it, the court concluded that "'bodily injury' occurs when asbestos is inhaled and retained in the lungs." *Id*. at 62. The court also noted that the medical evidence from other cases indicates that "inhalation of asbestos fibers starts the injurious chain of events which may culminate in an asbestos-related disease." *Id*. at 61.  By holding that *at a minimum* insurance coverage was triggered upon exposure, the court left open the possibility that coverage may be triggered at other times, as long as "bodily injury" occurs at those times.

The medical evidence in this case consists of the affidavit, submitted by Porter

---

[16]The *Mitchell* court stated that numerous courts construing standard CGL policy language have recognized that "'bodily injury' must result during the policy period, *albeit* nothing in the policy language expressly requires that the injury be diagnosed or identified within that period, or that the injury manifest itself or progress to sickness or disease during the policy period." 324 Md. at 60 (citing *Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119, 127 (D.C. Cir. 1986) and *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760, 764 (2d Cir. 1984)).

Hayden, of Dr. Edward Gabrielson, a pathologist and medical scientist. In his affidavit, Dr.

Gabrielson discussed the etiology of asbestos-related diseases, specifically asbestosis, non-

malignant pleural disease, bronchogenic carcinoma, and mesothelioma. He defined "injury"

as "an event that leads to an adverse alteration of bodily structure or function."[17] Dr.

Gabrielson expressed, *inter alia*, the following opinions:

> Asbestos fibers, once they have been deposited within tissue,
> repeatedly cause injuries at the cellular and molecular level.

***

> Diseases caused by asbestos include asbestosis, non-malignant
> pleural diseases, and asbestos-caused cancers, and these
> diseases are all results of multiple and virtually continuous
> injuries. These injuries start shortly after inhalation of fibers,
> which is well before patients present with symptoms. These
> injuries continue throughout the life of affected individuals,
> even during periods when there is no additional inhalation of
> asbestos fibers, due to durable fibers retained in lung tissue.

Gabrielson Affidavit at 2. Regarding asbestosis and non-malignant diseases of the lungs and

pleura, Dr. Gabrielson stated the following:

> Asbestosis is a term that refers to diffuse, widespread fibrosis,
> or scarring, of the alveolar walls in the lungs caused by asbestos
> injury. This disease can occur at variable degrees of severity;
> when advanced, asbestosis decreases lung volumes and restricts
> lung function. Ultimately, in some patients, asbestosis causes
> respiratory failure and death.

---

[17]In *Mitchell*, the Court of Appeals of Maryland quoted with approval *Insurance Company of North America v. Forty-eight Insulations*, 633 F.3d 1212, 1222 (6th Cir. 1980), in which the United States Court of Appeals for the Sixth Circuit said that "'for insurance purposes, court have long defined the term "bodily injury" [to mean] any localized abnormal condition of the living body.'" 324 Md. at 58.

The disease process that culminates in asbestosis is complex. The disease is initiated by specialized "caretaker" cells in the lungs, known as macrophages, ingesting asbestos fibers. The macrophages release oxygen free radicals and biologically active cytokines, such as platelet-derived growth factor (PDGF), in response to these ingested fibers.

Oxygen free radicals are chemically unstable molecules that are used by macrophages to kill microorganisms in the lungs. Experimental evidence indicates that oxygen free radical injury to normal cells contributes to the development of asbestosis.

The cytokines (e.g., PDGF) released by macrophages cause other cells in the lungs, known as fibroblasts, to aberrantly proliferate and produce collagen, the basic molecular component of scar tissue. Thus, cytokines also contribute to asbestos-induced injuries that can ultimately culminate in fibrosis (scarring) of the lungs.

\*\*\*

Asbestosis is characterized by diffuse, widespread pulmonary interstitial fibrosis that typically becomes more severe with time. Asbestosis is an essentially irreversible disease process. The fibrotic tissue that comprises this disease undergoes some modification and maturation with time, but does not resolve.

Thus, asbestosis is a permanent disease that is the cumulative manifestation of multiple injuries at the cellular level, which have occurred in multiple locations throughout the lungs and over a period of many years. These injuries begin very soon after initial inhalation of asbestos fibers. Additional injuries occur as a result of new fibers being inhaled by an individual, leading to additional fibrosis and advancement of the disease process. Moreover, because asbestos fibers are chemically stable, additional injuries also occur as a result of fibers that persist in lung tissue long after inhalation. *Consequently, beginning with the first inhalation of asbestos, and continuing for the remainder of life, an individual who has inhaled asbestos fibers continuously suffers injuries.*

The probability of an individual developing clinically significant asbestosis, and the severity of asbestosis in that individual, generally correlates with the duration and intensity of exposure of that individual to asbestos. *However it is important to recognize that asbestosis can progress in severity even after inhalation of new fibers by an individual has ceased, as a result of residual fibers in the lungs causing new injuries.*

\*\*\*

Asbestosis and benign pleural disease are possible consequences of the macrophage-mediated injury to the lungs. These diseases develop over a period of many years as a result of multiple and cumulative injuries, which begin shortly after initial inhalation of asbestos and long before the clinical manifestation of disease. *These injuries continue throughout the life of affected individuals, even during periods when there is no additional inhalation of asbestos fibers, due to durable fibers retained in lung tissue.*

*Id.* at 4-8, 16 (emphasis added) (footnotes omitted). Regarding the development of asbestos-

linked lung cancer and mesothelioma, Dr. Gabrielson said the following:

In addition to causing fibrosis (or scarring) of lungs and pleura, asbestos is well recognized to be an important cause of cancer. Most notably, asbestos is a cause of mesothelioma and lung cancer. The progenitor cells for these types of cancer – bronchial epithelial cells for lung cancer and mesothelial cells for mesothelioma – are exposed to asbestos fibers shortly after inhalation.

Cancers caused by asbestos present with clinical symptoms only after they have grown to a considerable size and long after the asbestos fibers initiated the carcinogenic process with cellular and molecular injuries.

\*\*\*

Asbestos produces critical genetic changes required for carcinogenesis by physically and chemically injuring

-17-

chromosomes. This injury results in chromosomal breaks and rearrangements.

Asbestos injury also contributes to the carcinogenesis process by functioning as a tumor promoter. Asbestos functions as a tumor promoter by at least two mechanisms. First, asbestos stimulates cells, including the genetically altered cells, to replicate. In addition, asbestos injury results in cytotoxicity (cell killing) to some cells, with a greater cytotoxic effect on normal cells than on cells with genetic alterations related to cancer.

The net result of these two mechanisms – stimulation and selective cytotoxicity – is an expansion of the cell population that has the cancer-related genetic changes.

＊＊＊

Many years – typically 20 to 50 – are required for the development and growth of a clinically recognized cancer after the onset of asbestos exposure.

＊＊＊

Injury to an individual with cancer does not cease when a malignant cell arises from the carcinogenesis process. In fact, as a cancer grows and invades surrounding normal tissue, additional injuries occur.

＊＊＊

Lung cancer and mesothelioma are possible consequences of injuries to chromosomes and of injuries that lead to proliferation of genetically altered cells. *These cancers develop well before clinical manifestations and over a period of many years as a result of multiple and virtually continuous injuries.*

*Id.* at 9, 12-13, 15-16.

The insurers submitted no expert medical testimony to rebut that of Dr. Gabrielson, relying solely on their contention, which I have rejected, that *Mitchell* controls the

disposition of the instant case. The *Mitchell* court acknowledged that "bodily injury" is what gives rise to an insurer's obligation to extend coverage. 324 Md. at 60. The court also made clear that while the policy definition of "bodily injury" includes sickness and disease, "bodily injury" also includes damage to the body which may be detectable only on a subclinical or microscopic level. *See id.* at 60-61 (citing cases for the proposition that "nothing in the policy language expressly requires that the injury be diagnosed or identified within [the policy] period, or that the injury manifest itself or progress to sickness or disease during the policy period").

The undisputed medical evidence in this case establishes that exposure to and inhalation of asbestos fibers begins a cumulative process in which the body suffers virtually continuous injuries. The insurance policies in this case obligate the insurers to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies." In light of the medical evidence of the pathogenesis of asbestos-related diseases and the policy language, coverage under the policies, obligating the insurers to afford a defense to and potential indemnification of Porter Hayden, is triggered upon exposure, exposure-in-residence, and manifestation. As bodily injury occurs almost immediately upon inhalation and continues until the manifestation of an asbestos-related disease, every policy in effect from the date of exposure until the date of manifestation is triggered.

A plethora of cases from around the country support this result. *See, e.g., Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1197 (2d Cir. 1995) (predicting that

New York and Texas will rule that, at least where the medical evidence establishes that successive injuries are recurring, all policies in effect at any time during the period between exposure and date of claim or death are triggered); *Keene Corp. v. Ins. Co. of North America,* 667 F.2d 1034, 1047 (D.C. Cir. 1981) (holding that insurance coverage in the context of asbestos-related diseases is triggered by exposure, exposure in residence, and manifestation); *Montrose Chemical Corp. of California v. Admiral Ins. Co.,* 10 Cal.4th 645, 689 (Cal. 1995) (holding that the continuous injury trigger of coverage should be applied to third party claims of continuous or progressively deteriorating bodily injury or property damage); *Owens-Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 478-79 (N.J. 1994) (adopting the continuous-trigger theory for activating insurers' obligation to respond in the context of progressive indivisible injury resulting from exposure to asbestos products); *J.H. France Refractories Co. v. Allstate Ins. Co., PMA,* 534 Pa. 29 (Pa. 1993) (holding that all stages of asbestosis disease process were "bodily injury" triggering insurers' obligation to indemnify); *Associated Aviation Underwriters v. Wood,* 98 P.3d 572, 602 (Ariz. App. 2005) (rejecting the exposure and manifestation theories and finding the continuous trigger theory to be appropriate in the context of personal injury damages resulting from exposure to a toxic substance). Moreover, even some of the cases adopting a so-called "injury-in-fact" trigger are not inconsistent with the continuous trigger based on successive and virtually continuous injuries. For example, in *Abex Corporation v. Maryland Casualty Company,* 790 F.2d 119 (D.C. Cir. 1986), the United States Court of Appeals for the District of Columbia Circuit applied New York's injury-in-fact trigger and, where the record was "devoid of evidence on

when asbestos-induced injury occurs," remanded to the district court for such a determination. The appellate court recognized that "'all that is necessary is reasonably reliable evidence that the injury, sickness, or disease more likely than not occurred during a period of coverage.'" *Id.* at 128 (quoting *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 565 F. Supp. 1485, 1509 (S.D.N.Y. 1983), *aff'd as modified*, 748 F.2d 760 (2d Cir. 1984)).

## B. Allocation and Completed Operations

Two other issues are in dispute. The first, the "allocation" issue, concerns the method by which coverage must be allocated among triggered policies. Under "all sums" or joint and several allocation, each triggered policy is liable in full for all damages, whether or not some portion of the bodily injury continues past the policy period, with the insurers relegated to bringing claims among themselves for contribution. Porter Hayden asserts that coverage must be allocated on an "all sums" basis. Porter Hayden maintains that the drafting history of the policies at issue supports this view. The insurers contend that allocation among multiple triggered policies must be done by application of a *pro rata*, time on the risk formulation, by which each insurer is liable only for its proportionate share of the total liability. The insurers contend that such a result is compelled by Maryland law and by the decision of the United States Court of Appeals for the Fourth Circuit addressing this issue under Maryland law in *In re The Wallace & Gale Company*, 385 F.3d 820 (4th Cir. 2004) ("*Wallace & Gale*").

The second issue, the "completed operations" issue, concerns whether any aggregate

limits of a triggered policy will apply. The policies provide a single aggregate limit of $1,000,000 for damages payable because of bodily injury included within the "completed operations hazard." Specifically, the policies provide:

> Subject to the above provision respecting "each occurrence," the total liability of the company for all damages because of (1) bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the schedule as "aggregate."

The policies define the "completed operations hazard" in relevant part as follows:

> "[C]ompleted operations hazard" includes bodily injury . . . arising out of operations . . . but only if the bodily injury . . . occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.

Porter Hayden argues that whether an injury falls within the completed operations hazard turns strictly on the cause of the injury, and to the extent that a claimant was exposed to asbestos during Porter Hayden's ongoing operations, that claimant was never "in hazard" from Porter Hayden's completed operations and thus the claim does not fall within the completed operations hazard. In other words, Porter Hayden asserts that even if a claimant suffered ongoing progressive injuries during policy periods when operations were complete, the injuries must be deemed to have occurred while Porter Hayden was conducting operations, because the injuries arose out of exposure to asbestos while Porter Hayden was still conducting operations.[18] The insurers argue, on the other hand, that if bodily injury

---

[18]Porter Hayden makes no mention of the inconsistency between its argument here and its
(continued...)

-22-

triggers a policy in effect after Porter Hayden's operations were completed, then the completed operations hazard aggregate limit of that policy applies, regardless of whether any other policy may also have been triggered. This interpretation, the insurers contend, is compelled by *Wallace & Gale*.

The facts of *Wallace & Gale* are virtually identical to those of the instant case. Wallace & Gale, Inc., an insulation contractor, ended its operations in the early 1970s and later filed for bankruptcy due to the large number of asbestos-related bodily injury claims filed against it. Wallace & Gale had purchased comprehensive general liability policies and excess policies from numerous insurers during the decades it installed asbestos-containing insulation materials. In 1994, Travelers Insurance Company brought a declaratory judgment action, as an adversary proceeding within the bankruptcy case, seeking a judicial determination of the applicability and extent of coverage of the insurance policies purchased by Wallace & Gale. A number of persons having bodily injury claims against Wallace & Gale intervened in the adversary proceeding, raising the issues of allocation and completed operations. As Porter Hayden and the Committee have argued in the present action, the intervenors argued that each triggered policy was liable for "all sums" and that no injuries were subject to the aggregate limits of the policies under the completed operations hazard clauses. The Wallace & Gale insurers argued in response that they would be liable only for a *pro rata* portion of the bodily injury that occurred during the time each insurer's policy

---

(...continued)
argument that, in the trigger-of-coverage context, bodily injury "occurs" continuously from the time of exposure to the time of manifestation.

was in place and that the aggregate limits of the completed operations coverage of their policies would apply to injuries that occurred after Wallace & Gale completed its installation work.

The Wallace & Gale intervenors and insurers filed cross-motions for summary judgment. Judge Messitte issued an initial opinion in February 2002. *See Aetna Cas. & Sur. Co. v. Wallace & Gale Co.*, 275 B.R. 223 (D. Md. 2002). Noting that both the insurers and the plaintiffs presented reasonable arguments with respect to the allocation issue and that Maryland had "yet to speak definitively to the question," Judge Messitte held that the "tie" must go in favor of the insured, meaning each insurer would be liable for "all sums." With respect to the completed operations issue, Judge Messitte granted Travelers' motion for summary judgment, holding that the insurers who issued policies to Wallace & Gale for time periods wholly after Wallace & Gale completed its operations would only be liable to the extent of the aggregate limit of the completed operations hazard.

Several months later, on July 2, 2002, the Court of Special Appeals of Maryland issued its ruling in *Mayor and City Council of Baltimore v. Utica Mutual Insurance Company*, 145 Md. App. 256 (Md. Ct. Spec. App. 2002), adopting as Maryland law the *pro rata* allocation theory.[19] *Id*. at 309. In light of this ruling, Travelers asked Judge Messitte to reconsider his February order adopting the all sums allocation approach. Judge Messitte

---

[19]*Mayor and City Council of Baltimore v. Utica Mutual Ins. Co.*, 145 Md. App. 256 (Md. Ct. Spec. App. 2002), arose out of litigation in which the City of Baltimore asserted that various defendants should be held liable for the cost of removal, management, abatement, or remediation of asbestos-containing building materials in certain city buildings. *Id*. at 266.

granted the motion for reconsideration and, on September 18, 2002, reversed the prior ruling

on allocation, adopting the *pro rata* approach and concluding that Wallace & Gale "will be

responsible for a prorated share for any period in which it may have been uninsured."*Aetna*

*Cas. & Sur. Co. v. Wallace & Gale Co.*, 284 B.R. 557, 559 (D. Md. 2002). The intervenors

appealed from the district court's decision on reconsideration and from that portion of the

district court's original decision not vacated on reconsideration.

The United States Court of Appeals for the Fourth Circuit affirmed the district court's

order on allocation and completed operations. *In re Wallace & Gale Company*, 385 F.3d 820

(4th Cir. 2004). The Fourth Circuit concluded that *pro rata* allocation is the settled law of

Maryland, which federal courts are obliged to follow. *Id*. at 832. The Fourth Circuit rejected

the intervenors' assertions, including their objection to the adoption of *Utica Mutual* on the

ground that the Maryland Court of Appeals had granted a petition for *certiorari* in that case,

but the parties settled the case prior to decision. The Fourth Circuit observed that "a federal

court can depart from an intermediate state court's fully reasoned holding as to state law only

if 'convinced' that the State's highest court would not follow that holding." *Id*. at 831 (citing

*Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997 (4th Cir. 1998)). The Fourth Circuit was

not persuaded that the Court of Appeals would decide the allocation issue differently than

did the Court of Special Appeals in *Utica Mutual. Id*. at 832. As to the completed operations

issue, the Fourth Circuit quoted from the district court's original opinion and affirmed its

ruling:

If a claimant's initial exposure occurred while Wallace & Gale

was still conducting operations, policies in effect at that time will not be subject to any aggregate limit. If, however, initial exposure is shown to have occurred after operations were concluded or if exposure that began during operations continued after operations were complete, then the aggregate limits of any policy that came into effect after operations were complete will apply. Where a given claimant falls within this framework will have to be considered on a case-by-case basis.[20]

*Id.* at 833 (quoting *Aetna Cas. & Sur. Co. v. Wallace & Gale Co.*, 275 B.R. at 241).

The Fourth Circuit and Judge Messitte applied principles of contract interpretation

---

[20]The court's discussion of "exposure" that occurs or continues to occur after operations were completed is, to some extent, confusing. It would have been more clear to refer to "injury" that occurs or continues to occur after operations were complete. Other passages in Judge Messitte's opinion are clarifying. For example, the court states that "[s]uggesting . . . that a claimant must be exposed to asbestos before there can be liability in no way conflicts with the proposition that injury (beginning with exposure) can occur either before or after operations are complete and that different aggregate limits might apply to the two circumstances." *Aetna Cas. & Sur. Co. v. The Wallace & Gale Co.*, 275 B.R. 223, 241 (D. Md. 2002). The court also explained its treatment of aggregate limits as follows:

> It remains true that asbestos-related injury can occur at any time from exposure onward and that it cannot be said with certainty when or to what extent it actually occurs. But whatever injury – theoretical or real – is assumed to have occurred after Wallace and Gale's operations were completed will always – by definition – be covered by the completed operations clause. The injury occurs after operations were completed. Nor does it matter whether an injury is viewed as occurring both upon initial exposure before operations are completed as well as thereafter. The portion of the injury extending beyond completion would still, by definition, occur post-operations and thus remain subject to the completed operations hazard aggregate limit.
>
> By the same token – to the extent that injuries, beginning with exposure, may be considered as occurring before operations were completed they would, by definition, be excluded from the completed operations clause. There would be no aggregate limit under the policies then in effect.

*Id.* at 238-39.

and settled Maryland law to new facts and reached sound conclusions within the dictates of

the law. The facts of the instant case are for all relevant purposes directly analogous to the

facts of *Wallace & Gale*, and the Fourth Circuit's decision is binding on this court.[21]

Accordingly, here, as in that case, notwithstanding Porter Hayden's vigorous assertion that

the Maryland Court of Appeals is likely to reject the reasoning of *Wallace & Gale*, allocation

among the multiple triggered policies must be effected by application of the *pro rata*, time

on the risk formulation. Furthermore, the aggregate limits of policies in effect after Porter

Hayden's operations were completed apply to claims that trigger these policies.

Porter Hayden contends that there is a dispute regarding whether its operations were

"completed" during the insurers' policy periods. Porter Hayden asserts that, even after it

ceased installing asbestos-containing litigation, Porter Hayden continued to conduct "tie-

ins"[22] and asbestos removals until it ceased operations altogether in 1989. Porter Hayden

claims that all of those operations resulted in the release of asbestos fibers inhaled by those

present. In support of these contentions, Porter Hayden submitted the affidavits of two

---

[21]Porter Hayden makes one argument that was made by the *Wallace & Gale* intervenors but considered waived by the Fourth Circuit. Porter Hayden contends that an exception to the definition of "completed operations" is applicable because the asbestos-containing insulation installed and asbestos fibers released during operations constitute "abandoned or unused materials" and are thus excluded from the definition of a completed operations hazard. I agree with the insurers that such an interpretation is nonsensical. *See also U.S. Sanitary Specialties Corp. v. Globe Indemnity Company*, 204 F.2d 774, 777 (7th Cir. 1953) (ruling that "this exception to 'completed operations' refers only to tools, equipment and materials which on completion of an operation *should have been removed* by the assured from the premises where the operation occurred but which, instead, were abandoned there by the insured and later were instrumental in causing an accident") (emphasis added).

[22]Performing a "tie-in" involves installing non-asbestos-containing insulation in a location that already has asbestos-containing insulation.

-27-

claimants who were present at Porter Hayden job sites into the late 1980s and who witnessed ongoing operations that resulted in the release of asbestos fibers. The insurers acknowledge that, with respect to these two claimants, there may be a question of fact which must be addressed in discovery. The insurers contend, however, that they are entitled to summary judgment on the completed operations issue with respect to all of the other thousands of claimants.

On this record, genuine issues of material fact remain as to whether Porter Hayden's operations were "completed" during the relevant policy periods and which if any of the claims triggering the policies necessarily fall within the completed operations hazard. Nevertheless, as a matter of law, any portion of bodily injury that occurs after completed operations will be subject to the aggregate limits of any policies that were in effect after Porter Hayden's operations were completed.[23]

Filed: September 9, 2005                                              /s/
                                                          Andre M. Davis
                                                          United States District Judge

---

[23]In view of the determinations made in this Memorandum Opinion, the miscellany of pending discovery motions shall be denied as moot, and the parties shall be directed to confer and to propose a case management order designed to bring these matters to a conclusion.

-28-