IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. | ) ) ) | |
| and | ) ) | |
| AMERICAN HOME ASSURANCE CO. | ) ) | |
| Plaintiffs | ) ) ) | Case No. 1:03-cv-03408-AMD (Consolidated with: 1:03-cv-03414-AMD) |
| v. | ) ) | |
| PORTER HAYDEN COMPANY | ) ) | |
| Defendant | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
ON CERTAIN COVERAGE ISSUES**

National Union Fire Insurance Company of Pittsburgh, Pa., ("National Union")  and

American Home Assurance Company ("American Home")(collectively "the Insurers") hereby

submit the following Memorandum of Points and Authorities in Support of their Motion for

Partial Summary Judgment on Certain Coverage Issues:

## I.  INTRODUCTION

In this action, Porter Hayden Company ("Porter Hayden") seeks a declaratory judgment

regarding the scope of insurance coverage available to it for asbestos-related bodily injury claims

asserted under policies issued by National Union and American Home.[1]  Porter Hayden operated

---

[1] National Union issued four primary CGL policies collectively effective from April 1, 1984 to April 1, 1988: Exhibit: A(1), *Policy No. 1524165*; Exhibit A(2), *Policy No. 1940385*; Exhibit A(3), *Policy No. 1803346*; Exhibit A(4), *Policy No. 5010570*.  American Home issued a second layer, excess liability policy effective July 11, 1975 to July 11, 1976: Exhibit A(5), *Policy No. 2751098*.  National Union issued two second layer, excess liability policies effective July 11, 1976 to January 1, 1978: Exhibit A(6), *Policy No. 1186636;* Exhibit A(7), *Policy No. 1186790.* The National Union and American Home excess liability policies follow form to the underlying first layer excess policies issued respectively by St. Paul Fire and Marine Insurance Company for the periods from 5/26/75 to 5/26/76

- 1 -

as an insulation contractor from the 1920's until 1992, installing insulation in various industrial and commercial applications.  Prior to 1973, some of the insulation materials installed by Porter Hayden contained asbestos.  After 1973, faced with increasing governmental regulation regarding the use of asbestos products, Porter Hayden discontinued the use of asbestos-containing insulation materials in connection with its installation projects.  The first asbestos-related bodily injury lawsuits began to be filed against Porter Hayden in 1982, and since then tens of thousands of additional suits or claims have been filed.  Under the pressure of these claims, Porter Hayden filed a petition for Chapter 11 bankruptcy in March of 2002.

Following lengthy negotiations with its creditors, Porter Hayden's Plan of Reorganization was confirmed on July 5, 2006.  With respect to its asbestos-related bodily injury liabilities, the Plan called for the creation of a new entity to which all of the claims against Porter Hayden would be channeled, leaving Porter Hayden released and discharged so it could continue along with its business of managing its insurance assets relating to its historical asbestos liabilities.

Porter Hayden now finds itself in a difficult situation of its own making, dating back to a 2005 agreement that it negotiated with the Insurers during the bankruptcy.  To clear the path for the issuance of a channeling injunction under 11 U.S.C. 524(g), Porter Hayden needed to convince National Union and American Home to withdraw their objections to its proposed Plan of Reorganization.   In exchange for the withdrawal of the objections, Porter Hayden stipulated that its Plan, the confirmation of that Plan, and the effectuating documents would all be "insurance neutral."  More specifically, Porter Hayden stipulated with the Insurers that: (i) the scope of any insurance coverage for asbestos-related bodily injury claims would be decided in accordance with the applicable non-bankruptcy law; (ii) the confirmation of the Plan of

---

and 5/26/76 to 5/26/77, and by First State Insurance Company for the period from 5/26/77 to 1/1/78.  Exhibits A(8)–(9).

Reorganization would not constitute a settlement or judgment with respect to any such claims; and, (iii) the Insurers did not consent to any of the terms or provisions of the plan.  These stipulations were codified in a Bankruptcy Insurance Stipulation and a Coverage Litigation Stipulation, which subsequently were approved by the Court.[2]  In reliance on the stipulations, the Insurers withdrew their objections, and thereafter Porter Hayden filed its Third Amended, Second Modified Plan of Reorganization ("the Plan").[3]

Even a cursory examination of the Bankruptcy Insurance Stipulation reveals that it radically modified Porter Hayden's then-existing Plan, adding numerous changes specifically setting forth that any purported assignment or transfer of any interest or right in Porter Hayden's insurance policies to the newly-created Trust would be subject to applicable non-bankruptcy law. For example, Porter Hayden stipulated to a modification of Article 4.4 of the Plan to provide as follows:

> Upon confirmation and consummation of this Plan, the Trust shall have, <u>to the greatest extent permitted by applicable non-bankruptcy law</u>, access to insurance coverage and/or insurance payments related to Asbestos Insurance Policies (subject to any applicable policy limits) to defend, resolve, and satisfy the Asbestos Bodily Injury Claims channeled to the Trust.

<u>Exhibit B, p. 7</u>.

The Stipulation further added the following sentences to Article 4.4:

> Notwithstanding any other provision in the Plan or the Plan Documents to the contrary, any transfer or assignment by Debtor of any Asbestos Insurance Action, Asbestos Insurance Policy, Asbestos Insurance Recoveries, Asbestos Insurance Rights, or Asbestos Insurance Settlement Agreement to the Trust or any other Person, including any post-Effective Date transfer or assignment, is subject to any

---

[2] <u>Exhibit B</u>, *Bankruptcy Insurance Stipulation*, and, <u>Exhibit C</u>, *Coverage Litigation Stipulation*.   The Bankruptcy Court granted Porter Hayden authority to enter into these stipulations on April 17, 2006.  The Court should note that the Official Committee of Unsecured Creditors and the Legal Representative of the Future Claimants joined Porter Hayden and the Insurers in entering the Bankruptcy Insurance Stipulation, and that at the time of the negotiation of these stipulations the Committee had intervened to control the coverage litigation on behalf of Porter Hayden.

[3] <u>Exhibit D</u>, *Third Amended, Second Modified Plan of Reorganization of Porter Hayden*.   The modified Plan was confirmed by the Bankruptcy Court on June 30, 2006, and affirmed by the District Court on July 7, 2006.

applicable Asbestos Insurance Coverage Defenses.   Upon confirmation and consummation of this Plan, the Trust shall be bound by the Bankruptcy Insurance Stipulation, the Coverage Litigation Stipulation and the Coverage Proceedings Agreement to the same extent as if the Trust had been a signatory at the time those stipulations and agreements were executed by the parties thereto.

Id.  The Bankruptcy Insurance Stipulation also modified other sections of the Plan in the same manner, notably at Article 7.1(d), to provide again that any access by the Trust to the policies must be decided in accordance with non-bankruptcy law, and at Article 10.7, which subjected the entire Plan to the principle of insurance neutrality and the application of non-bankruptcy law.[4]

In short, Porter Hayden wanted the Insurers out of the way so it could proceed with its Plan and walk away.   To achieve this goal, it voluntarily and deliberately entered into stipulations with the Insurers, requiring that all insurance coverage issues be decided in accordance with applicable non-bankruptcy law.  In exchange for the stipulations, the Insurers withdrew their objections to the Plan.  The applicable non-bankruptcy law is Maryland law, as the parties agreed in the previous motion for partial summary judgment.  Therein lies Porter

---

[4] Article 10.7(a) states as follows:

Nothing in the Plan, the Plan Documents, the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, shall limit the right of any Asbestos Insurance Company to assert any Asbestos Insurance Coverage Defenses.

The Bankruptcy Insurance Stipulation and the Plan define Asbestos Insurance Coverage Defenses as follows (emphasis added):

[...] [A]ll defenses at law or in equity, including any right of set-off or recoupment, that any Asbestos Insurance Company may have *under applicable non-bankruptcy law* to provide insurance coverage to or for (a) Asbestos Bodily Injury Claims or Trust Expenses of the Trust that have been channeled to or assumed by or incurred by the Trust, pursuant to the Plan, provided, however, that the pursuit of such defenses shall be subject to the terms of the Coverage Litigation Stipulation or the Coverage Proceedings Agreement (as applicable), or (b) any Debtor Insurance Claim.  Asbestos Insurance Coverage Defenses include, without limitation, any defense based on the terms of the Plan or the Plan Documents or the manner in which the Plan or the Plan Documents were negotiated prior to Confirmation, or were performed after Confirmation.

Hayden's problem, because under Maryland law there is no coverage under the Policies for the claims now channeled to the Trust.

## II.  ARGUMENT

Porter Hayden is a Named Insured under the National Union and American Home insurance policies (collectively "the Policies").  Each of the Policies covers only those damages for bodily injury or property damage for which an insured is legally obligated to pay.  Because Porter Hayden's asbestos-related bodily injury liabilities have been channeled to the Trust, and any action against Porter Hayden to enforce any legal rights with respect to such claims have been enjoined, Porter Hayden can have no legal obligation to pay damages to the Claimants.  The Policies, moreover, do not permit any assignment of interest to a third party without the consent of the Insurers.  To the extent that there once may have been coverage afforded to Porter Hayden absent the bankruptcy reorganization, all asbestos-related bodily injury claims are now channeled to the Trust, which has assumed the legal liability for all such claims.  As the Trust is not an insured under the Policies, and the Insurers have not consented to any assignment of coverage to the Trust, there can be no coverage available to the Trust and therefore the Insurers are entitled to summary judgment.

>    A.    **MARYLAND LAW CONTROLS THE RESOLUTION OF THE COVERAGE DISPUTES BETWEEN PORTER HAYDEN AND NATIONAL UNION AND AMERICAN HOME.**

Under the agreement that Porter Hayden reached with National Union and American Home in 2005, the insurance coverage disputes between the parties must be decided under applicable non-bankruptcy law.  As reflected in this Court's September 9, 2005 Memorandum Opinion resolving the previous motion for summary judgment, Porter Hayden has agreed with

the Insurers that Maryland law governs the construction of the Policies.  Maryland law therefore

provides the applicable non-bankruptcy law referenced in the Stipulations and the Plan.

### B.   PORTER HAYDEN NO LONGER HAS ANY LEGAL OBLIGATION TO PAY DAMAGES FOR ASBESTOS-RELATED BODILY INJURY CLAIMS AND CANNOT BE SUBJECT TO ENTRY OF JUDGMENT

#### 1.   The Insuring Agreements Of The Policies Issued To Porter Hayden Require A Legal Obligation To Pay Damages

The insurance policies issued to Porter Hayden are liability policies, not indemnity

policies.  Coverage under a liability policy focuses on whether the insured is legally liable to pay

damages.  This legal obligation of the insured to pay damages is a bedrock principle of liability

coverage, in which the insurer undertakes to cover the insured only for those damages that the

insured *must* pay as a consequence of legal responsibility.

This basic concept of insurance is embodied in the Insuring Agreements of the Policies.

Exhibits A(1)–(9).[5]   The Insuring Agreements create four prerequisites to coverage: (1) an

---

[5] The Insuring Agreements of the National Union CGL Policies state as follows:

> The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of A. bodily injury . . . to which this insurance applies, caused by an occurrence, […][5]

The Insuring Agreements of the St. Paul and First State first-layer excess liability policies provide respectively:

> The Company will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages, all as  more fully defined by the term "ultimate net loss" on account of:
> 1.        Personal Injuries,
> 2.        Property Damage,
> 3.        Advertising Offense,
> to which this Policy applies, caused by an occurrence.

[...]

> FIRST STATE INSURANCE COMPANY (hereinafter the Company) Agrees with the INSURED, named in the Declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

"occurrence", as defined in the policy, that (2) causes "bodily injury", again as defined in the policy, that (3) results in damages, for which (4) the insured is legally obligated to pay.  The insured's legal obligation to pay is a critical and fundamental element of any coverage provided under the Policies – an element that the insured has the burden to prove.

**a.     Under Maryland Law An Insured Is Legally Obligated When It Is Subject To Legal Compulsion To Pay Damages**

The Maryland Court of Appeals has addressed the question of when an insured becomes "legally obligated to pay damages" on two occasions.  The first occasion was in the context of environmental pollution.   In that context, the court construed the phrase to encompass an insured's liability to pay clean up costs as mandated by a state agency.  <u>Bausch & Lomb v. Utica Mutual Insurance Company</u>, 330 Md. 758, 625 A.2d 1021 (1993).  Bausch & Lomb ("B&L") received notice that an agency of the Maryland State Department of the Environment ("the State") had completed a preliminary assessment of one of its facilities.  The State informed B&L that it could either remediate the facility itself, voluntarily or under an injunction, or see the State conduct the clean up at B&L's later expense.[6]  Bausch & Lomb elected to remediate the facility at its own expense, and then sought coverage for its expenses from Utica Mutual under its CGL policies.  Utica Mutual denied coverage on the basis that B&L had acted voluntarily since it was never sued for damages by the State.  In the ensuing declaratory judgment action, however, the

---

To indemnify the INSURED for ULTIMATE NET LOSS, as defined hereinafter, in excess of RETAINED LIMIT, as herein stated, all sums which the insured shall be obligated to pay by reason of the liability imposed upon the INSURED by law or liability assumed by the INSURED under contract or agreement for damages and expenses, because of:

    A.    PERSONAL INJURY, as hereinafter defined;

    B.    PROPERTY DAMAGE, as hereinafter defined;

    C.    ADVERTISING INJURY OR DAMAGE, as hereinafter defined; to which this policy applies, caused by an OCCURRENCE, as hereinafter defined, happening anywhere in the world.

[6] The State possessed the statutory authority to compel the remediation under various provisions of the Environment Article of the Maryland Code.  <u>See</u>, MD. CODE ANN. [ENV.], §7-201, *et seq.*

trial court found "that the total circumstances constitute the sufficient coerciveness and advers[ness]" to give rise to a legal obligation to pay.  Id. at 772.

The Court of Appeals found the trial court's reasoning and its interpretation of Utica Mutual's CGL policies persuasive, concluding as follows:

> [T]he immediate contacts between B&L and State personnel carried weight in the clean-up project.  State regulators reviewed and approved B&L's studies and subsequent remediation program; implicit in their approval was the power to disapprove, and demand that more be done.  To be sure, the State agents did not adopt an overtly adversarial and coercive posture towards B&L.  The State did not sue the company.  It issued no order.  Yet "polite but puissant compulsion" may inhere to State regulatory activities, especially when, as here, the regulators actively monitor the clean-up.  *B&L ultimately faced the task of complying with the environmental laws, and paying the cost of compliance.*  As such, for the purposes of this analysis, we accept the trial court's finding that B&L's response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay.

Id. at 780 (citations omitted)(emphasis added).  The determinative factor therefore was the ultimately coercive nature of the state's authority.  Accord, Aetna Casualty & Surety Company v. Dow Chemical Company, 10 F. Supp.2d 771 (E.D. MI. 1998) and Ryan v. Royal Insurance Company of America, 916 F.2d 731 (1st Cir. 1990).  In short, the Court of Appeals found it dispositive that Bausch & Lomb had no choice but to comply with the state's orders.

The Court of Appeals next considered the question in the context of a bodily injury claim.  In that context, the Court of Appeals held that the phrase "legally liable" as contained in an insurance policy referred to the insured being subject to legal process to enforce the injured party's right to damages.  Megonnell v. USAA, 368 Md. 633, 796 A.2d 758 (2002).  USAA had issued two insurance policies to Megonnell, an automobile liability policy and an umbrella policy.  Id.  After Megonnell was involved in an accident resulting in four bodily injury claims, USAA agreed to settle three of the claims under the automobile coverage, but declined coverage under the excess policy for a jury verdict rendered as to the fourth claim.  USAA argued: (1) that

- 8 -

its excess policy required exhaustion of the underlying insurance by payment of damages for which the insured was legally liable, (2) that no judgment had been entered against the insured for the three settled claims, without which the underlying policy would not be exhausted, (3) that the settlements therefore did not represent sums for which the insured was legally liable, and accordingly (4) that the excess policy coverage was not implicated for the fourth claim.  Id.  The Court of Appeals rejected USAA's argument, however, holding as follows:

> The term "legally liable" to pay damages depends not upon when, and if, a judicial determination is made, but, generally, upon the creation of circumstances by and/or between parties, *whereby the parties, or one or the other of them, can enforce rights through legal process*.

Id. at 645 (emphasis added).

Just as in Bausch & Lomb, the Megonnell court held that legal obligation existed where the insured could be subjected to a legal compulsion to pay damages.  Where the Bausch & Lomb decision focused on the statutory authority of the state to enforce its environmental regulations, the Court of Appeals in Megonnell likewise emphasized that the persons injured in the automobile accident who settled their claims by agreement with the insurer could have enforced their legal rights to redress against USAA's insured in the tort system.  Id. at 649, quoting, Bausch & Lomb, 330 Md. at 780 ("[w]hile under a different insurance context, the situation in *Bausch & Lomb* is analogous to the case at bar in that Mr. Megonnell would have "ultimately faced the task" of having to pay the Anders for this negligence").  The Megonnell Court held that the settlements, to which USAA itself had agreed, represented legal liabilities that triggered the excess policy.  Under Maryland law, in other words, legal obligation depends upon the insured being subject to legal process to vindicate the rights of the injured party.

- 9 -

**b.      Porter Hayden Cannot Be Compelled To Pay Damages
To The Asbestos Bodily Injury Claimants**

Unlike the insureds in <u>Bausch & Lomb</u> and <u>Megonnell</u>, Porter Hayden cannot be subjected to legal process to vindicate the rights of the asbestos-related bodily injury claimants. Its potential legal obligation to the claimants has been channeled to an independent entity (the Trust) under a scheme that the claimants themselves approved.  Porter Hayden had other options, such as seeking to lift the automatic stay so that claims could proceed against it to the extent of its insurance coverage, so that its legal obligation would not have become an issue.  Porter Hayden chose, however, to follow a different course that ignored its insurers and relieved Porter Hayden forever from *any* potential legal obligation to pay damages for asbestos-related bodily injury liabilities under Maryland law.

**(i)      The Trust's Assumption of Porter Hayden's
Asbestos-Related Liabilities**

The Plan transferred all of Porter Hayden's liabilities, pending and future, to the Trust immediately, completely and irrevocably upon confirmation.  The Plan grouped all asbestos-related bodily injury claims into a single category known as Class 3.  Over 90% of Class 3 claim holders voted to approve the Plan.  The Plan provided that all of Porter Hayden's liabilities for Class 3 claims would pass to the Trust as follows:

> <u>Class 3 – Asbestos Bodily Injury Claims</u>.  *As of the Effective Date, liability for all Asbestos Bodily Injury Claims shall be automatically and without further act or deed assumed by the Trust*.  Each holder of an unsecured Asbestos Bodily Injury Claim whose claim is liquidated by the Trust under the Trust Distribution Procedures shall receive an amount from the Trust that is determined in accordance with the Trust Distribution Procedures.  This Class is impaired and, thus, is entitled to vote to accept or reject this Plan.

<u>Exhibit D §3.2(c), p.17</u> (emphasis added).

- 10 -

The Plan reiterated this absolute transfer of legal responsibility for Porter Hayden's asbestos-related bodily injury liabilities numerous times.  See Article 4.4 ("The Trust shall assume responsibility and liability for all Asbestos Bodily Injury Claims. [...]); and Article 7.1(b)(iii) ("[t]he Trust, upon the Effective Date, shall assume the liabilities of Debtor with respect to Asbestos Bodily Injury Claims").

### (ii)  Discharge and Injunctive Protection of Porter Hayden

After channeling the asbestos claims to the Trust, Porter Hayden needed to protect itself from any liability.  Article 9 of the Plan generally specified the discharges and releases effectuated by the Plan and by the required injunctions, and repeatedly reiterated the absolute and irrevocable transfer of liability from Porter Hayden to the Trust.  This Article provided as follows, in relevant part:

> Except as specifically provided in the Plan or in the Confirmation Order, effective on the Effective Date, *the Debtor shall be discharged from and in respect of any and all Asbestos Bodily Injury Claims that are Claims as of the Confirmation Date*, and other Claims, including but not limited to any Claim of a kind specified in sections 502(g), 502(h), 502(i), or 524(g) of the Bankruptcy Code [...]

Exhibit D §9.1, p.29 (emphasis added).

> [...]

> Except as specifically provided in the Plan to the contrary, *the discharge set forth in Article 9.1 of this Plan shall also operate as an injunction prohibiting and enjoining the commencement or continuation of any action or the employment of process with respect to, or any act to collect, recover from, or offset (a) any Claim discharged in Article 9.1 and (b) any cause of action, whether known or unknown, based upon the same subject matter as any Claim discharged in Article 9.1.*

Id. §9.2 (emphasis added).

> [...]

> In order to supplement the injunctive effect of the Discharge Injunction, [set forth in Article 9.2] and pursuant to the exercise of the legal and equitable jurisdiction

and power set forth in sections 524 (g) and 105(a) of the Bankruptcy Code, the Bankruptcy Court or, in the case of the Supplemental Injunction, the District Court, shall enter orders providing for the following injunctions to take effect as of the Effective Date, which shall be conditions to the Effective Date:

> (a)    To induce, preserve and promote the settlements contemplated by and provided for in the Plan, pursuant to sections 524(g) or 105(a) (or both) of the Bankruptcy Code, *all Asbestos Bodily Injury Claims shall be channeled to the Trust for a remedy under the Trust Distribution Procedures, and all Asbestos Bodily injury Claimants and Entities which have held or asserted, or which hold or assert, or which may in the future hold or assert, any Asbestos Bodily Injury Claim shall be permanently stayed, restrained and enjoined from taking any action against any Protected Party with respect to any such Asbestos Bodily Injury Claim, including without limitation, for the purpose of directly or indirectly obtaining a judgment, collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Asbestos Bodily Injury Claim, including but not limited to:*
>
> > (i)    *commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Asbestos Bodily Injury Claim against any Protected Party*, or against the property of any Protected Party with respect to any such Asbestos Bodily Injury Claim; [...]

provide that nothing in Article 9.3(a) of the Plan shall affect the assertion of rights preserved by Article 10.11 of the Plan.[7]

Id. §9.3 (emphasis added).

> [...]

The Confirmation Order shall provide that, on the Effective date and in addition to the effect of confirmation set forth in section 1141 of the Bankruptcy Code:

> (a)    *Any and all Claims or demands by any Entity against the Protected Parties relating to, associated with, arising from or on account of any Asbestos Bodily Injury Claim shall be deemed fully and permanently discharged and enjoined; provided, however, that Asbestos Bodily Injury Claims against Reorganized debtor shall be channeled to the Trust and may only be asserted against the Trust* in accordance with the Trust Distribution Procedures.

Id. §9.6, p.32 (emphasis added).

---

[7] Article 10.11 of the Plan preserved certain contribution claims of non-settling insurers against any settling insurers and did not authorize the commencement or maintenance of any action against Porter Hayden.

- 12 -

Since the Effective Date of the Plan has passed, Porter Hayden no longer faces any legal compulsion to pay damages for asbestos-related bodily injury claims.  All such claims, present or future, are channeled to the Trust by the Plan or its supporting injunctions immediately and irrevocably.  Unlike the insureds in the <u>Bausch & Lomb</u> and <u>Megonnell</u> cases, Porter Hayden is no longer subject to any form of legal compulsion to pay such claims.  There is not even the potential for such liability under the scheme voluntarily devised by Porter Hayden.  Unlike the policyholders in <u>Bausch & Lomb</u> and in <u>Megonnell</u> who were subject to legal process to enforce rights against them, Porter Hayden cannot be sued, cannot be found liable, and cannot be compelled to pay any damages <u>ever</u> for asbestos-related bodily injury claims.  Under Maryland law, Porter Hayden cannot be found legally obligated to pay damages as required under the Insuring Agreements of the Policies.  There is no coverage, therefore afforded to Porter Hayden under the Policies for the claims at issue.

**2.      There Can Be No Action Against The Insurers Absent A Judgment Against Porter Hayden, Or A Settlement With The Consent Of The Insurers, As A Condition Precedent To Coverage**

The legal obligation of the insured to pay damages, which is a prerequisite to coverage pursuant to the Insuring Agreements, is reinforced in the No Action clauses contained in the Policies.  No Action clauses are explicit conditions precedent to coverage under the Policies that require the legal obligation of the insured to be established in one of the following two ways prior to any action being brought against the Insurer:

> No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, *nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.*

> Any person or organization or the legal representative thereof *who has secured such judgment or written agreement* shall thereafter be entitled to recover under this policy *to the extent of the insurance afforded by this policy*.  No person or organization shall have any right under this policy to join the company as a party to any action against the insured to determine the insured's liability, nor shall the company be impleaded by the insured or his legal representative.  Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder.

See, e.g., Exhibit A(1)   (The remaining policies contain the same or substantially similar language.  Exhibits A(2)-(9)).

No Action clauses are fully enforceable under Maryland law.  In Phillips Way, Inc. v. American Equity Insurance Company, 143 Md. App. 515, 795 A.2d 216 (2002), the Court of Special Appeals held that an insurer validly disclaimed coverage to an insured under a policy of professional liability insurance where the insured settled a claim without the insurer's consent and later sought to enforce the policy.  The Court of Special Appeals found that the No Action clause barred the breach of contract suit and that the insurer was not required to show prejudice to rely upon the defense.  The No Action clauses of the Policies thus require either a judgment against Porter Hayden after trial, or a written settlement between the claimant, Porter Hayden, and the Insurers, both of which are now legal impossibilities.

By stipulation of the parties, the confirmed Plan is not a judgment or settlement of any claim against Porter Hayden.  The Bankruptcy Insurance Stipulation specifically provides as follows:

> Without otherwise limiting or impairing the Plan modifications set forth in Exhibit A hereto, the Parties agree that the confirmation of the Plan (including the occurrence of the Effective Date) will not constitute a settlement or judgment of any Asbestos Bodily Injury Claim or Demand.  The Insurers will retain the right to assert all Asbestos Insurer Coverage Defenses with respect to the resolution of Asbestos Bodily Injury Claims by the debtor, the Reorganized debtor, or the Trust pursuant to the Trust Distribution Procedures or otherwise.  The Parties stipulate and agree that the Insurers have not consented to the Plan or the Plan Documents,

- 14 -

including, *inter alia*, the Trust Distribution Procedures, and have not consented to the payment of any Asbestos Bodily Injury Claims or Demands thereunder.

Exhibit B ¶10, p.3.   Even if Porter Hayden could be a party to a settlement following the issuance of the §524(g) channeling injunction, which it cannot, the Insurers retain the right granted under the Policies requiring their consent to any settlement.   The Insurers have not consented to any such settlement involving Porter Hayden.

The requirement of a legal obligation of the insured to pay damages also is supported by the Maryland Direct Action Statute.   Maryland law prohibits, irrespective of language in a policy to the contrary, a direct action against a liability insurer absent an unsatisfied final judgment against the insured.   The Maryland Direct Action Statute in effect at the time the National Union and American Home policies were issued provided as follows:

> No liability insurance policy issued in this State shall contain any requirement for the payment of liability or loss under the policy, by the assured, but all such policies shall provide in substance that the bankruptcy or insolvency of the assured shall not release the insurer from liability; *that if an execution upon any final judgment against the assured is returned unsatisfied*, in whole or in part, in an action brought by the injured or by another person claiming, by, through, or under the injured, then an action may be maintained by the injured, or by such other person against the insurer *under the terms of the policy* for the amount of any judgment recovered in such action, not exceeding the amount of the policy, and every such policy shall be construed to so provide, anything in such policy to the contrary notwithstanding.

MD. CODE, ART. 48A, §481 (1974)(emphasis added).[8]   Every liability policy issued in Maryland is deemed to contain these statutory provisions regardless of whether such language actually appears in the policy.   Magalski v. Maryland Casualty Company, 21 Md. App. 136, 318 A.2d 843 (1974), cert. denied, 272 Md. 745.

---

[8] The 1981 and 1986 Replacement Volumes of the Code contained the same provisions verbatim.   The statute has been recodified at MD. CODE ANN., [INS.] § 19-102.

The statute explicitly provides that a final judgment must be obtained first against the insured and that any subsequent action against the insurer must proceed under the terms of the policy.  In other words, the insured must be legally obligated to pay damages as a condition precedent to any coverage under the policy.  If the insured, like Porter Hayden, cannot be held liable to the injured party, then there can be no coverage.  Consistent with the statute, the Policies each provide that Porter Hayden's legal obligation to pay must be established by final judgment or an agreed to settlement.  Because Porter Hayden cannot be subject to a judgment to pay damages for asbestos-related bodily injuries under Maryland law, and because the Insurers do not consent to any settlement of such claims, there can be no coverage under the terms of the Policies.[9]

### C.   THERE HAS BEEN NO EFFECTIVE ASSIGNMENT OF THE NATIONAL UNION OR AMERICAN HOME POLICIES TO THE TRUST

#### 1.   The Plan Does Not Explicitly Assign Any Of The Policies To The Trust

As intentionally devised by Porter Hayden, the Plan does not assign any of the Policies to the Trust.  The words "assign" or "assignment" appear nowhere in the document.  The Plan nevertheless purports to grant the Trust "access" to the proceeds of the insurance policies to the extent permitted by non-bankruptcy law.  Article 7.1(d) of the Plan provides, in relevant part, as follows:

> Upon confirmation and consummation of this Plan, the Trust and/or any transferee or assignee of any Asbestos Insurance Policy or Asbestos Insurance Rights shall have access, *to the greatest extent permitted by applicable non-*

---

[9] It is imperative to note that the Insurers are <u>not</u> asserting Porter Hayden's bankruptcy is itself a defense to any coverage obligation or direct action, although it would be strange, indeed, if Porter Hayden were now considered bankrupt or insolvent since the purpose of its reorganization and continuing existence – not to mention its justification for receiving a § 524(g) injunction – was to fund the Trust with its own income on an ongoing basis. Instead, the Insurers contend that the terms of the Policies control their coverage obligations irrespective of Porter Hayden's bankruptcy, and those terms include a legal obligation to pay damages.

*bankruptcy law*, to insurance coverage and/or insurance payments related to Asbestos Insurance Policies (subject to any applicable policy limits) to defend, resolve, and satisfy the Asbestos Bodily Injury Claims channeled to the trust in the same manner as such insurance coverage and/or insurance payments were available to the Debtor to respond to asbestos related claims prior to confirmation of this Plan, subject to the assertion of any Asbestos Insurance Coverage Defenses.

Exhibit D, p.22 (emphasis added).  As discussed below, however, the Trust has no "access" to

the Policies or any of the proceeds from the Policies under applicable Maryland non-bankruptcy

law.  The Trust is not an insured and is not entitled to coverage for the asbestos-related bodily

injury claims at issue.

> **2.     The National Union and American Home Insurance Policies Contain Anti-Assignment Clauses That Are Enforceable Under Maryland Law**

The National Union and American Home Policies require the consent of the Insurers to

any assignment of an interest under the Policies, including any purported assignment of or

"access" to coverage under the Policies.  The National Union Policies state as follows:

Assignment of interest under this Policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, but only until the appointment and qualification of the legal representative.

See generally, Exhibits A(1)–(9).  Maryland law has long held that an anti-assignment clause in a

contract, including an insurance policy requiring the consent of the insurer, is valid and

enforceable.   See, Michaelson v. Sokolove, 169 Md. 529, 182 A. 458 (1936); Clay v.

Government Employees Insurance Company, 356 Md. 257, 739 A.2d 5 (1998).

The Insurers have not consented to any assignment of any right or interest in the Policies,

whether disguised as "access" to coverage or otherwise.  Both the Plan and the Bankruptcy

Insurance Stipulation explicitly acknowledged that such consent was not given by the Insurers.

Article 10.7(b) of the Plan provides, in relevant part, as follows:

> [...] While the obligations, if any of the Trust to pay holders of Asbestos Bodily Injury Claims and Demands shall be determined pursuant to the Plan and the Plan Documents, neither (I) the Court's approval of (x) the Plan, (y) the Asbestos Bodily Injury Trust Distribution Procedures, or (z) the Plan Documents, nor (II) the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan shall, with respect to any Asbestos Insurance Company, constitute a trial or hearing on the merits, an adjudication or judgment, or be used as evidence to prove:
> [...]
>
> (v)     that any of the Asbestos Insurance Companies participated in and/or consented to the negotiation of the Plan, the Trust Distribution Procedures, or any of the Plan Documents.

See Exhibit D, p.35.

Moreover, the Bankruptcy Insurance Stipulation provides specifically at Paragraphs 10 and 11 that the Insurers did not consent to the confirmation of the Plan, and preserved the Insurers' right to assert that any alleged assignment of the Policies is invalid and unenforceable pursuant to applicable non-bankruptcy law.   The Stipulation provided, in relevant part, as follows:

> [...] The Parties stipulate and agree that the Insurers have not consented to the Plan or the Plan Documents, including, *inter alia*, the Trust Distribution Procedures, and have not consented to the payment of any Asbestos Bodily Injury Claims or Demands thereunder.

Exhibit B ¶10.

> Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the confirmation of the Plan shall limit the right of any Insurer to assert any Asbestos Insurance Coverage Defense, including, but not limited to, any Insurer's defense that the Alleged Assignment, whether it transpires upon the occurrence of the Effective Date of the Plan or upon a date subsequent thereto, pursuant to the terms of the Plan or otherwise, is not valid or enforceable under, *inter alia*, the anti-assignment provisions of the applicable Asbestos Insurance Policies, the United States Constitution, the Bankruptcy Code, *and/or applicable state law.*

- 18 -

Id. ¶11.

In Clay v. GEICO, 356 Md. 257, 739 A.2d 5 (1998), the Court of Appeals held that an insurer's refusal of consent to an assignment of the insured's right to receive benefits under the policy rendered the purported assignment invalid. The dispute involved an assignment of uninsured motorist benefits under an automobile insurance policy to a physician who treated the insured for injuries caused by an uninsured tortfeasor. The policy contained an anti-assignment clause, and the insured did not obtain the insurer's consent prior to the assignment. The physician asserted that a public policy in favor of treatment for victims of automobile accident overrode the anti-assignment clause. Even though uninsured motorist coverage is mandatory in Maryland, the Court of Appeals affirmed judgment in favor of the insurer on the grounds that the insured "had no contractual right to assign any interest she had under the policy to anyone else without GEICO's consent [and] GEICO never gave that consent." Id. at 261, 7.

In the present case, the contracts entered into between Porter Hayden and the Insurers contained clauses requiring the consent of the Insurers to any assignment or transfer of the rights and duties of the parties. The stipulations entered into between Porter Hayden and the Insurers required the Plan to preserve the Insurers' rights to enforce those contracts in accordance with non-bankruptcy law.[10]  Whether termed an assignment or camouflaged as a grant of "access,"

---

[10] In contrast to the present case, other recent Section 524(g) asbestos bankruptcies explicitly found that the assignment of insurance policies to a trust was effective over the objections of the insurers. See, e.g., In re: Kaiser Aluminum Corp., 2006 Bankr. LEXIS 3945 (D. Del. February 6, 2006); OneBeacon Am. Ins. Co. v. A.P.I., Inc., 2006 U.S. Dist. LEXIS 34297, 48 Bankr. Ct. Dec. 168 (D. Minn. 2006).  In those cases, however, the plans specifically provided for such an assignment, whereas the Plan here permits the Trust to have "access" to such proceeds "to the greatest extent permitted by applicable non-bankruptcy law."  The confirmation orders, such as in Kaiser Aluminum, also specifically approved of the explicit assignment of the insurance policies in those cases, and overruled any effect of anti-assignment clauses. Here Judge Derby's confirmation order makes no mention of any such transfer.  The A.P.I. court, for instance, noted that the reorganization plan in that case provided:

> Pursuant to Bankruptcy Code sections 541(c) and 1123(a)(5)(B), on the Effective Date, the Trust shall succeed to all of Debtor's Asbestos Insurance Rights in the Asbestos Insurance Policies

these clauses are enforceable under Maryland law to preclude any such purported transfer of rights.  The Trust therefore possesses no rights under the Policies, nor does it have any legally enforceable "access" to any coverage or proceeds under the Policies.

### D.   THE TRUST IS NOT AN INSURED AND NOT ENTITLED TO ANY COVERAGE IN LIEU OF PORTER HAYDEN

#### 1.   The Trust Is Not A Named Insured Or Additional Insured Under Any Of The Policies

Porter Hayden, not the Trust, was and is the insured under the terms of the Policies.  Each of the National Union policies contains substantially similar Named Insured Endorsements which identify the following as Named Insureds under those policies:

> <u>Named Insured</u>
> Porter Hayden Company
> Phoenix Harbor Corporation
> P.H. Sales Company
> United Insulation Company
> Vogt & Company[11]

<u>Exhibits A(1)–(4)</u>.  Moreover, Porter Hayden was the only Named Insured under the National Union and American Home excess liability policies.  <u>Exhibits A(5)–(7)</u>.

Similarly, the definitions of "insured" under all of the Policies demonstrate that the Trust cannot qualify as an additional insured.  The National Union primary CGL policies provided in subparagraph (c) of the Definitions that "if the named insured is designated in the declarations as

---

*without regard to any state law limitations on the assignment of such policies*, which limitations, if any, shall be of no force and effect in respect to the revesting of such rights in the Trust. No documents of transfer shall be required to effectuate this succession, and the Trust shall be fully authorized to act in its own name, or in the name of the Debtor, to enforce any right, title or interest of the Debtor in the Asbestos Insurance Rights.

<u>Id.</u> at *3-4 (emphasis added).

Because Porter Hayden, with the approval of the Class 3 claimants, strongly desired to have the Insurers withdraw their objections to the confirmation of the Plan, they agreed specifically to subject the validity of the claims and counterclaims of the parties to Maryland law, <u>i.e.</u>, the applicable non-bankruptcy law, and not the Bankruptcy Code.

[11] Out of the entities named in the policies as insured, only Porter Hayden ever faced any asbestos-related bodily injury liabilities.

other than an individual, partnership or joint venture, the organization so designated and any executive officers, directors or stockholders thereof while acting within the scope of his duties as such" will be recognized as the insured.  Exhibits A(1)–(4).  The St. Paul and First State policies, underlying the National Union and American Home excess policies, contained similar language limiting the definition of "insured" to the entity designated in the declarations and its executive employees when acting in that capacity.  Exhibits A(8)–(9).

The Trust cannot qualify as an insured under the Policies.  The Trust is not designated as the Named Insured in the Declarations, nor is it listed as a Named Insured or Additional Insured in any endorsement.  Indeed, the earliest of these policies was issued twenty-two years before the Trust was created.  The Trust therefore is not entitled to any coverage as an insured under the Policies.

> **2.    There Is No Precedent Under Maryland Law By Which The Trust Could Unilaterally Become A Successor In Interest To Porter Hayden's Insurance Coverage Without The Consent Of The Insurers**

In a single provision, the Plan purports to establish the Trust as a successor in interest to Porter Hayden's rights as an insured under the Policies.  Article 10.8 of the Plan provides, in pertinent part, as follows:

> All provisions of this Article 10.8 are subject to the terms of the Plan, including without limitation Article 10.7 and the Asbestos Insurance Coverage Defenses.
>
> [...]
>
> Except as provided in an Asbestos Insurance Settlement Agreement, or the provisions of the Supplemental Injunction relative to such Agreement, none of the Debtor's discharge, the Plan, the Plan Documents, nor the Injunctions shall diminish or impair the enforceability of any of the Asbestos Insurance Policies.  The Trust is, and shall be deemed to be, for all purposes, including, but not limited, to for purposes of insurance and indemnity, a successor in interest to Debtor in respect of Asbestos Bodily Injury Claims."

Exhibit D, p.36.

The Bankruptcy Insurance Stipulation modified the Plan to explicitly subject Article 10.8 to the insurance neutrality principle expressed in Article 10.7 and the Asbestos Insurance Coverage Defenses.  As noted above, the Coverage Defenses were defined to include, "[...] all defenses at law or in equity, including any right of set-off or recoupment, that any Asbestos Insurance Company may have *under applicable non-bankruptcy law*."  See, fn 4, *supra*.  The actual status of the Trust as a successor in interest to Porter Hayden must be determined, therefore, in accordance with Maryland law.

There is no legal theory that has been applied by a Maryland Court that would allow an entity not a party to an insurance policy unilaterally to declare itself an insured, or that would permit an insured to name such a successor in interest and thereby effectuate an assignment without the consent of the insurer.  Accordingly, under Maryland law the statement hat the Trust shall succeed to the interest of Porter Hayden is ineffective to transfer any coverage rights under the Policies.

Maryland law recognizes only one exception to the rule that a successor does not succeed to the insurance rights of an insured absent the consent of the insurer.  Where the putative insured is the surviving corporation in a merger, the successor may be vested with the rights and duties of the former insured without the consent of the insurer.  See e.g., Brunswick Corporation v. St. Paul Fire and Marine Insurance Company, 509 F. Supp. 750 (E.D. Pa. 1981)(citing Maryland corporate law, and finding that a merged corporation was entitled to coverage under a CGL insurance policy previously issued to one of the extinguished corporations).  This exception plainly does not apply to the Trust.  Porter Hayden and the Trust did not merge, but rather the Trust was created as a new and separate entity pursuant to bankruptcy law.  Porter Hayden

continues to operate as a separate and independent corporation.  Accordingly, the status granted to the Trust by the Plan, that of a successor in interest to Porter Hayden's insurance coverage, cannot and did not assign any rights over the expressed objections of the Insurers.

### III.  CONCLUSION

The National Union and American Home insurance policies cover only those damages for bodily injury or property damage for which an insured is legally obligated to pay.  Porter Hayden can have no legal obligation to pay damages for asbestos-related bodily injury claims, because it voluntarily and deliberately transferred any legal obligation it otherwise would have had to the Trust.  Since the Trust was not and cannot be an insured under the Policies, and is not entitled to any coverage thereunder, its legal obligations pursuant to bankruptcy law are irrelevant.  Both the applicable Maryland law and the plain language of the Policies require both a legal obligation on the part of the insured, and a final judgment or agreed to settlement, as conditions precedent to any coverage obligation attaching to the Insurers.  The consent of the Insurers is required, moreover, for any assignment or grant of access to coverage under the Policies to be valid.  The Insurers have not consented to any settlement of claims by the Trust or assignment of, access to, or grant of status of successor in interest under any of the Policies.  For the foregoing reasons, National Union and American Home respectfully request that this Court grant their Motion and find that there is no coverage under the National Union or American Policies for the asbestos-related bodily injury claims channeled to the Trust.

Dated: January 30, 2009        Respectfully Submitted,

**JACKSON & CAMPBELL, P.C.**

_____/s/_____
Timothy R. Dingilian, Esquire
Fed. Bar No. 15444
Brian C. Malone, Esquire
Fed. Bar No. 16025
1120 20th Street, N.W.
South Tower
Washington, D.C. 20036
(202) 457-5487
(202) 457-1678 (f)