IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, et al., <br><br> Plaintiff, <br><br> vs. <br><br> PORTER HAYDEN COMPANY, <br><br> Defendant. | Case No. 1:03-cv-03408-AMD <br> (consolidated with: 1:03-cv-03414-AMD) |

MEMORANDUM OF LAW IN SUPPORT OF
**PORTER HAYDEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Porter Hayden Company ("Porter Hayden") respectfully submits the following Memorandum of Law in Support of its Motion for Partial Summary Judgment against National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union").

**I.    INTRODUCTION**

National Union sold Porter Hayden two insurance policies promising to provide Porter Hayden with "litigation insurance," that is, insurance for the risk of litigation against the company in connection with allegations of injury during National Union's policy periods. *See Brohawn v. Transamerica Ins. Co.*, 347 A.2d 842, 850 (Md. 1975) (discussing litigation insurance). Porter Hayden now moves this Court for a declaration that National Union's contractual defense obligation includes its fair share of the costs Porter Hayden incurs in defending asbestos-related tort claims. Due to Porter Hayden's bankruptcy and the subsequent court injunction, such claims now are channeled to the Porter Hayden Bodily Injury Trust ("Porter Hayden Trust" or "Trust") instead of being filed directly in a court of law. National Union's promises to protect Porter Hayden are not reduced following Porter Hayden's

bankruptcy nor is Porter Hayden seeking a larger recovery because of its bankruptcy. To the contrary, National Union promised that the event of Porter Hayden's bankruptcy would "not relieve [National Union] of any of its obligations" under the policy. *E.g.*, National Union Policy Nos. GLA 152 41 65 RA (4/1/84-85) at Conditions ¶5 and GLA 194 03 85 RA (4/1/85-86) at Conditions ¶5 (Exhs. A & B). Thus, Porter Hayden seeks only the same costs of lawyers and other defense efforts that it would be entitled to in the conventional tort system; Porter Hayden does not seek the general costs of administering the Trust.

Despite notice of the proceedings on the Porter Hayden Trust and Porter Hayden's request for a defense, National Union has not acted or acknowledged its defense obligation. National Union has indicated that its policies only provide a defense to suits filed in a court of law and that, following the creation of the Porter Hayden Trust and its associated claim process, there are no such suits to defend. Such an argument fails.

Even in the absence of the protections of Maryland Code, Insurance § 19-102(b)(1), and the policy language preserving coverage after bankruptcy, it simply is not the case that National Union's obligation to defend Porter Hayden in "suits seeking damages" is confined to conventional complaints filed in a court of law. In Maryland and elsewhere, courts have refused to give a narrow technical definition to terms like "suit" where it would defeat a reasonable, coverage-providing construction, instead making clear that an insurer's defense obligation extends to various situations in which an insured's liability to a third-party is resolved. Here, following its bankruptcy, Porter Hayden's third-party asbestos-related liabilities are resolved by presentation to the Porter Hayden Trust for scrutiny and, if meritorious, payment. These third-party asbestos claims filed with the Porter Hayden Trust are "suits" under National Union policies and the costs of reviewing and resolving each one claim are within National Union's defense obligation.

## II.  BACKGROUND

Porter Hayden sold and installed insulation in commercial and industrial facilities over several decades.  Porter Hayden maintained policies of liability insurance through various insurers, including National Union.  *See* Exhs. A and B (policies).  National Union agreed to indemnify Porter Hayden for "all sums which the insured shall become legally obligated to pay as damages because of [bodily injury] to which this insurance applies."  Exh. B (National Union Policy No. GLA 194 03 85 RA at Coverage I).  National Union also contracted to provide defense coverage for indemnified claims:

> [T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient

*E.g.,* Exh. B at Coverage I (1985-86 policy).

Several years ago, Porter Hayden became a target of individuals claiming injury from exposure to the asbestos in materials sold by Porter Hayden or released by Porter Hayden's operations.  These asbestos-related tort claims mounted, *see* Porter Hayden's First Amended Complaint ¶16-19 and, eventually, caused Porter Hayden's bankruptcy.  The bankruptcy court, with knowledge that the asbestos claims were expected to continue for decades, relied upon the bankruptcy code's endorsement of trusts and established the Porter Hayden Trust ("Trust") to resolve the claim stream in place of continued piecemeal litigation.  11 U.S.C. 524 (g)(2)(B)(i)-(ii) (discussing asbestos trusts and authorizing them to "value, and be in a financial position to pay" asbestos-related claims arising over time where "pursuit . . . outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably"); Order Confirming Third Amended Plan of Reorganization of Porter Hayden Company as Modified ¶16 (Exh. C).

The Trust's organizing documents charge it with "liquidat[ing] all Asbestos Bodily Injury Claims that meet the presumptive Medical/Exposure Criteria" of five defined, asbestos-related diseases. Porter Hayden Company Asbestos Trust Distribution Procedures ("TDP") § 2.2(b) (Exh. D). Now asbestos claimants must pursue Porter Hayden by bringing their asbestos claims against the Trust pursuant to procedures replacing the standard civil procedures under which claimants could sue Porter Hayden directly. There are many analogous aspects to the procedures. Just as a complaint signals the initiation of a lawsuit in court, a claimant initiates his claim against the Porter Hayden Trust by filing a proof of claim. TDP § 5.3. The Trust then has a period in which it can seek disclosure from the claimant of additional information so that it can evaluate the support for the claim, including "medical evidence . . . [that] is credible and consistent with recognized medical standards" and credible evidence of exposure to asbestos for which Porter Hayden would bear liability. TDP § 5.7(a)(2); TDP § 5.7(b)(1). (Much as a defense lawyer evaluates a lawsuit, the TDP requires careful consideration of the evidence presented by the claimants.) After the Trust's evaluation, it can deny the claim or, if the claim has merit, it can offer payment of a scheduled value in return for a release of liability and end the process. TDP § 5.3(a)(2). Claimants upset with the result can institute an arbitration to determine whether the Trust's actions in evaluating the claim were proper or whether the claimant's medical condition or exposure history meets the TDP's requirements. TDP § 5.10(a). In the event a claimant opts for non-binding arbitration and again disagrees with the result, the claimant can file a court action, TDP § 5.11, but even if the court action is successful and the claimant secures a judgment larger than either the Trust's initial evaluation or the arbitral award, the Trust is protected against paying the excess judgment for five years and then is entitled to pay the remaining over the ensuing five years (subject to other provisions). TDP § 7.7.

The Porter Hayden Trust has retained Verus Claim Services, LLC ("Verus") to resolve asbestos tort claims in the most efficient and expeditious manner. Verus deploys teams of claim reviewers, secondary reviewers, and senior personnel (many of whom gained considerable experience evaluating asbestos claims in their prior employ in the claim departments of insurers) to investigate and defend the claim submissions the Trust receives. *See* Declaration of Robert Capritti ("Capritti Decl.") at 3. Verus ensures that the Porter Hayden Trust denies unmeritorious claims (*e.g.*, those subject to a statute-of-limitations defense or for which there is no credible evidence of exposure or injury) and, where faced with meritorious claims, seeks to resolve them. *Id.*

The alternate procedures of the Trust expedite the resolution of asbestos-related tort claims. The Trust is expressly charged with attempting to ensure that claimants are treated similarly despite the passage of time. *See* TDP § 1.1 (requiring "fair and equitable treatment for all . . . Claims that may presently exist or may arise in the future"). The Trust furthers bankruptcy's goals of preserving assets for claimants (rather than expending them on transaction costs) and precluding a race to the courthouse by claimants seeking a share of Porter Hayden's limited assets. *See* Exh. C at ¶HH).

As the Porter Hayden Trust began accepting claims last September, Porter Hayden specifically asked National Union to provide a defense.[1] National Union has not responded. Although National Union has not given Porter Hayden a reason as to why it has not complied with its contractual obligation, earlier statements suggest that National Union will contend that a claim submitted to the Trust cannot constitute a "suit" as that term is used in the policies.

---

[1] *See* Letter from T. Dennis Feeley, President, Porter Hayden Company, to Timothy Dingilian, Counsel for National Union (Oct. 21, 2008) (Exh. F).

## III. ARGUMENT

National Union sold Porter Hayden policies in which National Union promised to defend and indemnify Porter Hayden against certain third-party liabilities, promises that expressly survive the insured's bankruptcy. Having been through bankruptcy, Porter Hayden continues to face liability claims that are in substance, but not procedure, identical to pre-bankruptcy claims that are within the coverage grants of the policies. Though National Union may argue that a technical reading of policy language promising to defend any "suit" limits the coverage to only those claims for which a complaint has been filed in a court of law, neither Maryland coverage law nor the decisions of courts in other jurisdictions support the effort by National Union to escape a defense obligation that, absent Porter Hayden's bankruptcy, it would owe.

### A. The Fortuity of Porter Hayden's Bankruptcy Does Not Alter National Union's Contractual Obligation to Defend Porter Hayden

Numerous cases have held that third-party asbestos liability claims trigger an insurer's duty to defend. *See, e.g., Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178 (2d Cir. 1995); *In re: Eagle-Picher Industries, Inc.,* 134 B.R. 248 (Bankr. S.D. Ohio 1991); *In re: Amatex Corp.,* 107 B.R. 856 (E.D. Pa. 1989).

Porter Hayden's bankruptcy should have no effect on the continued existence of coverage for asbestos-related liability claims. By operation of Maryland law, the procedural adjustments wrought by the bankruptcy court are coverage neutral: "Each liability insurance policy issued in the State shall provide that: (1) the bankruptcy or insolvency of the insured does not release the insurer from liability." MD Code Ann., Ins. § 19-102 (1). In compliance with Maryland law, National Union's policies state that "Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder." Exhs. A & B at Conditions ¶5.

6

The basis for the Maryland statute and the National Union policy language is twofold. First, there is the unexceptionable principle that a claimant's right to compensation for the debtor's torts survives bankruptcy and discharge, even if the bankruptcy law alters the procedural means by which that claimant pursues that right and the assets against which that right can be asserted. *See In re Bacon*, 274 B.R. 682 (Bankr. D. Md. 2002). Second, it reflects the parties' intent that the fortuity of an insured's bankruptcy should not provide a windfall to a solvent insurer. *See In re Wallace & Gale Co.*, 385 F.3d 820, 832 (4th Cir. 2004). Given the inclusion of the policy language expressly recognizing the potential bankruptcy of the insured, which presupposes that the manner in which claims can be brought against that insured will no longer be governed by the forum's rules of civil procedure, National Union cannot contend that the change in procedures for asserting liability against its insured was somehow outside the intent of the parties to the contract. Consequently, National Union's obligation to defend its insured and pay otherwise valid claims is not extinguished by the changes worked by its insured's bankruptcy discharge.

In the context of the Porter Hayden Trust, a finding that incoming claims were not suits and that coverage only applies when the claims mature into suits following evaluation and arbitration, the Trust would have the incentive to summarily deny all claims and attempt to provoke the lawsuits authorized by the TDP's appeal process, subverting the purpose of the Trust, increasing transactions costs while decreasing amounts available for compensating injured parties, and making claim submissions futile.

### B. "Suit" Encompasses more than a Narrow and Technical Interpretation Limited to Complaints Filed in a Court of Law

The National Union policies provide "the company shall have the right and duty to defend any suit against the Insured seeking damages."[2] The policies contain no definition of "suit." In the absence of a definition, Maryland law provides that a term is to be interpreted as a reasonable insured would understand it, with the parties' intent derived "from the policy as a whole." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1031 (Md. 1993). While Maryland does not automatically construe policies against the insurer, "if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer as drafter." *Megonnell v. U.S. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002).

Maryland and several other jurisdictions have interpreted promises made in insuring agreements broadly to fulfill the purpose of protecting the insured and rejecting constrained constructions that leave the insured unprotected. For instance, Maryland's high court refused a carrier's request for "a special or technical meaning to the term 'damages'" that would deny an insured indemnity coverage for amounts spent remediating environmental harm under state monitoring but outside the context of a suit in court. *See Bausch & Lomb*, 625 A.2d at 1032-33. The court refused the insurer's proffered narrow reading:

> Absent an express provision in the document itself, insurance policy-holders surely do not anticipate that coverage will depend on the mode of relief, *i.e.*, a cash payment rather than an injunction, sought by an injured party. Policy-holders will, instead, reasonably infer that the insurer's pledge to pay damages will apply generally to compensatory outlays of various kinds, including expenditures made to comply with administrative orders or formal injunctions.

*Id.* at 1033. More recently, the court reiterated its refusal to impose narrow, coverage-defeating constructions when it rebuffed a carrier's request to read the term "legally liable" as requiring an

insured to await an entry of judgment against it, the effect of which would have been to deny coverage to an insured who settled a claim prior to trial. *See Megonnell*, 796 A.2d at 765. The court recognized that a legal obligation, *i.e.*, a liability, arises with the tortious act such that a court judgment is a *post hoc* determination of what is a pre-existing liability. *Id.* at 765-66, 767.

While the Maryland Court of Appeals has not considered the scope of the term "suit," other jurisdictions ruling in accord with Maryland's rejection of narrow, legalistic interpretations of policy terms from insuring agreements have found that "suit" extends beyond actions initiated by complaints filed in a court of law. These courts look for the existence of a process by which parties' pre-existing legal rights will be determined, whether that be a statutorily-authorized regulatory proceeding under CERCLA, arbitration, mediation, or otherwise. If there is a process, the proceedings constitute a "suit" for purposes of the duty to defend. For instance, in *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864 (Mich. 1994) (rejecting carrier arguments that there was no suit) (overruled on other grounds), the Michigan Supreme Court held that the term "suit" is "capable of application to legal proceedings initiated in other than a traditional court setting," and that suit "means, and should be construed as intended to include, the mode or manner authorized and adopted by law to redress civil injuries." *See Millers*, 519 N.W.2d at 869. Several other courts similarly have found defense coverage for environmental proceedings involving suits taking place *other* than in a court of law.[3]

---

[2] Exh. B (National Union Policy No. GLA 194 03 85 RA at Coverage I).

[3] *See also Edo Corp. v. Newark Ins. Co.*, 898 F. Supp. 952 (D. Conn. 1995) (holding that a PRP letter is a suit); *Liberty Mut. Ins. Co. v. Black & Decker Corp.*, 2004 WL 1771589 (D. Mass. Aug. 5, 2004) (State's Notice of Responsibility sufficient to trigger duty to defend); *Compass Ins. Co. v. Littleton,* 984 P.2d 606 (Colo. 1999) (recognizing that a reasonable person would find a PRP notice to be a suit); *Westling Mfg Co., Inc. v. Western Nat. Mut. Ins. Co.*, 581 N.W.2d 39 (Minn. App. 1998) (insurer had duty to defend proceedings brought by Minnesota Pollution Control Agency); *Metex Corp. v. Federal Ins. Co.*, 675 A.2d 220 (N.J. 1996) (liability is what matters, regardless of the existence of a suit or enforcement proceeding); and *State v. CNA Ins.*

Defense coverage for suits extends beyond situations involving administrative proceedings under CERCLA or analogous state environmental statutes. Courts have required a carrier to defend an insured when the insured is involved in other administrative proceedings. *See School District No.1 v. Mission Ins. Co.*, 650 P.2d 929, 937 (Or. App.1982) ("suits" include administrative proceedings and do not have to take place in court).[4] Courts have also required carriers to defend in arbitrations and informal dispute resolution proceedings.[5]

What unites these different settings is that with each there is a measurement of liability and a determination of obligation. Courts look at the character of the proceeding and whether that proceeding will have an effect on the insured's rights. The U.S. Court of Appeals for the District of Columbia stated that "it is the character of the proceedings in which the claim for damages against the insured is made . . . that determines whether there is a 'suit against the insured.'" *Continental Cas. Co. v. Cole*, 809 F.2d 891, 898 (D.C. Cir.1987) ("an insured who is being 'proceeded against' albeit in an unorthodox fashion, is no less entitled to a defense than his insured contemporaries who are legally attacked in a more conventional manner").[6]

---

*Cos.*, 779 A.2d 662 (Vt. 2001) (administrative proceedings can be sufficiently adversarial to constitute a "suit").

[4] *See also Campbell Soup Co. v. Liberty Mut. Ins. Co.*, 571 A.2d 969, 970-71 (N.J. App. Div. 1990).

[5] *See Aecon Bldgs., Inc. v. Zurich North America,* 572 F. Supp.2d 1227, 1230 (W.D. Wash. 2008) (policy obligated insurer to defend insured during the information dispute resolution process because insured could have been held responsible for damages); *Madawick Contracting Co. v. Travelers Insurance Co.,* 307 N.Y. 111, 120 N.E.2d 520 (1954) ("the word 'suit' appearing in the liability insurance policy is a broad term" encompassing arbitration proceedings).

[6] In *Cole*, the Court of Appeals held that the insurer had a duty to defend its insured even though the insured was not a party to the lawsuit (the insured was counsel whose fees would be determined in the proceeding). *Id.* In much the same way, an insured who affirmatively brings a lawsuit for defensive purposes can trigger an insurer's duty to defend. *See Simon v. Maryland Cas. Co.*, 353 F.2d 608 (5th Cir. 1965).

That said, courts also have found insurers to breach the duty to defend when they fail to defend claims that may (but have not yet) become suits. In *Alderman v. Hanover Insurance Group*, the insurer denied coverage of a claim against the insured. 363 A.2d 1102 (Conn. 1975). Following the coverage denial but before the claimant filed suit, the insured incurred investigation costs and legal fees and negotiated a settlement. *Id.* at 1107. The Connecticut Supreme Court held that the insured was entitled to recover the costs of investigation and legal fees resulting from the claim, in addition to the amount of the settlement. The Court found that it would be "a gesture of futility and would have fostered unnecessary litigation" to require the insured "to remain passive while suit was filed and judgment taken." *Id.* at 1107. Results such as *Alderman* are an outgrowth of an insurer's contractual obligation to act in good faith by settling the claim against its insured. *Fireman's Fund Ins. Co. v. Continental Ins. Co.*, 519 A.2d 202, 204 (Md. 1987).

Unlike *Bausch & Lomb*, who acted in anticipation of a claim that it had a legal liability and sought coverage for amounts outside its insurer's duty to indemnify, *Bausch & Lomb*, 625 A.2d at 790, Porter Hayden faces actual claims for existing legal liabilities that are being brought pursuant to the only mechanism now available to the claimants (some of whom had suits pending when Porter Hayden entered bankruptcy), presentment against the Porter Hayden Trust. Like the reasonable insurance policy-holders to which the Maryland Court of Appeals refers in *Bausch & Lomb* and *Megonnell*, Porter Hayden surely does not anticipate that its defense coverage turns on whether it has been through bankruptcy (and thus claims once presented in court must now be presented in a different mode, against the Trust), particularly given that Maryland statute and the policy expressly contemplate the continuance of insurance following bankruptcy.

### C.     The Claim Evaluation Expenses Further Porter Hayden's Defense.

The expenditures for which Porter Hayden seeks recovery under the policies' defense obligation serve defensive purposes, that is to say, these expenditures ensure that Porter Hayden does not pay invalid claims or for excessive damages. *See, e.g.,* Capritti Decl. at ¶8. These expenditures are amounts that an insured reasonably would consider to be within a defense obligation.

The insurer's duty to defend is broad, "broader than the duty to indemnify." *Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.*, 457 F.3d 368, 372 (4th Cir. 2006) (quoting *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 695 A.2d 566, 569 (Md. 1997)). Under the standard insuring agreement, the defense obligation encompasses not only claims that, if reduced to judgment, would obligate the insurer to indemnify, but also those claims where the coverage merely is possible. *Brohawn,* 347 A.2d at 850("[T]he insurer still must defend if there is a *potentiality* that the claim could be covered by the policy.")(emphasis in original). Maryland's courts have held that an insurer's duty to defend exists so that "a proper defense is made to the claim and that unwarranted, overstated, and collusive claims are exposed and defeated." *Sherwood Brands, Inc. v. Hartford Accident & Indemnity Co.*, 698 A.2d 1078, 1083 (Md. 1997) (*citing* 7C Appleman Ins. Law & Pract. § 4681 at 2-4 (Berdal ed. 1979 & Supp. 1996-97)).[7] An insurer's defense duty arises regardless of whether the insured has provided notice, even if, as a practical matter, the insurer cannot exercise its right to control the defense until notified: "The duty to defend, rationally, should attach at the same moment the correlative right to control attaches, *i.e., when*

---

[7] *See also Great West Cas. Co. v. Marathon Oil Co.*, 315 F. Supp. 2d 879, 882-883 (D. Ill. 2003) ("'Defense' is about avoiding liability. . . . A duty to defend would be nothing but a form of words if it did not encompass all litigation by the insured); *Oscar W. Larson Co. v. United Capital Ins. Co.*, 845 F. Supp. 458, 461 (W.D. Mich. 1993), aff'd, 64 F.3d 1010 (6th Cir. 1995); *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1027 (Ind. Ct. App. 1999).

*the claim is made or, if the policy so provides, when an insured occurrence happens."* Id. at 1083-84 (finding the duty arises "as soon as there is something to defend") (emphasis added).

The National Union policy states that it has a duty to defend Porter Hayden against those "seeking damages on account of bodily injury or property damage." *See* Exh. B (National Union Policy No. GLA 194 03 85 RA at Coverage I). Because the right to call on an insurer's resources for the defense of third party claims is a motive for the purchase of insurance, *Sherwood Brands*, 698 A.2d at 1083 (duty to defend serves as "litigation insurance 'protecting the insured from the expense of defending suits brought against him'"), courts have held that defense costs include reasonable expenses for investigation of matters that might fall within the duty to indemnify. *Aerojet Corp. v. Transp. Indem. Co.*, 948 P.2d 909, 917-20 (Cal. 1997). The duty to defend "requires the undertaking of reasonable and necessary efforts for that purpose . . . including investigation . . . . It also requires the incurring of reasonable and necessary costs to that end . . . including investigative expenses." *Aerojet* at 920.[8] Investigation includes examining the facts, the relative rights and duties of the actors, the nature of the damages, and the reasonableness of any offer of settlement. *See, e.g., Blakely v. American Employers' Ins. Co.*, 424 F.2d 728 (5th Cir. 1970).

---

[8] *See also Cooley v. Mid-Century Ins. Co.*, 218 N.W.2d 103, 105 (Mich. Ct. App. 1974):

> We are of the opinion that the duty to defend necessarily includes any investigation necessary and proper in preparing a defense, for absent such investigation the defense of any subsequent suit filed will be seriously impaired. Therefore, where the insurer's duty to defend is in issue, its liability for the costs of a necessary and proper investigation will depend on the resolution of that issue. If a trial court determines that an insurer was obligated to defend its insured, then the insurer is liable for any investigative costs. Where an insurer breaches its duty to defend, it is not permitted to reap the fruits of an investigation performed by its insured without compensating the insured for the costs of his investigative efforts.

13

Lawyers may investigate and defend an insured, but in the mass-tort asbestos context where many of the claims can be categorized for handling, much of the investigation and defense is performed by central clearinghouses that retain various claim handlers and reviewers. *See In re: Eagle-Picher Industries, Inc.*, 134 B.R. 248, 258 (1991) (finding coverage for surcharges of central clearinghouse hired to administer, defend, and settle asbestos related claims; coverage "embrace[d] the reasonable steps taken by debtors" to participate in the ACF, "an expert facility in this field.") Like Porter Hayden, Eagle-Picher Industries, Inc. ("Eagle-Picher) was bankrupted by asbestos claims. After its primary insurance exhausted, Eagle-Picher took steps to control the cost of its defense. It engaged its carrier, Liberty Mutual Insurance Company, to continue defending and administering the claims. *Id.* at 251. Eagle-Picher also joined the Asbestos Claims Facility, a central clearinghouse established by a group of asbestos defendants and their insurers to defend and settle claims under a cost-sharing formula under which Eagle-Picher was obligated to pay more than $1,000,000 of ACF surcharges. *Id.; see also* Capritti Decl. ¶ 34 & Exh. 1 (attaching copy of agreement creating ACF). When Eagle-Picher sought reimbursement from the excess carriers above the exhausted Liberty Mutual coverage, they balked at the fees as being "the [uncovered] cost of doing business." *Id.* at 253. The court roundly rejected the cost-of-doing-business argument and found that under a policy promising to pay the insured's ultimate net loss,[9] the coverage "embrace[d] the reasonable steps taken by the debtors in retaining the services of Liberty Mutual to dispose of claims, and to participate in the ACF, likewise an expert facility in this field." *Id.* at 254. Courts considering matters outside the mass-tort asbestos context similarly have found coverage for an array of expenditures, including situations where an insured has supplemented its outside counsel, *e.g.*, such as by using its own

---

[9] In *Eagle-Picher*, the insured's excess policies provided coverage of the insured's "ultimate net loss," which included expenses for "lawyers . . . and other persons, and for litigation, settlement,

employees for certain tasks in lieu of outside counsel. *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co.*, 281 F.2d 538, 542 (3d Cir. 1960); *Travelers Inc. Co. v. State Ins. Fund*, 588 N.Y.S.2d 973, 975 (Ct. Cl. 1992).

Porter Hayden's asbestos liabilities fall within the coverage grant for indemnification and, as such, within the scope of the broader duty to defend. Prior to bankruptcy, Porter Hayden paid lawyers and their assistants to investigate and defend each case. With the procedural changes wrought by its bankruptcy, Porter Hayden's primary investigation and defense of the allegations of its asbestos liability must be conducted through the claims on the Trust. In order to keep its costs low and maximize the assets available for the claimants, Porter Hayden has retained Verus to investigate the formal claims brought on the Trust by claimants (the vast majority of whom are represented by counsel), to seek additional documentation where it is needed to build a record that can be reviewed against the standards confirmed by the bankruptcy court, and then provide the initial evaluation of whether the claim is appropriate for settlement.

## IV   CONCLUSION

Porter Hayden, as an insured, has reason to expect that National Union is responsible for covering the costs for processing the Trust claims given the broad language of the duty to defend in National Union's policies. Although bankruptcy has changed the initial forum from a trial court to the Trust, Porter Hayden still is being pursued by adversaries who have traditionally brought their cases in court and still are seeking damages that are otherwise payable under the

---

adjustment and investigation of claims." *Id.* at 253.

terms of the policy. For the foregoing reasons, Porter Hayden respectfully moves the Court to grant its motion for partial summary judgment.

Dated: January 30, 2009

Respectfully submitted,

Marc S. Mayerson
Donald R. McMinn
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D C  20005
(202) 898-5800
(202) 682-1639 (Fax)
*Attorneys for Defendant*
*PORTER HAYDEN COMPANY*